# EXHIBIT A

34605269v1 A8732

 CT Corporation

**Service of Process Transmittal**
06/28/2016
CT Log Number 529417699

**TO:**   Michael Johnson, Legal Assistant
The Hartford
1 Hartford Plz, HO-1-09
Hartford, CT 06155-0001

**RE:**   **Process Served in Connecticut**

**FOR:**   Sentinel Insurance Company, Ltd.  (Domestic State: CT)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | GSNRH, LLC, Pltf. vs. Sentinel Insurance Company, Ltd., Dft. |
| **DOCUMENT(S) SERVED:** | Summons, Proof of Service, Cover Sheet(s), Order(s), Complaint, Attachment(s) |
| **COURT/AGENCY:** | Commonwealth of Massachusettts Middlesex Superior Court, MA<br>Case # 1681CV01764D |
| **NATURE OF ACTION:** | Insurance Litigation - Claim for policy benefits |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Hartford, CT |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 06/28/2016 at 14:55 |
| **JURISDICTION SERVED :** | Connecticut |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | Sheldon H. Ganz<br>GSNRH, LLC<br>190 North Main Street<br>Natick, MA 01760-2057<br>508-545-2576 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 06/29/2016, Expected Purge Date: 07/04/2016 |
| | Image SOP |
| | Email Notification,  Michael Johnson  MICHAEL.JOHNSON@THEHARTFORD.COM |
| | Email Notification,  Massimo Fraschilla  Massimo.Fraschilla@thehartford.com |
| | Email Notification,  Fiona Rosenberg  Fiona.Rosenberg@thehartford.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | One Corporate Center<br>Hartford, CT 06103-3220 |
| **TELEPHONE:** | 860-724-9044 |

Page 1 of  1 / DS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

Commercial Recording Division                                            Page 1 of 1

## Business Inquiry

### Business Details

| | | | |
|---|---|---|---|
| Business Name: | SENTINEL INSURANCE COMPANY, LTD. | Citizenship/State Inc: | Domestic/CT |
| Business ID: | 0621786 | Last Report Filed Year: | NONE |
| Business Address: | NONE | Business Type: | Stock/Insurance |
| Mailing Address: | NONE | Business Status: | Active |
| Date Inc/Registration: | Jul 06, 1999 | | |

### Principals Details

No Principal Records found for Business with ID: 0621786

### Agent Summary

Agent Name   C T CORPORATION SYSTEM

Agent Business Address   ONE CORPORATE CENTER, HARTFORD, CT, 06103-3220

Agent Residence Address   NONE

TO PLAINTIFF'S ATTORNEY:  PLEASE CIRCLE TYPE OF ACTION INVOLVED: —
TORT — MOTOR VEHICLE TORT — CONTRACT —
EQUITABLE RELIEF — OTHER

## COMMONWEALTH OF MASSACHUSETTS

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION
No. 1681CV01764 D

................... MIDDLESEX ................ , ss

GSNRH, LLC ........................ , Plaintiff(s)

v.

SENTINEL INSURACE COMPANY, LTD Defendant(s)

## SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon ...................................................................

..... Sheldon H. Ganz .............. plaintiff's attorney, whose address is ......................................

.. 190 North Main St. Natick, MA 01760 ........................, an answer to the complaint which is herewith

served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you

fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also

required to file your answer to the complaint in the office of the Clerk of this court at ... 200 Trade Center,

.. Woburn, MA 01801 ............................................................ either before service upon plaintiff's attorney or within a

reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may

have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's

claim or you will thereafter be barred from making such claim in any other action.

Witness, **Judith Fabricant**, Esquire, at ........ Woburn ............................................................

the ............ 21st .............................. day of .......... June  2016 ............................................

.................., in the year of our Lord ........................................ .

................................................... 
**Clerk**

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption. If a separate summons is used
   for each defendant, each should be addressed to the particular defendant.

**ATTEST:**

**CHARLES J. LILLEY**
**CONNECTICUT MARSHAL**
**HARTFORD COUNTY**

FORM NO. SUP. — 001

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

**PROOF OF SERVICE OF PROCESS**

I hereby certify and return that on ..............................................................................
20........., I served a copy of the within summons, together with a copy of the complaint in this action,
upon the within-named defendant, in the following manner (See Mass. R. Civ. P. 4 (d) (1-5)):

..................................................................................................................................
..................................................................................................................................
..................................................................................................................................
          ........................................................................................

Dated: ....................................................................................., 20.........


**N.B.  TO PROCESS SERVER:**
           **PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN THIS BOX
           ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.**


                    ( _____ )

                    (          ................................................, 20.......... )

                    ( _____ )


**COMMONWEALTH OF MASSACHUSETTS**

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION
No.1681CV0 1764D

MIDDLESEX ........ss.

GSNRH, LLC ................................, Plff.

v.

SENTINEL INSURANCE
COMPANY, LTD ................................, Deft.

**SUMMONS**
(Mass. R. Civ. P. 4)

| CIVIL ACTION COVER SHEET | DOCKET NUMBER 1681CV01764D | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| PLAINTIFF(S): | GSNRH, LLC | COUNTY |
|---|---|---|
| ADDRESS: | 33 Deer Path, Hudson, MA 01749 | Middlesex |

sent

DEFENDANT(S): SENTINEL INSURANCE COMPANY, LTD.

| ATTORNEY: | Sheldon H. Ganz | |
|---|---|---|
| ADDRESS: | 190 North Main Street | ADDRESS: One Hartford Plaza |
| | Natick, MA 01760 | Hartford, CT |

BBO: 185600

## TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. A06 | TYPE OF ACTION (specify) Contract-Insurance Controversy | TRACK F | HAS A JURY CLAIM BEEN MADE? ☒ YES   ☐ NO |
|---|---|---|---|

*If "Other" please describe:

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses ............................................................... $ _____
2. Total doctor expenses ................................................................ $ _____
3. Total chiropractic expenses ......................................................... $ _____
4. Total physical therapy expenses ................................................... $ _____
5. Total other expenses (describe below) ........................................... $ _____
Subtotal (A): $ _____

B. Documented lost wages and compensation to date .......................... $ _____
C. Documented property damages to dated ....................................... $ _____
D. Reasonably anticipated future medical and hospital expenses .......... $ _____
E. Reasonably anticipated lost wages .............................................. $ _____
F. Other documented items of damages (describe below) ..................... $ _____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

TOTAL (A-F):$ _____

### CONTRACT CLAIMS
(attach additional sheets as necessary)

Provide a detailed description of claims(s):
Defendant failed to pay loss and canceled policy

TOTAL: $ 140,000.00

Signature of Attorney/Pro Se Plaintiff: X                               Date: June 21, 2016

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

## CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X                               Date: June 21, 2016

ATTEST:
A TRUE COPY

CHARLES J. LILLEY
CONNECTICUT MARSHAL
HARTFORD COUNTY

# CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

### AC Actions Involving the State/Municipality *

AA1 Contract Action involving Commonwealth, Municipality, MBTA, etc. (A)
AB1 Tortious Action involving Commonwealth, Municipality, MBTA, etc. (A)
AC1 Real Property Action involving Commonwealth, Municipality, MBTA etc. (A)
AD1 Equity Action involving Commonwealth, Municipality, MBTA, etc. (A)
AE1 Administrative Action involving Commonwealth, Municipality, MBTA,etc. (A)

### CN Contract/Business Cases

A01 Services, Labor, and Materials (F)
A02 Goods Sold and Delivered (F)
A03 Commercial Paper (F)
A04 Employment Contract (F)
A06 Insurance Contract (F)
A08 Sale or Lease of Real Estate (F)
A12 Construction Dispute (A)
A14 Interpleader (F)
BA1 Governance, Conduct, Internal Affairs of Entities (A)
BA3 Liability of Shareholders, Directors, Officers, Partners, etc. (A)
BB1 Shareholder Derivative (A)
BB2 Securities Transactions (A)
BC1 Mergers, Consolidations, Sales of Assets, Issuance of Debt, Equity, etc. (A)
BD1 Intellectual Property (A)
BD2 Proprietary Information or Trade Secrets (A)
BG1 Financial Institutions/Funds (A)
BH1 Violation of Antitrust or Trade Regulation Laws (A)
A99 Other Contract/Business Action - Specify (F)

\* Choose this case type if ANY party is the Commonwealth, a municipality, the MBTA, or any other governmental entity UNLESS your case is a case type listed under Administrative Civil Actions (AA).

† Choose this case type if ANY party is an incarcerated party, UNLESS your case is a case type listed under Administrative Civil Actions (AA) or is a Prisoner Habeas Corpus case (E97).

### ER Equitable Remedies

D01 Specific Performance of a Contract (A)
D02 Reach and Apply (F)
D03 Injunction (F)
D04 Reform/ Cancel Instrument (F)
D05 Equitable Replevin (F)
D06 Contribution or Indemnification (F)
D07 Imposition of a Trust (A)
D08 Minority Shareholder's Suit (A)
D09 Interference in Contractual Relationship (F)
D10 Accounting (A)
D11 Enforcement of Restrictive Covenant (F)
D12 Dissolution of a Partnership (F)
D13 Declaratory Judgment, G.L. c.231A (A)
D14 Dissolution of a Corporation (F)
D99 Other Equity Action (F)

### PA Civil Actions Involving Incarcerated Party †

PA1 Contract Action involving an Incarcerated Party (A)
PB1 Tortious Action involving an Incarcerated Party (A)
PC1 Real Property Action involving an Incarcerated Party (F)
PD1 Equity Action involving an Incarcerated Party (F)
PE1 Administrative Action involving an Incarcerated Party (F)

### TR Torts

B03 Motor Vehicle Negligence - Personal Injury/Property Damage (F)
B04 Other Negligence - Personal Injury/Property Damage (F)
B05 Products Liability (A)
B06 Malpractice - Medical / Wrongful Death (A)
B07 Malpractice - Other (A)
B08 Wrongful Death, G.L. c.229 §2A (A)
B15 Defamation (A)
B19 Asbestos (A)
B20 Personal Injury - Slip & Fall (F)
B21 Environmental (F)
B22 Employment Discrimination (F)
BE1 Fraud, Business Torts, etc. (A)
B99 Other Tortious Action (F)

### RP Real Property

C01 Land Taking (F)
C02 Zoning Appeal, G.L. c. 40A (F)
C03 Dispute Concerning Title (F)
C04 Foreclosure of a Mortgage (X)
C05 Condominium Lien & Charges (X)
C99 Other Real Property Action (F)

### MC Miscellaneous Civil Actions

E18 Foreign Discovery Proceeding (X)
E97 Prisoner Habeas Corpus (X)
E22 Lottery Assignment, G.L. c. 10 §28 (X)

### AB Abuse/Harassment Prevention

E15 Abuse Prevention Petition, G.L. c. 209A (X)
E21 Protection from Harassment, G.L. c. 258E(X)

### AA Administrative Civil Actions

E02 Appeal from Administrative Agency, G.L. c. 30A (X)
E03 Certiorari Action, G.L. c.249 §4 (X)
E05 Confirmation of Arbitration Awards (X)
E06 Mass Antitrust Act, G. L. c. 93 §9 (A)
E07 Mass Antitrust Act, G. L. c. 93 §8 (A)
E08 Appointment of a Receiver (X)
E09 Construction Surety Bond, G.L. c. 149 §§29, 29A (A)
E10 Summary Process Appeal (X)
E11 Worker's Compensation (X)
E16 Auto Surcharge Appeal (X)
E17 Civil Rights Act, G.L. c.12 §11H (X)
E24 Appeal from District Court Commitment, G.L. c.123 §9(b) (X)
E25 Pleural Registry (Asbestos cases)
E94 Forfeiture, G.L. c265 §56 (X)
E95 Forfeiture, G.L. c.94C §47 (F)
E99 Other Administrative Action (X)
Z01 Medical Malpractice - Tribunal only, G. L. c. 231 §60B (F)
Z02 Appeal Bond Denial (X)

### SO Sex Offender Review

E12 SDP Commitment, G.L. c. 123A §12 (X)
E14 SDP Petition, G.L. c. 123A §9(b) (X)

### RC Restricted Civil Actions

E19 Sex Offender Registry, G.L. c.6 §178M (X)
E27 Minor Seeking Consent, G.L. c.112 §12S (X)

**TRANSFER YOUR SELECTION TO THE FACE SHEET**

EXAMPLE:

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES   ☐ NO |

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF** - The plaintiff shall set forth, on the face of the civil action cover sheet (or attach additional sheets as necessary), a statement specifying the facts on which the plaintiff relies to determine money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served with the complaint. A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or pro se party.

**DUTY OF THE DEFENDANT** - If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with his/her answer a statement specifying the potential damages which may result if the plaintiff prevails.

## A CIVIL COVER SHEET MUST BE FILED WITH EACH COMPLAINT.
## FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY
## MAY RESULT IN DISMISSAL OF THIS ACTION.

| CIVIL TRACKING ORDER<br>(STANDING ORDER 1- 88) | DOCKET NUMBER<br>1681CV01764 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| CASE NAME:<br>GSNRH, LLC vs. Sentinel Insurance Company, LTD | Michael A. Sullivan, Clerk of Court<br>Middlesex County |
|---|---|

| TO: Sheldon H Ganz, Esq.<br>190 N. Main Street<br>Natick, MA 01760 | COURT NAME & ADDRESS<br>Middlesex County Superior Court - Woburn<br>200 Trade Center<br>Woburn, MA 01801 |
|---|---|

### TRACKING ORDER - F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

| STAGES OF LITIGATION | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 09/19/2016 | |
| Response to the complaint filed (also see MRCP 12) | | 10/19/2016 | |
| All motions under MRCP 12, 19, and 20 | 10/19/2016 | 11/18/2016 | 12/19/2016 |
| All motions under MRCP 15 | 10/19/2016 | 11/18/2016 | 12/19/2016 |
| All discovery requests **and depositions** served and non-expert despositions completed | 04/17/2017 | | |
| All motions under MRCP 56 | 05/17/2017 | 06/16/2017 | |
| Final pre-trial conference held and/or firm trial date set | | | 10/16/2017 |
| Case shall be resolved and judgment shall issue by | | | 06/21/2018 |

**The final pre-trial deadline is <u>not the scheduled date of the conference</u>.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| DATE ISSUED<br>06/21/2016 | ASSISTANT CLERK<br>Leona M Kusmirek | PHONE |
|---|---|---|

Date/Time Printed: 06-21-2016 09:38:08

SCV026\ 11/2014

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX

JUN 2 1 2016

*CLERK*

SUPERIOR COURT DEPARTMENT
DOCKET NO.

16-1764

GSNRH, LLC
*Plaintiff*

*vs.*

SENTINEL INSURANCE COMPANY, LTD
*Defendant*

COMPLAINT

NATURE OF THE ACTION: This is an insurance coverage action.

THE PARTIES:

1. The plaintiff, GSNRH, LLC, is a limited liability corporation with a usual place of business at 33 Deer Path, Hudson, County of Middlesex, in the Commonwealth of Massachusetts.

2. Gary Sinewitz (Gary) and Richard Heller are the principals of GSNRH, LLC.

3. GSNRH owns the building at 250 Worcester Road, Framingham, Massachusetts which property is the subject of this action.

4. The Defendant, THE SENTINEL INSURANCE COMPANY, LTD (Sentinel), with a usual place of business at One Hartford Plaza, Hartford, Connecticut, doing business in Massachusetts.

5.  Sentinel issued a business insurance policy to the plaintiff providing liability and property coverage for the premises.

THE INSURANCE POLICY

6.  Sentinel issued a renewal business policy, No.  08 SBA PY2938 DW, to the plaintiff effective from July 1, 2015, to July 1, 2016, a copy of which is hereto attached and marked Exhibit A, in consideration of the payment by the plaintiff to the defendant of the applicable deposit premium.  The policy was entitled "Spectrum Business Owner's Policy" with the logo of The Hartford imprinted on the cover page and on other pages.

7.  The renewal policy incorporated the terms of the previous policy together with a new declarations page and policy forms, notices and brochures which were different from the previous policy.

8.  The policy limits for the business liability coverage included bodily injury and property damage combined in the amount of $1,000,000 for each occurrence.

9.  The policy covered the building owned by GSNRH which was located at 250 Worcester Road in Framingham, Massachusetts.

THE CLAIM

10.  On Sunday, February 14, 2016, a pipe burst in the building which was discovered by Gary the following day.  Gary immediately telephoned the plumber to minimize the damage; he then notified his insurance agent and filed a claim with Sentinel on behalf of GSNRH:  Claim No. CP6669209.

3

11. Sentinel sent its adjuster, Chris Herrara, to the premises who, after investigating the claim, told Gary that the loss would be covered. In response to Gary's question, "What do I do next?", Herrara instructed Gary to obtain the services of a clean-up company and do "whatever they tell you," and then send him the estimate.

12. Gary hired Belfor Property Restoration (Belfor) a licensed company with offices at 138 Bartlett Street, Marlborough, Massachusetts. Belfor advised him that they would need to remove walls and flooring to ascertain the full amount of the damage and Gary told them to proceed per Herrara's instructions. While Gary was waiting for the complete estimate, he received two payments from Sentinel, one for $3,772 and another for approximately $1,500 to pay for the initial cleanup and the plumber.

13. On March 15, 2016, Gary received the final estimate of $103,954.76 from Belfor which he forwarded to the Herrara. (Exhibit B) Immediately upon receiving this estimate, Sentinel replaced the Herrara with John Perry, who advised Gary that now there might be a problem of coverage.

14. On April 7, 2016, Perry sent a letter to GSNRH denying coverage based on the policy's vacancy condition and the frozen plumbing provisions (pp.22-23, par. 8. a. and b., and p.17, par. 2d., respectively).

15. **Par. 8 a.(1)(b) Vacancy Description of Terms**:

> "When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:
>
> "(i)   Rented to a lessee or sublessee and used by the lessee or sub-lessee
>        to conduct its customary operations; and/or
> "(ii)  Used by the building owner to conduct customary operations.
>
> "(2)  Buildings under construction or renovation are not considered vacant.

**"b. Vacancy Provisions**

"If the building where physical loss or physical damage occurs has been vacant for more than 60 consecutive days before that physical loss or physical damage occurs:

"(1)  We will not pay for any physical loss or physical damaged caused by any of the following even if they are Covered Causes of Loss:

". . .

"(b)  sprinkler leakage, unless you had protected the system against freezing"

16.  **Frozen Plumbing. (Policy, par. 2.d, p. 17)**

**2."** We will not pay for physical loss or physical damage caused by or resulting from: d. Frozen Plumbing: Water, other liquids, powder or molten material that leaks or flows from plumbing, heating,  air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

(1) You do your best to maintain heat in the building or structure;"

17.  In response to the denial letter, Gary, on behalf of GSNRH, wrote to Mr. Perry, pointing out that all conditions precedent had been met.  Although the prior tenant, a Mexican restaurant, had left in March, 2015, the building was not left "vacant" thereafter within the meaning of the policy, and the heat in the building was maintained at a constant 60 degrees F.

18.  GSNRH had owned the property for about eight years. The initial tenants were PC Health Stop, Inc., which relocated across the street to 255 Worcester Road.  The subsequent three tenants were restaurants.  After the Mexican restaurant left the premises, GSNRH put the building on the market for sale, and sold the building to MassMedicum Corp. under a purchase and sale agreement dated July 15, 2015.  The deal fell through when the Town of Framingham would not permit it to operate as a medical marijuana business.  GSNRH again put the property on the market in the fall of 2015 for sale or lease.  All the personal property necessary for conducting a restaurant remained in the building:  the equipment (*e.g.*, stove, walk-in freezer),

furnishings and furniture (*e.g.*, tables, chairs, dishes, and glasses).  The building was ready and available for a turn-key operation.

19.  GSNRH throughout the period leading up to the loss, performed the customary operations of a building owner in preparing and marketing the building.  These endeavors required the substantial and continuing presence of several people in the building: realtors, prospective buyers or tenants, cleaning and maintenance crews.  In addition, Gary, who is the owner of PC Health Stop, Inc., with an office directly across the street from the building, would go to the building or send his son or his assistant there on virtually a daily basis.

20.  Despite being apprised of these facts, Mr. Perry on behalf of Sentinel still refused to cover the loss.  On May 18, 2016, the plaintiff received a bill from Belfor for work done to date in the amount of $41, 570.99. (Exhibit C).

## COUNT ONE

### BREACH OF CONTRACT

21.  The plaintiff realleges paragraphs 1-20 as if fully set forth herein.  The defendants Sentinel and The Hartford Insurance Group breached their contract of insurance by denying the plaintiff's claim, despite the fact that the policy was in full force and effect prior to and including the loss event, bursting and leaking frozen plumbing was a covered loss and the plaintiff had met all of the conditions precedent.  The defendants also breached the duty of good faith and fair dealing inherent in any contract.

## COUNT TWO

### UNFAIR AND DECEPTIVE PRACTICES

22. The plaintiff realleges paragraphs 1-21 as if fully set forth herein. The defendants Sentinel and The Hartford Insurance Group had already sent an adjuster who investigated the plaintiff's claim and had made a determination that there was coverage, until the clean-up company gave the estimate of $106,000. Only then did Sentinel replace the first adjuster with a second adjuster whose only role was to deny coverage spuriously. These actions were unfair and deceptive and in violation of G. L.c. 93A, §§ 2 and 11, and G. L c. 176D, were willful violations, and have caused damage to the plaintiff. The insurer's refusal to return the affected portion of the property to its pre-leak condition, having instructed that it be torn apart, is unfair and evidence of the insurer placing its own interests ahead of the policyholder.

## COUNT THREE

### PROMISSORY ESTOPPEL

23. The plaintiff realleges paragraphs 1-22 as if fully set forth herein. The defendants Sentinel and The Hartford Insurance Group sent an adjuster to fully investigate the plaintiff's claim. After the investigation, the adjuster assured the plaintiff that the claim was covered and indeed the plaintiff received a partial down payment on the claim. The adjuster further instructed the plaintiff to hire a clean-up company and to do "whatever they tell you to do" and then send the estimate to him and the insurer would pay it. The plaintiff was entitled to rely on these representations and promises, and did so rely on them.

The clean-up company advised that the walls and floorboards be removed to gauge the extent of the leak and the damage. The plaintiff reasonably relied on this expert advice and the insurance adjuster's instruction to follow this advice to his detriment. The interior of the

building has been torn apart with an estimate of over $100,000 to repair it, making it impossible

for the plaintiff now to market and sell or lease the property.

WHEREFORE, the plaintiff seeks judgment against the defendants for double or treble

damages, costs, and attorney's fees.

GSNRH, LLC,
By its attorney,

Sheldon H. Ganz
BBO No. 184600
190 North Main Street
Natick, MA  01760-2057
(508) 545-2576
sganzesq@50congress.com

Dated:   June 14, 2016

PLAINTIFF CLAIMS A TRIAL BY JURY

ATTEST:
A TRUE COPY

CHARLES J. LILLEY
CONNECTICUT MARSHAL
HARTFORD COUNTY

A



GSNRH, LLC

255 WORCESTER RD
FRAMINGHAM          MA 01701

Policy Number:  08 SBA PY2938
Renewal Date:  07/01/15

Thank you for being a loyal customer of The Hartford.

**# 1: Your Hartford Policy**
Enclosed are renewal documents for your policy, which is scheduled to renew on 07/01/15 . Along with a new Declarations Page, which details the coverages provided by your policy, we are enclosing important policy documents. Please be aware that you will receive an invoice separately for this new policy term approximately 30 days prior to the renewal date; no action is required now.

To ensure the premium you paid for this past policy term was accurate, we may contact you by letter, phone or email to conduct a premium audit. If contacted, we will advise what information is needed to complete the audit.

**# 2: Your Business Insurance Coverage Checkup**
Now is a great time to complete a business insurance coverage checkup with a Hartford Insurance Professional. Because you wear so many hats each day, you may not be thinking about how changes to your business can impact the type and amount of insurance coverage needed to protect it.

Together we will evaluate how your needs may have changed over the past year. Examples include:
- Has your mailing address and/or the physical location of your business changed?
- Has there been any increase/decrease in the amount of business property/equipment you own?
- Has there been any increase/decrease in your company's payroll or sales?
- Have you added or eliminated any vehicles used in your business operations?
- Are the bill plan and deductible on your policy right for your business?

**During the review we may make coverage recommendations, provide peace of mind solutions, and possibly reduce your costs. Here is all you need to do:**
- **Call toll free** (866) 467-8730 , **and select our renewal review service option any weekday from** 8 A.M. **to** 6 P.M. **EST** **and request your business insurance check-up.**
- **To best serve you, please have your Policy Number or Account Number and a Copy of your current Renewal Policy in hand when you call.**

**# 3: Servicing Your Needs**
To login or register for our Online Business Service Center, go to www.thehartford.com/servicecenter where any time, day or night you can:
- Pay your bill, view payment history and enroll in Auto Pay
- Request Auto ID Cards and Certificates of Insurance
- View electronic copies of billing and policy documents and sign up for paperless delivery

**# 4: If You've Had A Loss or Accident... Report It Immediately**
We want to help! Contact us as quickly as possible at 1-800-327-3636.
- Representatives are available 24-7 to assist in helping you recover from your loss.

On behalf of FITTS INSURANCE AGENCY, INC/PHS          and The Hartford, we appreciate the opportunity to have been of service to you this past year and look forward to serving your business insurance needs for the upcoming year.

Sincerely,
Your Hartford Team

# Insurance Policy Billing Information

**Thank you for selecting The Hartford for your business insurance needs.**

**Shortly, you will receive your first bill from us. You are receiving this Notice so you know what to expect as a valued customer of The Hartford. Should you have any questions after reviewing this information, please contact us at 866-467-8730, and we will be happy to assist you.**

o  Your total policy premium will appear on your policy's Declarations Page. You will be billed based on the payment plan you selected.

o  You may pay the "minimum due" as it appears on your insurance bill or pay the policy balance in full.

o  An installment service fee is added to each installment. A late fee will also be applied if the "minimum due" is not **received** by the due date shown on your bill. Service and late payment fees do not apply in all states.

o  If you selected installment billing, any credit or additional premium due as the result of a change made to your policy, will be spread over the remaining billing installments. Additional premium due as a result of an **audit** will be billed in full on your next bill date following the completion of the audit.

o  If you elected Electronic Funds Transfer (EFT), policy changes may result in changes to the amount automatically withdrawn from your bank account. The invoice you receive following a policy change will include future withdrawal amounts. If you need to adjust or stop your next scheduled EFT withdrawal, please contact us **at least 3 days prior** to the scheduled withdrawal date at the telephone number shown below.

o  If you selected installment billing and pay the premiums for your first policy term on time, at renewal, your account may qualify for our "Equal Installment" feature. This means that the percentage due for each installment, including the initial renewal installment, will be the same throughout the policy term – helping you better manage cash flow. Equal installments will continue as long as you pay your premiums on time and no cancellation notices are issued for any policy on your account. If you no longer qualify for Equal Installments, future renewals will be billed based on the payment plan you selected, which includes a higher initial installment amount.

o  If your policy is eligible for renewal, your bill for the upcoming policy term will be sent to you approximately 30 days prior to your policy's renewal date. If your insurance needs change, please contact us at least 60 days prior to your renewal date so we can properly address any adjustments needed.

o  **One bill convenience** -- you have the option of combining all eligible Hartford policies on one single bill allowing you to make one payment for all policies on your account as payments are due.

## You're In Control

In addition to selecting a bill plan option that best meets your budget, you have the flexibility to decide *how* your payments are made ...

o  **Repetitive EFT:** Sign up for Repetitive EFT payments and have payments automatically withdrawn from your bank account. This option saves you money by reducing the amount of the installment service fee.

o  **Pay Online:** Register at **www.thehartford.com/servicecenter.** Online Bill Pay is Quick, Easy and Secure!

o  **Pay by Check:** Send a check with your remittance stub in the envelope provided with your bill.

o  **Pay by Phone:** Call toll-free **1-866-467-8730.**

**Should you have any questions about your bill, please call Customer Service toll-free number:**
**1-866-467-8730 - 7AM – 7PM CST.  We look forward to being of service to you.**

Form 100722 11th Rev. Printed in U.S.A.

# Spectrum®

## Business Owner's Policy



THE
HARTFORD

**POLICY NUMBER:** 08 SBA PY2938



**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

---

**SCHEDULE**

Terrorism Premium:

$          $83.00

---

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, as amended (TRIA), we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for "certified acts of terrorism" under TRIA. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement.

**B.** The following definition is added with respect to the provisions of this endorsement:

1. A "certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of TRIA, to be an act of terrorism under TRIA. The criteria contained in TRIA for a "certified act of terrorism" include the following:

   a. The act results in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to TRIA; and

   b. The act results in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of an United States mission; and

   c. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion

**C. Disclosure Of Federal Share Of Terrorism Losses**

The United States Department of the Treasury will reimburse insurers for a portion of insured losses, as indicated in the table below, attributable to "certified acts of terrorism" under TRIA that exceeds the applicable insurer deductible:

| Calendar Year | Federal Share of Terrorism Losses |
|---|---|
| 2015 | 85% |
| 2016 | 84% |
| 2017 | 83% |
| 2018 | 82% |
| 2019 | 81% |
| 2020 or later | 80% |

However, if aggregate industry insured losses under TRIA exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion. The United States government has not charged any premium for their participation in covering terrorism losses.

Form SS 83 76 01 15

Page 1 of 2

© 2015 , The Hartford
(Includes copyrighted material of the Insurance Services Office, Inc., with its permission.)

D.  **Cap On Insurer Liability for Terrorism Losses**

If aggregate industry insured losses attributable to "certified acts of terrorism" under TRIA exceed $100 billion in a calendar year and we have met, or will meet, our insurer deductible under TRIA, we shall not be liable for the payment of any portion of the amount of such losses that exceed $100 billion. In such case, your coverage for terrorism losses may be reduced on a pro-rata basis in accordance with procedures established by the Treasury, based on its estimates of aggregate industry losses and our estimate that we will exceed our insurer deductible. In accordance with the Treasury's procedures, amounts paid for losses may be subject to further adjustments based on differences between actual losses and estimates.

E.  **Application of Other Exclusions**

The terms and limitations of any terrorism exclusion, the inapplicability or omission of a terrorism exclusion, or the inclusion of terrorism coverage, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Form, Coverage Part or Policy.

F.  **All other terms and conditions remain the same.**



# IMPORTANT NOTICE TO POLICYHOLDERS - EMPLOYMENT PRACTICES LIABILITY COVERAGE

Thank you for being a customer of The Hartford.

You are receiving this Notice because on renewal, your Employment Practices Liability Coverage Part will be replaced with a new and updated Employment Practices Liability Coverage Part. This Notice describes the major changes that apply to your Employment Practices Liability Coverage Part.

These changes, explained below, include broadening, clarifications and reductions of coverage. This Notice is provided to explain the changes to you but it is not a policy form and does not grant coverage. Please read your policy carefully to understand the full detail of these changes.

I. **Changes Applicable To The Employment Practices Liability Coverage Form  SS 09 01 12 14**
   <u>SECTION I – INSURING AGREEMENT</u>

   The Insuring Agreement has been modified to remove the language about the making, reporting, defense, and investigation of "claims" to separate sections of the policy. The new wording simply states:

   We shall pay "loss" on behalf of the "insureds" resulting from an "employment practices claim" first made against the "insureds" during the "policy period" or Extended Reporting Period, if applicable, for an "employment practices wrongful act" by the "insureds".

   <u>SECTION II – DEFINITIONS</u>

   The following definitions have been modified or are new, to clarify coverage grants and limitations:

   1. "Application" now means the application for this Coverage Part, including any materials or information submitted therewith or made available to us during the underwriting process, which application shall be on file with us. Such **"application"** shall be deemed a part of this Coverage Part and attached hereto. In addition, "application" includes any warranty, representation or other statement provided to us within the past three years in connection with any policy or coverage part of which this Coverage Part is a renewal or replacement.

   2. "Claim" now means an "employment practices claim" which includes written demands for civil non-monetary relief. The defininition of "claim" may be modified further to include coverage for "third party claims" by adding the Third Party Liability Endorsement – Employment Practices Liability endorsement.

   3. "Claims Expenses" now include "extradition costs", which are reasonable and necessary fees and expenses directly resulting from a "claim" in which an "insured person" lawfully opposes, challenges, resists or defends against any request for the extradition of such "insured person" from his or her current country of employ and domicile to any other country for trial or otherwise to answer any criminal accusation, including the appeal of any order or other grant of extradition of such "insured person". "Claims expenses" continue to erode the limits of liability and do not include fees, expenses or costs which are incurred by or on behalf of a party which is not a covered "insured" or prior to the date on which the we received written notice of "claim", nor do they include costs to investigate a "claim".

   4. "Damages" now expressly does not include "benefits", "stock benefits" and future compensation for any person hired, promoted, or reinstated pursuant to a judgment, settlement, order or other resolution of a "claim". "Benefits" and "stock benefits" are newly added definitions to this Coverage Part and are defined as:

      "Benefits" means perquisites, fringe benefits, deferred compensation, severance pay and any other form of compensation (other than salaries, wages, or bonuses as a component of a front or back pay award)."

      "Stock benefits" means any offering, plan or agreement between an "insured entity" and any "employee" that grants stock, stock options or stock appreciation rights in the "insured entity" to such person, including, without limitation, restricted stock or any other stock grant. "Stock benefits" shall not include employee stock ownership plans or employee stock purchase plans.

   5. "Insured" is now broken down into two subsets: "Insured Entities" and "Insured Persons." "Insured Person" may now include any natural person working in the capacity of an independent contractor pursuant to an "independent contractor agreement".

6. "Notice Manager" is a new term that means the natural persons in the offices of the chief executive officer, chief financial officer, general counsel, risk manager, human resources manager or any equivalent position to the foregoing, of an "Insured Entity".

7. "Loss" is a new term and is defined to include "damages" and "claims expenses".

8. "Wage and Hour Violation" is a new term and means any actual or alleged violation of the duties and responsibilities that are imposed upon an "insured" by any federal, state or local law or regulation any where in the world, including but not limited to the Fair Labor Standards Act or any similar law (except the Equal Pay Act), which govern wage, hour and payroll practices. Such practices include but are not limited to: the calculation and payment of wages, overtime wages, minimum wages and prevailing wage rates; the calculation and payments of benefits; the classification of any person or organization for wage and hour purposes; reimbursing business expenses; the use of child labor; or garnishments, withholdings and other deductions from wages.

9. "Wrongful act" now means an "employment practices wrongful act". It may be amended to include "third party wrongful acts" by adding the Third Party Liability Endorsement – Employment Practices Liability endorsement. In the definition of "employment practices wrongful act", wrongful deprivation of career opportunity, bullying in the workplace, and employment discrimination based upon gender identity or expression, genetic makeup, HIV or other health status, or military status are all expressly included. Certain "employee data privacy wrongful acts" may also be covered. This coverage includes insurance for the failure to prevent unauthorized access to or use of data containing "private employment information" of any "employee" or applicant and the failure to notify any "employee" or applicant of unauthorized access to or use of "private employment information". Therefore, "claims" by an "employee" or applicant due to the loss of an "employee's" personal information may now be covered. Some "employment practices wrongful act", are required to be alleged in addition to or as part of any "employment practices wrongful act" described in sections L.1. – L.6. to qualify as an "employment practices wrongful act". These items include, but are not limited to, a.  employment-related wrongful infliction of emotional distress, b. failure to create, provide or enforce adequate employment-related policies and procedures, and d. employment-related invasion of privacy, defamation, or misrepresentation.

## SECTION III - EXCLUSIONS

1. The following exclusions have been deleted from your Coverage Part, which may broaden coverage in certain circumstances:

   a. relating to injury or damage arising from pollutants;

   b. relating to any dishonest, fraudulent, criminal, or malicious act or omission committed by or at the direction of the insured; and

   c. relating to the insured's activities and or capacity as an officer, director, partner, trustee or employee of a charitable organization or pension, welfare profit sharing, mutual or investment fund or trust.

2. The following exclusions, which reduce coverage in certain circumstances, have been added to your Coverage Part:

   a. in connection with any "claim" based upon, arising from, or in any way related to liability incurred for breach of any oral, written, or implied employment contract; provided, however, that this exclusion shall not apply to liability that would have been incurred in the absence of such contract nor shall it apply to the portion of "loss" representing "claim expenses" incurred to defend against such liability; and

   b. in connection with any "claim" based upon, arising from, or in any way related to any prior or pending demand, suit, or proceeding against any "insured" as of, or audit initiated by the United States Office of Federal Contract Compliance Programs before, the effective date of the first Employment Practices Liability Coverage Part issued and continuously renewed by us, or the same or substantially similar fact, circumstance, or situation underlying or alleged in such demand, suit, proceeding, or audit.

3. The exclusion relating to any breach of contract, which had applied to all contracts other than contracts creating or continuing an employer-employee relationship among the parties to the contract, has been deleted and replaced with exclusions that apply to the breach of an "independent contractor agreement" and to any "claim" based upon, arising from, or in any way related to liability incurred for breach of any oral, written, or implied employment contract; provided, however, that this latter exclusion shall not apply to liability that would have been incurred in the absence of such contract nor shall it apply to the portion of "loss" representing "claim expenses" incurred to defend against such liability.

4. The exclusion relating to bodily injury and destruction of tangible property now excludes false arrest or imprisonment, abuse of process, malicious prosecution, trespass, nuisance or wrongful entry or eviction, and diminution of value.

5. The exclusion relating to laws governing wage and hour, overtime wages, or minimum wages, has been modified. "Wage and hour violations" are still not covered. However, the new exclusion contains an exception for certain "retaliation" claims. Please also note, if the Wage And Hour Claims Expenses – Employment Practices Liability endorsement is on your policy, we will pay a certain amount of "claims expenses" in relation to certain "claims" containing a "wage and hour violation".

## SECTION VII – LIMITS OF LIABILITY AND DEDUCTIBLE

The Limits Of Liability And Deductible section now contains a provision stating that if the applicable Limit of Liability for this Coverage Part is exhausted, the premium for this Coverage Part shall be deemed fully earned.

## SECTION VIII – DUTIES IN THE EVENT OF CLAIM; DEFENSE AND SETTLEMENT

1. We now have the right and duty to defend "claims" covered under this Coverage Part even if such "claim" is groundless, false or fraudulent, provided that such "claim" does not involve allegations, in whole or in part, of a "wage and hour violation". For any "claim" involving allegations, in whole or in part, of a "wage and hour violation", it shall be the duty of the "insureds", and not our duty, to defend such "claim". With respect to a covered "claim" for which we does not have the duty to defend, we shall advance "claims expenses" based on the relative legal exposure of all parties to such matters that the Insurer believes to be covered under this Policy. However, please note that if the Wage And Hour Claims Expenses – Employment Practices Liability endorsement is on your policy, we will pay a certain amount of "claims expenses" in relation to certain "claims" containing a "wage and hour violation".

2. There now needs to be insurer and insured consent to settle any "claims". In your old form, there were provisions that contained substantially similar language. You shall not now admit or assume any liability, make any settlement offer or enter into any settlement agreement, stipulate to any judgment, or incur any "claims expense" regarding any "claim" without the prior written consent of the Insurer, such consent not to be unreasonably withheld. We shall not be liable for any admission, assumption, settlement offer or agreement, stipulation, or "claims expense" to which we have not consented.

3. However, your old form contained a provision relating to consent to settle, that stated that if the "insured" refuses to consent to any settlement or compromise recommended by us and acceptable to the claimant, then our liability to pay "damages" and "claims expenses" shall not exceed the amount which we would have paid for "damages" and "claims expenses" at the time the "claim" could have been settled or compromised, less any deductible. This provision has been removed from your new Coverage Part, which may broaden coverage in certain circumstances.

4. The obligations with respect to your providing us with notice of "claims" made against you now contemplate the different types of employment practices-related claims that the "insureds" may typically become involved in, which may require the reporting of a "claim" within 180 days after a "notice manager" becomes aware of it.

## SECTION IX – CONDITIONS

1. The Other Insurance section now states that the coverage provided for any "employment practices claims" shall be primary, with certain exceptions. In your old form, the Other Insurance clause stated that the insurance would apply in excess of any other valid and collectible insurance available. This may broaden your coverage in certain circumstances.

2. If the "named insured" is taken over, such transaction must be reported to us with full written details as soon as practicable (but, in all cases, within 90 days of such transaction). If such transaction occurs, we will not be obligated to offer any renewal or replacement of this Policy.

II. **New Endorsements That May Be Part Of Your Policy And Amend Your Employment Practices Liability Coverage Part..**

1. **Third Party Liability Endorsement – Employment Practices Liability, SS 09 70 12 14**

   If **Third Party Liability Endorsement – Employment Practices Liability** is attached to your Coverage Part, we will provide coverage for "loss" resulting from a "third party claim" for a "third party wrongful act". A "third party claim" is a claim brought by a "third party", which means any person who is a customer, vendor, service provider or other business invitee of an "insured entity" (does not include "employees"). This coverage will be provided for certain discrimination or harassment claims brought by a "third party". This endorsement results in a broadening of coverage.

2. **Wage And Hour Claims Expenses – Employment Practices Liability, SS 09 67 09 14**

   If **Wage And Hour Claims Expenses – Employment Practices Liability** is attached to your Coverage Part, we will provide coverage for "claims expenses" incurred to defend certain "wage and hour violations" subject to a sub-limit of liability, the Wage And Hour Defense Costs Sub-Limit). "Wage and hour violation" is defined in the Coverage Part to include claims relating to violations in connection with wage, hour, and payroll practices. This endorsement results in a broadening of coverage.

3.   Retroactive Date Endorsement  - Employment Practices Liability, SS 09 71 12 14

Retroactive Date Endorsement  - Employment Practices Liability shall be attached to your new Coverage Part.  This endorsement contains language relating to the "retroactive date".  The provisions addressing the "retroactive date" that appeared in your old Employment Practices Liability Coverage Form now appear in this endorsement.  This endorsement does not change coverage relating to the usage of the "retroactive date".

## III.  STATE AMENDATORY ENDORSEMENTS APPLICABLE TO YOUR EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

Please be advised that certain State Amendatory Endorsments may apply to your Coverage Part.  Some of these endorsements have been revised and updated in your new Employment Practices Liability Coverage Part.  New State Amendatory Endorsements may have also been added to your Coverage Part. These State Amendatory Endorsements are on your Coverage Part primarily to comply with state laws.  Please note that the above-referenced changes may have certain state exceptions addressed in your State Amendatory Endorsements. Please review your State Amendatory Endorsements for state-specific language that may apply to your Coverage Part.

## IV.  REMOVAL OF CERTAIN EMPLOYMENT PRACTICES LIABILITY FORMS

Please be advised that if any of the following forms were on your previous policy, they will be removed upon renewal and no longer apply to your policy:

Definition of Damages – Amended, SS 09 47 07 99;  This form amended the definition of damages.

Employment Practices - Exclusion – Prior Acts, SS 09 42 07 99;  This form amended the insuring agreement.

Employment Practices – Contractual Liability,  SS 09 41 07 99; This form amended the definition of "wrongful act" and amended item I, Section III, Exclusions.

Definition Of Insured (Independent Contractor), SS 09 43 07 99 This form amended the definition of "insured".


While this Notice identifies the substantive changes that will be made on your renewal to your Employment Practices Liability Coverage Part, this Notice does not include every reduction or expansion in coverage made by this update. Please be sure to read your renewal Employment Practices Liability Coverage Part carefully. Should you have any questions, please contact your insurance agent, broker or you may contact us directly.

We appreciate your business and look forward to being of continued service to you.



# IMPORTANT NOTICE TO POLICYHOLDERS

To help your insurance keep pace with increasing costs, we have increased your amount of insurance . . . giving you better protection in case of either a partial, or total loss to your property.

If you feel the new amount is not the proper one, please contact your agent or broker.

Form PC-374-0   Printed in U.S.A.

38
29
PY
SBA

This **Spectrum Policy** consists of the Declarations, Coverage Forms, Common Policy Conditions and any other Forms and Endorsements issued to be a part of the Policy. This insurance is provided by the stock insurance company of The Hartford Insurance Group shown below.

INSURER:   SENTINEL INSURANCE COMPANY, LIMITED
                    ONE HARTFORD PLAZA, HARTFORD, CT 06155
COMPANY CODE: A

Policy Number:   08 SBA PY2938  DW

THE
HARTFORD

# SPECTRUM POLICY DECLARATIONS

Named Insured and Mailing Address:        GSNRH, LLC
(No., Street, Town, State, Zip Code)

                                          255 WORCESTER RD
                                          FRAMINGHAM        MA   01701

Policy Period:          From   07/01/15   To   07/01/16   1   YEAR
12:01 a.m., Standard time at your mailing address shown above. **Exception:** 12 noon in New Hampshire.

Name of Agent/Broker: FITTS INSURANCE AGENCY, INC/PHS
Code:   088027

Previous Policy Number:  08 SBA PY2938

Named Insured is: LIMITED LIAB CORP

Audit Period:  NON-AUDITABLE

Type of Property Coverage: SPECIAL

Insurance Provided: In return for the payment of the premium and subject to all of the terms of this policy, we agree with you to provide insurance as stated in this policy.

TOTAL ANNUAL PREMIUM IS:            $4,663

Countersigned by   *Susan L. Castaneda*
                   Authorized Representative

04/22/15
Date

## SPECTRUM POLICY DECLARATIONS (Continued)
POLICY NUMBER: 08 SBA PY2938

Location(s), Building(s), Business of Named Insured and Schedule of Coverages for Premises as designated by Number below.

Location: 001     Building: 001

250 WORCESTER RD
FRAMINGHAM        MA 01702

Description of Business:
Building Owner - Lessors Risk Only - Restaurant Occupancy

Deductible: $   500 PER OCCURRENCE

### BUILDING AND BUSINESS PERSONAL PROPERTY   LIMITS OF INSURANCE

BUILDING

  REPLACEMENT COST                        $   669,900

BUSINESS PERSONAL PROPERTY

  REPLACEMENT COST                     NO COVERAGE

PERSONAL PROPERTY OF OTHERS

  REPLACEMENT COST                     NO COVERAGE

MONEY AND SECURITIES

  INSIDE THE PREMISES                  $    10,000
  OUTSIDE THE PREMISES                 $     5,000

## SPECTRUM POLICY DECLARATIONS (Continued)
POLICY NUMBER: 08 SBA PY2938

Location(s), Building(s), Business of Named Insured and Schedule of Coverages for Premises as designated by Number below.

**Location: 001    Building: 001**

| PROPERTY OPTIONAL COVERAGES APPLICABLE TO THIS LOCATION | LIMITS OF INSURANCE |
|---|---|
| BUILDING STRETCH FORM: SS 04 52 THIS FORM INCLUDES MANY ADDITIONAL COVERAGES AND EXTENSIONS OF COVERAGES. A SUMMARY OF THE COVERAGE LIMITS IS ATTACHED. | |
| LIMITED FUNGI, BACTERIA OR VIRUS COVERAGE: FORM SS 40 93 THIS IS THE MAXIMUM AMOUNT OF INSURANCE FOR THIS COVERAGE, SUBJECT TO ALL PROPERTY LIMITS FOUND ELSEWHERE ON THIS DECLARATION. INCLUDING BUSINESS INCOME AND EXTRA EXPENSE COVERAGE FOR: | $   50,000 |
| | 30 DAYS |

**SPECTRUM POLICY DECLARATIONS (Continued)**
POLICY NUMBER: 08 SBA PY2938

| PROPERTY OPTIONAL COVERAGES APPLICABLE TO ALL LOCATIONS | LIMITS OF INSURANCE |
|---|---|
| BUSINESS INCOME AND EXTRA EXPENSE COVERAGE<br>COVERAGE INCLUDES THE FOLLOWING COVERAGE EXTENSIONS: | 12 MONTHS ACTUAL LOSS SUSTAINED |
| ACTION OF CIVIL AUTHORITY: | 30 DAYS |
| EXTENDED BUSINESS INCOME: | 30 CONSECUTIVE DAYS |
| EQUIPMENT BREAKDOWN COVERAGE<br>COVERAGE FOR DIRECT PHYSICAL LOSS DUE TO:<br>  MECHANICAL BREAKDOWN,<br>  ARTIFICIALLY GENERATED CURRENT AND STEAM EXPLOSION | |
| THIS ADDITIONAL COVERAGE INCLUDES THE FOLLOWING EXTENSIONS<br>  HAZARDOUS SUBSTANCES<br>  EXPEDITING EXPENSES | $   50,000<br>$   50,000 |
| MECHANICAL BREAKDOWN COVERAGE ONLY APPLIES WHEN BUILDING OR BUSINESS PERSONAL PROPERTY IS SELECTED ON THE POLICY | |
| IDENTITY RECOVERY COVERAGE FORM SS 41 12 | $   15,000 |

## SPECTRUM POLICY DECLARATIONS (Continued)
POLICY NUMBER: 08 SBA PY2938

| BUSINESS LIABILITY | LIMITS OF INSURANCE |
|---|---|
| LIABILITY AND MEDICAL EXPENSES | $1,000,000 |
| MEDICAL EXPENSES - ANY ONE PERSON | $   10,000 |
| PERSONAL AND ADVERTISING INJURY | $1,000,000 |
| DAMAGES TO PREMISES RENTED TO YOU   ANY ONE PREMISES | $1,000,000 |
| AGGREGATE LIMITS   PRODUCTS-COMPLETED OPERATIONS | $2,000,000 |
|    GENERAL AGGREGATE | $2,000,000 |

EMPLOYMENT PRACTICES LIABILITY
COVERAGE: FORM SS 09 01

| EACH CLAIM LIMIT | $   10,000 |
|---|---|
|    DEDUCTIBLE - EACH CLAIM LIMIT     NOT APPLICABLE | |
| AGGREGATE LIMIT | $   10,000 |

RETROACTIVE DATE: 07012012

This **Employment Practices Liability Coverage** contains claims made coverage.  Except as may be otherwise provided herein, specified coverages of this insurance are limited generally to liability for injuries for which claims are first made against the insured while the insurance is in force.  Please read and review the insurance carefully and discuss the coverage with your Hartford Agent or Broker.

The Limits of Insurance stated in this Declarations will be reduced, and may be completely exhausted, by the payment of "defense expense" and, in such event,  The Company will not be obligated to pay any further "defense expense" or sums which the insured is or may become legally obligated to pay as "damages".

AMENDMENT OF LIQUOR LIABILITY
EXCLUSION: FORM SS 40 34
DESCRIPTION OF ACTIVITY:
NONE

BUSINESS LIABILITY OPTIONAL
COVERAGES

## SPECTRUM POLICY DECLARATIONS (Continued)
POLICY NUMBER: 08 SBA PY2938

**BUSINESS LIABILITY OPTIONAL COVERAGES**    LIMITS OF INSURANCE
    (Continued)

UMBRELLA LIABILITY - SEE
SCHEDULE ATTACHED

## SPECTRUM POLICY DECLARATIONS (Continued)
POLICY NUMBER: 08 SBA PY2938

Form Numbers of Forms and Endorsements that apply:

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SS | 00 | 01 | 03 | 14 | SS | 00 | 05 | 10 | 08 | SS | 00 | 07 | 07 | 05 | |
| SS | 84 | 31 | 09 | 07 | SS | 01 | 01 | 07 | 08 | SS | 04 | 15 | 07 | 05 | |
| SS | 04 | 44 | 07 | 05 | SS | 04 | 52 | 09 | 07 | SS | 40 | 18 | 07 | 05 | |
| SS | 40 | 93 | 07 | 05 | SS | 41 | 12 | 12 | 07 | SS | 41 | 51 | 10 | 09 | |
| SS | 41 | 63 | 06 | 11 | SS | 05 | 47 | 09 | 01 | SS | 50 | 18 | 04 | 05 | |
| SS | 09 | 67 | 09 | 14 | SS | 09 | 70 | 12 | 14 | SS | 09 | 71 | 12 | 14 | |
| IH | 99 | 40 | 04 | 09 | IH | 99 | 41 | 04 | 09 | SX | 80 | 01 | 06 | 97 | |
| SS | 83 | 76 | 01 | 15 | | | | | | | | | | | |

| | | | | |
|---|---|---|---|---|
| SS | 00 | 08 | 04 | 05 |
| SS | 04 | 19 | 04 | 09 |
| SS | 40 | 34 | 03 | 00 |
| SS | 41 | 62 | 06 | 11 |
| SS | 09 | 01 | 12 | 14 |
| SS | 50 | 19 | 01 | 15 |
| SS | 38 | 25 | 12 | 07 |

# COMMON POLICY CONDITIONS

© 2008, The Hartford

QUICK REFERENCE - SPECTRUM POLICY

DECLARATIONS
and
COMMON POLICY CONDITIONS


I.  **DECLARATIONS**

Named Insured and Mailing Address
Policy Period
Description and Business Location
Coverages and Limits of Insurance


II.  **COMMON POLICY CONDITIONS**                              **Beginning on Page**

A.  Cancellation                                                    1
B.  Changes                                                         1
C.  Concealment, Misrepresentation Or Fraud                         2
D.  Examination Of Your Books And Records                           2
E.  Inspections And Surveys                                         2
F.  Insurance Under Two Or More Coverages                           2
G.  Liberalization                                                  2
H.  Other Insurance - Property Coverage                             2
I.  Premiums                                                        2
J.  Transfer Of Rights Of Recovery Against Others To Us             2
K.  Transfer Of Your Rights And Duties Under This Policy            3
L.  Premium Audit                                                   3

Form SS 00 05 10 08



# COMMON POLICY CONDITIONS

All coverages of this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 5 days before the effective date of cancellation if any one of the following conditions exists at any building that is Covered Property in this policy:

      (1) The building has been vacant or unoccupied 60 or more consecutive days. This does not apply to:

         (a) Seasonal unoccupancy; or

         (b) Buildings in the course of construction, renovation or addition.

         Buildings with 65% or more of the rental units or floor area vacant or unoccupied are considered unoccupied under this provision.

      (2) After damage by a Covered Cause of Loss, permanent repairs to the building:

         (a) Have not started; and

         (b) Have not been contracted for,

         within 30 days of initial payment of loss.

      (3) The building has:

         (a) An outstanding order to vacate;

         (b) An outstanding demolition order; or

         (c) Been declared unsafe by governmental authority.

      (4) Fixed and salvageable items have been or are being removed from the building and are not being replaced. This does not apply to such removal that is necessary or incidental to any renovation or remodeling.

      (5) Failure to:

         (a) Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of seasonal unoccupancy; or

         (b) Pay property taxes that are owing and have been outstanding for more than one year following the date due, except that this provision will not apply where you are in a bona fide dispute with the taxing authority regarding payment of such taxes.

   b. 10 days before the effective date of cancellation if we cancel for nonpayment of premium.

   c. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is canceled, we will send the first Named Insured any premium refund due. Such refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

© 2008, The Hartford
(Includes copyrighted material of Insurance Services Office, Inc. with its permission)

COMMON POLICY CONDITIONS

**C. Concealment, Misrepresentation Or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time.  It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This policy;

2. The Covered Property;

3. Your interest in the Covered Property; or

4. A claim under this policy.

**D. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to the policy at any time during the policy period and up to three years afterward.

**E. Inspections And Surveys**

1. We have the right but are not obligated to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. Any inspections, surveys, reports or recommendations will relate only to insurability and the premiums to be charged.  We do not make safety inspections.  We do not undertake to perform the duty of any person or organization to provide for the health or safety of any person.  We do not represent or warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations on our behalf.

**F. Insurance Under Two Or More Coverages**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**G. Liberalization**

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to, or at any time during, the policy period, the broadened coverage will immediately apply to this policy.

**H. Other Insurance - Property Coverage**

If there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not.  But we will not pay more than the applicable Limit of Insurance.

**I. Premiums**

1. The first Named Insured shown in the Declarations:

   a. Is responsible for the payment of all premiums; and

   b. Will be the payee for any return premiums we pay.

2. The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued.  If applicable, on each renewal, continuation or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

3. With our consent, you may continue this policy in force by paying a continuation premium for each successive one-year period.  The premium must be:

   a. Paid to us prior to the anniversary date; and

   b. Determined in accordance with Paragraph 2. above.

   Our forms then in effect will apply.  If you do not pay the continuation premium, this policy will expire on the first anniversary date that we have not received the premium.

4. Changes in exposures or changes in your business operation, acquisition or use of locations that are not shown in the Declarations may occur during the policy period.  If so, we may require an additional premium.  That premium will be determined in accordance with our rates and rules then in effect.

**J. Transfer Of Rights Of Recovery Against Others To Us**

Applicable to Property Coverage:

If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment.  That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them.  But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property; or

2. After a loss to your Covered Property only if, at time of loss, that party is one of the following:

**COMMON POLICY CONDITIONS**

a. Someone insured by this insurance;

b. A business firm:

   (1) Owned or controlled by you; or

   (2) That owns or controls you; or

c. Your tenant.

You may also accept the usual bills of lading or shipping receipts limiting the liability of carriers.

This will not restrict your insurance.

K. **Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

L. **Premium Audit**

a. We will compute all premiums for this policy in accordance with our rules and rates.

b. The premium amount shown in the Declarations is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Any additional premium found to be due as a result of the audit are due and payable on notice to the first Named Insured. If the deposit premium paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must maintain all records related to the coverage provided by this policy and necessary to finalize the premium audit, and send us copies of the same upon our request.

Our President and Secretary have signed this policy. Where required by law, the Declarations page has also been countersigned by our duly authorized representative.

Lisa Levin, Secretary

Douglas Elliot, President



THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**BUSINESS LIABILITY COVERAGE FORM**
**OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM**
**SPECIAL PROPERTY COVERAGE FORM**
**STANDARD PROPERTY COVERAGE FORM**
**UMBRELLA LIABILTY PROVISIONS**

**A. Disclosure Of Federal Share Of Terrorism Losses**

The United States Department of the Treasury will reimburse insurers for a portion of such insured losses, as indicated in the table below that exceeds the applicable insurer deductible:

| Calendar Year | Federal Share of Terrorism Losses |
|---|---|
| 2015 | 85% |
| 2016 | 84% |
| 2017 | 83% |
| 2018 | 82% |
| 2019 | 81% |
| 2020 or later | 80% |

However, if aggregate industry insured losses, attributable to "certified acts of terrorism" under the federal Terrorism Risk Insurance Act, as amended (TRIA), exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion. The United States government has not charged any premium for their participation in covering terrorism losses.

**B. Cap On Insurer Liability for Terrorism Losses**

A "certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of federal Terrorism Risk Insurance Act, to be an act of terrorism under TRIA. The criteria contained in TRIA for a "certified act of terrorism" include the following:

1. The act results in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to TRIA; and

2. The act results in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of an United States mission; and

3. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate industry insured losses attributable to "certified acts of terrorism" under TRIA exceed $100 billion in a calendar year, and we have met, or will meet, our insurer deductible under TRIA, we shall not be liable for the payment of any portion of the amount of such losses that exceed $100 billion. In such case, your coverage for terrorism losses may be reduced on a pro-rata basis in accordance with procedures established by the Treasury, based on its estimates of aggregate industry losses and our estimate that we will exceed our insurer deductible. In accordance with the Treasury's procedures, amounts paid for losses may be subject to further adjustments based on differences between actual losses and estimates.

**C. Application Of Exclusions**

The terms and limitations of any terrorism exclusion, the inapplicability or omission of a terrorism exclusion, or the inclusion of terrorism coverage, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Form or Policy, such as losses excluded by the Pollution Exclusion, Nuclear Hazard Exclusion and the War And Military Action Exclusion.

Form SS 50 19 01 15                                                                                                    Page 1 of 1
© 2015, The Hartford
(Includes copyrighted material of Insurance Services Office, Inc. with its permission)



**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

# WAGE AND HOUR CLAIMS EXPENSES - EMPLOYMENT PRACTICES LIABILITY

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM**

Exclusion **B.** in **SECTION III - EXCLUSIONS** is deleted and replaced by the following:

**B.** We shall not pay "loss" in connection with any "claim" based upon, arising from, or in any way related to:

1. any claims for unpaid wages (including overtime pay), workers' compensation benefits, unemployment compensation, disability benefits, or social security benefits;

2. any actual or alleged violation of the Worker Adjustment and Retraining Notification Act, the National Labor Relations Act, the Occupational Safety and Health Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, "ERISA", or any similar law; or

3. any "wage and hour violation".

Provided, however, that this Exclusion **B.** shall not apply to that portion of "loss" that represents:

a. a specific amount the "insureds" become legally obligated to pay solely for a "wrongful act" of "retaliation"; or

b. "Claims expenses" incurred to defend a "wage and hour violation" referenced in sub-paragraph **3.** above subject to a Sub-Limit of Liability of $ 0010000 that is part of, and not in addition to, the Limits of Liability applicable to this Coverage Part (the Wage and Hour Defense Costs Sub-Limit). Moreover:

1. SECTION VIII.I.2. of this Coverage Part notwithstanding, 100% of the "insured's" "claims expenses" covered pursuant to this sub-paragraph b. shall be allocated to covered "loss" until the Wage and Hour Defense Costs Sub-Limit is exhausted. Once the Wage and Hour Defense Costs Sub-Limit is exhausted, allocation shall continue in accordance with SECTION VIII.I.2.;

2. the Wage and Hour Defense Costs Sub-Limit is available notwithstanding the fact that a "wage and hour violation" is not an "employment practices wrongful act"; and

3. the Wage and Hour Defense Costs Sub-Limit is only available for "claim expenses" incurred to defend a "wage and hour violation" that occurred on or after the "retroactive date" and before the end of the "policy period", regardless of whether any such "claim" for a "wage and hour violation" is made during the "policy period" or the Extended Reporting Period, if applicable.

All other terms and conditions of this Coverage Part remain unchanged.

© 2014, The Hartford

# EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM (CLAIMS MADE)

© 2014, The Hartford

# QUICK REFERENCE

# EMPLOYMENT PRACTICES LIABILITY
# COVERAGE FORM (CLAIMS MADE)

## READ YOUR POLICY CAREFULLY

| | Beginning on Page |
|---|---|
| SECTION I:  INSURING AGREEMENT | 1 |
| SECTION II:  DEFINITIONS | 1 |
| SECTION III:  EXCLUSIONS | 5 |
| SECTION IV:  DISCOVERY CLAUSE | 6 |
| SECTION V:  EXTENDED REPORTING PERIOD | 6 |
| SECTION VI:  COVERAGE TERRITORY | 6 |
| SECTION VII:  LIMITS OF LIABILITY AND DEDUCTIBLE | 6 |
| SECTION VIII:  DUTIES IN THE EVENT OF CLAIM; DEFENSE AND SETTLEMENT | 7 |
| SECTION IX:  CONDITIONS | 9 |

Form SS 09 01 12 14

EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM



# EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM (CLAIMS MADE)

NOTICE: COVERAGE PROVIDED BY THIS COVERAGE PART IS CLAIMS MADE COVERAGE.  EXCEPT AS OTHERWISE SPECIFIED HEREIN:  COVERAGE APPLIES ONLY TO A CLAIM FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND WHICH HAS BEEN REPORTED TO US IN ACCORDANCE WITH THE APPLICABLE NOTICE PROVISIONS.  COVERAGE IS SUBJECT TO THE INSURED'S PAYMENT OF THE APPLICABLE DEDUCTIBLE.  PAYMENTS OF CLAIM EXPENSES ARE SUBJECT TO, AND REDUCE, THE AVAILABLE LIMITS OF LIABILITY.  PLEASE READ THE COVERAGE PART CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER. UPON TERMINATION OF THIS COVERAGE PART, EXTENDED REPORTING PERIOD COVERAGE IS AVAILABLE.

Various provisions in this policy restrict coverage.  Please read the entire policy carefully to determine your rights, duties and what is and is not covered.

Throughout this Coverage Part the words you and your refer to the "Named Insured" in the Declarations.  The words we, us and our refer to the stock insurance company member of THE HARTFORD shown on the Declarations Page.

Words and phrases that appear in quotation marks are defined in **SECTION II - DEFINITIONS** of this Coverage Part.

In consideration of, and subject to, the payment of the premium by you and in reliance upon the accuracy and completeness of the "application", including but not limited to the statements, attachments and exhibits contained in and submitted with the "application", we agree with you, subject to all terms, exclusions and conditions of this Coverage Part, as follows:

## SECTION I - INSURING AGREEMENT

### Employment Practices Liability

We shall pay "loss" on behalf of the "insureds" resulting from an "employment practices claim" first made against the "Insureds" during the "policy period" or Extended Reporting Period, if applicable, for an "employment practices wrongful act" by the "insureds".

## SECTION II - DEFINITIONS

A. "Application" means the application for this Coverage Part, including any materials or information submitted therewith or made available to us during the underwriting process, which application shall be on file with us. Such "application" shall be deemed a part of this Coverage Part and attached hereto. In addition, "application" includes any warranty, representation or other statement provided to us within the past three years in connection with any policy or coverage part of which this Coverage Part is a renewal or replacement.

B. "Benefits" means perquisites, fringe benefits, deferred compensation, severance pay and any other form of compensation (other than

salaries, wages, or bonuses as a component of a front or back pay award).

C. "Claim" means any "employment practices claim".

D. "Claims expenses" means:

1. reasonable and necessary legal fees and expenses, including, but not limited to, e-discovery expenses, incurred in the defense or appeal of a "claim";

2. "Extradition costs"; or

3. the costs of appeal, attachment or similar bonds, provided that we shall have no obligation to furnish such bonds.

However, "claim expenses" shall not include:

a. salaries, wages, remuneration, overhead or benefit expenses associated with any "insureds";

b. any fees, expenses or costs which are incurred by or on behalf of a party which is not a covered "insured"; or

c. any fees, expenses or costs which were incurred prior to the date on

EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM

which we received written notice of the "claim" from the "insured".

E. "Controlled partnership" means a limited partnership in which and so long as the "named insured" owns or controls, directly or indirectly, more than 50% of the limited partnership interest and an "insured entity" is the sole general partner.

F. "Damages" means the amounts, other than "claim expenses", that the "insureds" are legally liable to pay solely as a result of a "claim" covered by this Coverage Part, including:

1. compensatory damages, including front pay and back pay;

2. settlement amounts;

3. pre- and post-judgment interest;

4. costs awarded pursuant to judgments;

5. punitive and exemplary damages;

6. the multiple portion of any multiplied damage award; or

7. liquidated damages under the Age Discrimination in Employment Act and the Family and Medical Leave Act.

However, "damages" shall not include:

a. taxes, fines or penalties imposed by law;

b. non-monetary relief;

c. "Benefits";

d. future compensation for any person hired, promoted, or reinstated pursuant to a judgment, settlement, order or other resolution of a "claim";

e. "Stock benefits";

f. costs associated with providing any accommodations required by the Americans with Disabilities Act or any similar law; or

g. any other matters uninsurable pursuant to any applicable law; provided, however, that with respect to punitive and exemplary damages, or the multiple portion of any multiplied damage award, the insurability of such damages shall be governed by the internal laws of any applicable jurisdiction that most favors coverage of such damages.

G. "Debtor in possession" means a "debtor in possession" as such term is defined in Chapter 11 of the United States Bankruptcy Code as well as any equivalent status under any similar law.

H. "Domestic partner" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or any domestic partner relationship arrangement recognized outside of the United States and under the Human Resource policy of the "insured entity".

I. "Employee" means any natural person who was, is or shall become a(n):

1. employee of an "insured entity" including any part time, seasonal, temporary, leased, or loaned employee; or

2. volunteer or intern with an "insured entity".

J. "Employee data privacy wrongful act" means:

1. the failure to prevent any unauthorized access to or use of data containing "Private Employment Information" of any "Employee" or applicant for employment with the "Insured Entity" including any such failure that directly results in a violation with respect to the privacy of such "Employee's" or applicant's medical information under the Health Insurance Portability and Accountability Act (HIPAA) or credit information under the Fair Credit Reporting Act (FCRA); or

2. the failure to notify any "employee" or applicant for employment with the "insured entity" of any actual or potential unauthorized access to or use of "private employment information" of any "employee" or applicant for employment with the "insured entity", if such notice was required by state or federal regulation or statute.

K. "Employment practices claim" means any:

1. written demand for monetary damages or other civil non-monetary relief commenced by the receipt of such demand, including, without limitation, a written demand for employment reinstatement;

2. civil proceeding, including an arbitration or other alternative dispute resolution proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading; or

3. formal administrative or regulatory proceeding, including, without limitation, a proceeding before the Equal Employment Opportunity Commission or similar governmental agency, commenced by the filing of a notice of charges, formal investigative order or similar document;

by or on behalf of an "employee", an applicant for employment with an "insured entity", or an "independent contractor".

EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM

"Employment practices claim" also means the receipt of a notice of violation, order to show cause, or a written demand for monetary or injunctive relief that is the result of an audit conducted by the United States Office of Federal Contract Compliance Programs.

"Employment practices claim" also means a written request to the "insureds" to toll or waive a statute of limitations regarding a potential "Employment practices claim" as described above. Such "claim" shall be commenced by the receipt of such request.

However, "employment practices claim" shall not include any labor or grievance proceeding or arbitration that is subject to a collective bargaining agreement.

L. "Employment practices wrongful act" means:

1. wrongful dismissal, discharge, or termination of employment (including constructive dismissal, discharge, or termination), wrongful failure or refusal to employ or promote, wrongful discipline or demotion, failure to grant tenure, negligent employment evaluation, or wrongful deprivation of career opportunity;

2. sexual or other workplace harassment, including bullying in the workplace, quid pro quo and hostile work environment;

3. employment discrimination, including discrimination based upon age, gender, race, color, creed, marital status, sexual orientation or preference, gender identity or expression, genetic makeup, or refusal to submit to genetic makeup testing, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state, or local law;

4. "Retaliation";

5. breach of any oral, written, or implied employment contract, including, without limitation, any obligation arising from a personnel manual, employee handbook, or policy statement; or

6. violation of the Family and Medical Leave Act.

"Employment practices wrongful act" also means the following, but only when alleged in addition to or as part of any "employment practices wrongful act" described above:

a. employment-related wrongful infliction of mental anguish or emotional distress;

b. failure to create, provide for or enforce adequate or consistent employment-related policies and procedures;

c. negligent retention, supervision, hiring or training;

d. employment-related invasion of privacy, defamation, or misrepresentation; or

e. an "employee data privacy wrongful act".

M. "ERISA" means the Employee Retirement Income Security Act of 1974.

N. "Extradition costs" means reasonable and necessary fees and expenses directly resulting from a "claim" in which an "insured person" lawfully opposes, challenges, resists or defends against any request for the extradition of such "insured person" from his or her current country of employ and domicile to any other country for trial or otherwise to answer any criminal accusation, including the appeal of any order or other grant of extradition of such "insured person".

O. "Financial insolvency" means the status of an "insured entity" as a result of:

1. the appointment of any conservator, liquidator, receiver, rehabilitator, trustee, or similar official to control, supervise, manage or liquidate such "insured entity"; or

2. such "insured entity" becoming a "debtor in possession".

P. "Independent contractor" means any natural person working in the capacity of an independent contractor pursuant to an "independent contractor agreement".

Q. "Independent contractor agreement" means any express contract or agreement between an "independent contractor" and an "insured entity" specifying the terms of the "insured entity's" engagement of such "independent contractor".

R. "Insured entity" means:

1. the "named insured"; or

2. any "subsidiary".

"Insured entity" shall include any such entity as a "debtor in possession".

"Insured entity" shall also include any such entity in its capacity as a general partner of a "controlled partnership".

S. "Insured person" means any:

1. "Employee";

2. "Manager"; or

EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM

3. regarding the Employment Practices Liability Insuring Agreement, an "independent contractor" provided that within 30 days of an "employment practices claim" having been made against such "independent contractor" that the "insured entity" agrees in writing to indemnify such "independent contractor" for any "loss" arising out of such "claim".

T. "Insureds" means any:

1. "Insured entity"; or

2. "Insured person".

U. "Interrelated wrongful acts" means "wrongful acts" that have as a common nexus any fact, circumstance, situation, event, transaction, goal, motive, methodology, or cause or series of causally connected facts, circumstances, situations, events, transactions, goals, motives, methodologies or causes.

V. "Loss" means "claim expenses" and "damages".

W. "Manager" means any natural person who was, is or shall become a(n):

1. duly elected or appointed director, advisory director, board observer, advisory board member, officer, member of the board of managers or management committee member of an "insured entity";

2. "Employee" in his/her capacity as legal counsel to an "insured entity"; or

3. executive of an "insured entity" created outside the United States to the extent that such executive holds a position equivalent to those described in 1. or 2. above.

X. "Named insured" means the individuals, partnerships or corporations designated in the Declarations.

Y. "Notice manager" means the natural persons in the offices of the chief executive officer, chief financial officer, general counsel, risk manager, human resources manager or any equivalent position to the foregoing, of an "Insured Entity".

Z. "Policy period" means the period from the Effective Date to the Expiration Date set forth in the Declarations or any earlier cancellation date.

AA. "Private employment information" means any information regarding an "employee" or applicant for employment with the "insured entity", which is collected or stored by an "insured" for the purposes of establishing, maintaining or terminating an employment relationship.

BB. "Retaliation" means adverse treatment of an "employee" or "independent contractor" based upon such person:

1. exercising any rights under law, including, without limitation, rights under any workers compensation laws, the Family and Medical Leave Act, "ERISA", or the Americans with Disabilities Act;

2. refusing to violate any law;

3. assisting, testifying, or cooperating with a proceeding or investigation regarding alleged violations of law by any "insured";

4. disclosing or threatening to disclose alleged violations of law to a superior or to any governmental agency; or

5. filing any *whistle blower* claim against any "insured" under the federal False Claims Act, the Sarbanes-Oxley Act of 2002, or any similar law.

CC. "Stock benefits" means any offering, plan or agreement between an "insured entity" and any "employee" that grants stock, stock options or stock appreciation rights in the "insured entity" to such person, including, without limitation, restricted stock or any other stock grant. "Stock benefits" shall not include employee stock ownership plans or employee stock purchase plans.

DD. "Subsidiary" means any:

1. corporation in which and so long as the "named insured" owns or controls, directly or indirectly, more than 50% of the outstanding securities representing the right to vote for the election of the board of directors of such corporation;

2. limited liability company in which and so long as the "named insured" owns or controls, directly or indirectly, the right to elect, appoint or designate more than 50% of such entity's managing members;

3. a "controlled partnership";

4. corporation operated as a joint venture in which and so long as the "named insured" owns or controls, directly or indirectly, exactly 50% of the issued and outstanding voting stock and which, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock of such corporation, the "named insured" solely controls the management and operation of such corporation; or

5. foundation, charitable trust or political action committee in which and so long as such entity or organization is controlled by the "named insured" or any "subsidiary" as defined in 1. through 4. above.

EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM

EE. "Wage and hour violation" means any actual or alleged violation of the duties and responsibilities that are imposed upon an "insured" by any federal, state or local law or regulation anywhere in the world, including but not limited to the Fair Labor Standards Act or any similar law (except the Equal Pay Act), which govern wage, hour and payroll practices. Such practices include but are not limited to:

1. the calculation and payment of wages, overtime wages, minimum wages and prevailing wage rates;

2. the calculation and payments of benefits;

3. the classification of any person or organization for wage and hour purposes;

4. reimbursing business expenses;

5. the use of child labor; or

6. garnishments, withholdings and other deductions from wages.

FF. "Wrongful act" means any actual or alleged "employment practices wrongful act".

## SECTION III - EXCLUSIONS

A. We shall not pay "Loss":

1. for bodily injury, sickness, disease, death, false arrest or imprisonment, abuse of process, malicious prosecution, trespass, nuisance or wrongful entry or eviction, or for injury to or destruction of any tangible property including loss of use or diminution of value thereof; provided, however, that this exclusion shall not apply to that portion of "loss" that directly results from mental anguish or emotional distress when alleged in connection with an otherwise covered "employment practices wrongful act";

2. for any actual or alleged "wrongful act" by "insured persons" of any "subsidiary" in their capacities as such, or by any "subsidiary", if such "wrongful act" actually or allegedly occurred when such entity was not a "subsidiary";

3. in connection with any "claim" based upon, arising from, or in any way related to any:

   a. prior or pending demand, suit, or proceeding against any "insured" as of, or

   b. audit initiated by the United States Office of Federal Contract Compliance Programs before,

   the effective date of the first Employment Practices Liability Coverage Part issued and continuously renewed by us, or the same or substantially similar fact, circumstance, or situation underlying or alleged in such demand, suit, proceeding, or audit;

4. in connection with any "claim", arising from, or in any way related to any fact, circumstance, or situation that, before the Effective Date in the Declarations, was the subject of any notice given under any other employment practices liability policy, management liability policy or other insurance policy which insures "wrongful acts" covered under this Coverage Part;

5. in connection with any "claim" based upon, arising from, or in any way related to the liability of others assumed by an "insured" under any contract or agreement; provided, however, this exclusion shall not apply to liability that would have been incurred in the absence of such contract or agreement;

6. for breach of any "independent contractor agreement"; or

7. for a lockout, strike, picket line, hiring of replacement workers or similar action in connection with any labor dispute, labor negotiation or collective bargaining agreement.

B. We shall not pay "loss" in connection with any "claim" based upon, arising from, or in any way related to:

1. any claims for unpaid wages (including overtime pay), workers' compensation benefits, unemployment compensation, disability benefits, or social security benefits;

2. any actual or alleged violation of the Worker Adjustment and Retraining Notification Act, the National Labor Relations Act, the Occupational Safety and Health Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, "ERISA", or any similar law; or

3. any "wage and hour Violation"

Provided, however, that this exclusion B. shall not apply to that portion of "loss" that represents a specific amount the "insureds" become legally obligated to pay solely for a "wrongful act" of "retaliation".

C. We shall not pay "loss" in connection with any "claim" based upon, arising from, or in any way related to liability incurred for breach of any oral, written, or implied employment contract; provided, however, that this exclusion shall not apply to liability that would have been incurred in the absence of such contract nor shall it apply to the portion of "loss" representing "claim expenses" incurred to defend against such liability.

EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM

## SECTION IV - DISCOVERY CLAUSE

If, during the "policy period", the "insureds" become aware of a "wrongful act" that may reasonably be expected to give rise to a "claim", and, if written notice of such "wrongful act" is given to us during the "policy period", including the reasons for anticipating such a "claim", the nature and date of the "wrongful act", the identity of the "insureds" allegedly involved, the alleged injuries or damages sustained, the names of potential claimants, and the manner in which the "insureds" first became aware of the "wrongful act", then any "claim" subsequently arising from such "wrongful act" shall be deemed to be a "claim" first made during the "policy period" on the date that we receive the above notice.

## SECTION V - EXTENDED REPORTING PERIOD

Subject to provisions **A.** through **G.** below, if this Coverage Part is canceled or non-renewed other than for non-payment of premium, you shall have the right to purchase an extended period to report "claims" under this Coverage Part for any "claim" first made during the period of time set forth in the Supplemental Extended Reporting Period Endorsement, and following the effective date of such cancellation or nonrenewal and reported in writing during such period or within sixty (60) days thereafter, but only with respect to any "wrongful act" which takes place prior to the effective date of such cancellation or nonrenewal.

A. The Extended Reporting Period shall be effective only upon the payment of an additional premium. The additional premium will be 200% of the annual advance premium for this coverage. At the commencement of the Extended Reporting Period, the entire premium thereof shall be deemed fully earned and non-refundable.

B. The quotation of a different premium or deductible or limit of liability for renewal is not a cancellation or refusal to renew for the purposes of this provision.

C. You shall have no right to purchase the Extended Reporting Period, unless you have satisfied all conditions of the Coverage Part and all premiums and deductibles outstanding have been paid.

D. Your right to purchase the Extended Reporting Period shall terminate unless written notice together with full payment of the premium for the Extended Reporting Period is given to us no later than sixty (60) days following the effective date of cancellation or nonrenewal.

E. The fact that the period of time to report "claims" is extended by virtue of the Extended Reporting Period shall not increase or reinstate the Limit of Liability stated in the Declarations.

F. Extended Reporting Periods do not extend the "policy period" or change the scope of coverage provided. They apply only to "wrongful acts" that occur before the end of the "policy period".

"Claims" for such injury which are first received within sixty (60) days after the "policy period", or during the Extended Reporting Period if in effect, will be deemed to have been made on the last date of the "policy period".

G. Once in effect, Extended Reporting Periods may not be canceled by us.

## SECTION VI -COVERAGE TERRITORY

Coverage under this Coverage Part applies worldwide, provided that the "claim" is made and any legal action is pursued within the Unites States, its territories, possessions or commonwealths, or Canada.

## SECTION VII - LIMITS OF LIABILITY AND DEDUCTIBLE

A. The maximum we will pay for each "claim" under this Coverage Part is the Each Claim Limit of Liability stated in the Declarations, subject to the Annual Aggregate Limit of Liability stated in the Declarations.

The maximum we will pay for all "claims" under this Coverage Part is the Annual Aggregate Limit of Liability stated in the Declarations, regardless of the number of "claims".

If the applicable Limit of Liability for this Coverage Part is exhausted, the premium for this Coverage Part shall be deemed fully earned. "Claim expenses" shall be part of, and not in addition to, the Limits of Liability. Payment of "claim expenses" by us shall reduce each Limit of Liability.

B. We shall pay "loss" in excess of the Deductible applicable to each "claim" as specified on the Declarations.

C. All Deductibles shall be borne by the "insureds" at their own risk; they shall not be insured.

D. The Deductible shall apply to "claim expenses" covered hereunder. If, any "claim expenses" are incurred by us prior to the "insured's" complete payment of the Deductible, then the "insureds" shall reimburse us therefor upon our request.

E. No Deductible shall apply to "loss" incurred by any "insured person" that an "insured entity" is not permitted by common or statutory law to indemnify, or is permitted or required to indemnify, but is not able to do so by reason of "financial insolvency".

**EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM**

F. If an "insured entity" is permitted or required by common or statutory law to indemnify an "insured person" for any "loss", or to advance "claim expenses" on their behalf, and does not do so other than because of "financial insolvency", then such "insured entity" and the "named insured" shall reimburse and hold us harmless for our payment or advancement of such "loss" up to the amount of the Deductible that would have applied if such indemnification had been made.

G. If a "subsidiary" is unable to indemnify an "insured person" for any "loss", or to advance "claim expenses" on their behalf, because of "financial insolvency", then the "named insured" shall reimburse and hold us harmless for our payment or advancement of such "loss" up to the amount of the applicable Deductible that would have applied if such indemnification had been made.

The Limit of Liability for this Coverage Part applies separately to each consecutive annual period and to any remaining period of less than twelve (12) months starting with the beginning of the "policy period" shown in the Declarations, unless the "policy period" is extended after issuance for an additional period of less than twelve (12) months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limit of Liability.

**SECTION VIII - DUTIES IN THE EVENT OF CLAIM; DEFENSE AND SETTLEMENT**

A. We shall have the right and duty to defend "claims" covered under this Coverage Part, even if such "claim" is groundless, false or fraudulent, provided that:

   1. the "insureds" give notice to us in accordance with the applicable notice provisions; and

   2. such "claim" does not involve allegations, in whole or in part, of a "wage and hour violation".

   For any "claim" involving allegations, in whole or in part, of a "wage and hour violation", it shall be the duty of the "insureds", and not our duty, to defend such "claim".

B. If we have the duty to defend a "claim", our duty to defend such "claim" shall cease upon exhaustion of any applicable Limit of Liability.

C. The "insureds" shall not admit or assume any liability, make any settlement offer or enter into any settlement agreement, stipulate to any judgment, or incur any "claim expenses" regarding any "claim" without our prior written consent, such consent not to be unreasonably withheld.   We shall not be liable for any

admission, assumption, settlement offer or agreement, stipulation, or "claim expenses" to which we have not consented.

D. We shall have the right to associate ourself in the defense and settlement of any "claim" that appears reasonably likely to involve this Coverage Part.    We may make any investigation we deem appropriate in connection with any "claim".  We may, with the written consent of the "insureds", settle any "claim" for a monetary amount that we deem reasonable.

E. The "insureds" shall give to us all information and cooperation as we may reasonably request.  However, if we are, in our sole discretion, able to determine coverage for cooperating "insureds", the failure of one "insured person" to cooperate with us shall not impact coverage provided to cooperating "insureds".

F. With respect to a covered "claim" for which we do not have the duty to defend, we shall advance "claim expenses" in accordance with Section VIII I. that we believe to be covered under this Coverage Part until a different allocation is negotiated, arbitrated or judicially determined.

G. **Required Notice to Us**

As a condition precedent to coverage under this Coverage Part, the "insureds" shall give us written notice of any "claim" as soon as practicable after a "notice manager" becomes aware of such "claim", but in no event later than:

   1. if this Coverage Part expires or is otherwise terminated without being renewed with us, ninety (90) days after the effective date of said expiration or termination; or

   2. subject to **SECTION V**, the expiration of the Extended Reporting Period, if applicable;

provided, however, that if the Coverage Part is cancelled for non-payment of premium, the "insured" will give us written notice of such "claim", prior to the effective date of cancellation.

However, with regard to any "employment practices claim" which is brought as a formal administrative or regulatory proceeding, including, without limitation, a proceeding before the Equal Employment Opportunity Commission or similar governmental agency, commenced by the filing of a notice of charges, formal investigative order or similar document, as a condition precedent to coverage under this Coverage Part the

EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM

"insureds" shall give us written notice of any "claim" as soon as practicable after a "notice manager" becomes aware of such "claim", but in no event later than:

3. if this Coverage Part is renewed, no more than 180 days after a "notice manager" becomes aware of such "claim"; or

4. if this Coverage Part expires or is otherwise terminated without being renewed with us, ninety (90) days after the effective date of said expiration or termination; or

5. subject to **SECTION V**, the expiration of the Extended Reporting Period, if applicable;

provided, if the Coverage Part is cancelled for non-payment of premium, the "insured" will give us written notice of such "claim", prior to the effective date of cancellation.

H. **Subrogation**

1. We shall be subrogated to all of the "insureds'" rights of recovery regarding any payment of "loss" by us under this Coverage Part. The "insureds" shall execute all papers required and do everything necessary to secure and preserve such rights, including the execution of any documents necessary to enable us to effectively bring suit in the name of the "insureds". The "insureds" shall do nothing to prejudice our position or any potential or actual rights of recovery.

2. We shall not exercise our rights of subrogation against an "insured person" under this Coverage Part unless such "insured person" has:

   a. obtained any personal profit, remuneration or advantage to which such "insured person" was not legally entitled, or

   b. committed a criminal or deliberately fraudulent act or omission or any willful violation of law,

   if a judgment or other final adjudication establishes such personal profit, remuneration, advantage, act, omission, or violation.

I. **Allocation**

Where "insureds" who are afforded coverage for a "claim" incur an amount consisting of both "loss" that is covered by this Coverage Part and also loss that is not covered by this Coverage Part, because such "claim" includes both covered and uncovered matters, then coverage shall apply as follows:

1. with respect to a covered "claim" for which we have the duty to defend:

   a. 100% of the "insured's" "claim expenses" shall be allocated to covered "loss"; and

   b. All other "loss" shall be allocated between covered "loss" and non-covered loss based upon the relative legal exposure of all parties to such matters.

2. with respect to a covered "claim" for which we do not have the duty to defend, all "loss" shall be allocated between covered "loss" and non-covered loss based upon the relative legal exposure of such matters.

**SECTION IX - CONDITIONS**

A. **Coverage Part Priority; Headings**

If any provision in this Coverage Part is inconsistent or in conflict with the terms and conditions of any provisions in this Policy, the terms and conditions of this Coverage Part shall control only for purposes of determining coverage hereunder. The headings of the various sections of this Coverage Part are intended for reference only and shall not be part of the terms and conditions of coverage.

B. **Notice Addresses**

1. All notices to the "insureds" shall be sent to the first "named insured" at the address specified in the Declarations.

2. All notices to us shall be sent to the address specified in the Declarations. Any such notice shall be effective upon receipt by us at such address.

C. **Spousal/Domestic Partner Liability Coverage**

Coverage shall apply to the lawful spouse or "domestic partner" of an "insured person" for a "claim" made against such spouse or "domestic partner", provided that:

1. such "claim" arises solely out of:

   a. such person's status as the spouse or "domestic partner" of an "insured person"; or

   b. such spouse or "domestic partner's" ownership of property sought as recovery for a "wrongful act";

2. the "insured person" is named in such "claim" together with the spouse or "domestic partner"; and

3. coverage of the spouse or "domestic partner" shall be on the same terms and conditions, including any applicable

EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM

Deductible , that applies to coverage of the "insured person" for such "claim".

No coverage shall apply to any "claim" for a "wrongful act" of such spouse or "domestic partner".

### D. Estates and Legal Representatives

In the event of the death, incapacity or bankruptcy of an "insured person", any "claim" made against the estate, heirs, legal representatives or assigns of such "insured person" for a "wrongful act" of such "insured person" shall be deemed to be a "claim" made against such "insured person".  No coverage shall apply to any "claim" for a "wrongful act" of such estate, heirs, legal representatives or assigns.

### E. Minimum Standards

In the event that there is an inconsistency between:

1. the terms and conditions that are required to meet minimum standards of a state's law (pursuant to a state amendatory endorsement attached to this Coverage Part ), and

2. any other term or condition of this Coverage Part,

it is understood and agreed that, where permitted by law, we shall apply those terms and conditions of **1.** or **2.** above that are more favorable to the "insured".

### F. Other Insurance

1. The coverage provided under this Coverage Part for any "employment practices claim" shall be primary.

2. Notwithstanding the above, the coverage provided under this Coverage Part for any "employment practices claim" made against a temporary, leased or loaned "employee" or an "independent contractor" shall be excess of the amount of any deductible, retention and limits of liability under any other policy or policies applicable to such "claim", whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy or policies to this Policy's Policy Number.

### G. Interrelationship of Claims

All "claims" based upon, arising from or in any way related to the same "wrongful act" or "interrelated wrongful acts" shall be deemed to be a single "claim" for all purposes under this Coverage Part first made on the earliest date that:

1. any of such "claims" was first made, regardless of whether such date is before or during the "policy period";

2. notice of any "wrongful act" described above was given to us under this Coverage Part pursuant to Sections IV or VIII; or

3. notice of any "wrongful act" described above was given under any prior insurance policy.

### H. Deductible Waiver

Regarding a "claim" that is a class action civil proceeding, no Deductible shall apply to "claim expenses" incurred in connection with such "claim", and we shall reimburse the "insureds" for any covered "claim expenses" paid by the "insureds" within the Deductible otherwise applicable to such "claim", if a:

1. final adjudication with prejudice pursuant to a trial, motion to dismiss or motion for summary judgment; or

2. complete and final settlement with prejudice;

establishes that none of the "insureds" in such "claim" are liable for any "loss".

### I. Application

1. The "insureds" represent that the Declarations and statements contained in the "application" are true, accurate and complete. This Coverage Part is issued in reliance upon the "application".

2. If the "application" contains intentional misrepresentations or misrepresentations that materially affect the acceptance of the risk by us no coverage shall be afforded under this Coverage Part for any "insureds" who knew on the Effective Date of this Coverage Part of the facts that were so misrepresented, provided that:

   a. knowledge possessed by any "insured person" shall not be imputed to any other "insured person"; and

   b. knowledge possessed by any of your chief executive officer, general counsel, chief financial officer, human resources director or any position equivalent to the foregoing of the "named insured", or anyone signing the "application", shall be imputed to all "insured entities".   No other person's knowledge shall be imputed to an "insured entity".

EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM

J.  **Changes in Exposure**

1.  **Acquisitions or Created Subsidiaries**

If, before or during the "policy period", any "insured entity" acquires or creates a "subsidiary", then such acquired or created entity and its subsidiaries, and any natural persons that would qualify as "insured persons" thereof, shall be "insureds" to the extent such entities and persons would otherwise qualify as "insureds" under this Coverage Part,, but only for "wrongful acts" occurring after such acquisition or creation.  No coverage shall be available for any "wrongful act" of such "insureds" occurring before such acquisition or creation, or for any "interrelated wrongful acts" thereto.

However, if the fair value of the assets of any such acquired or created entity exceed 25% of the total assets of the "named insured" as reflected in its most recent consolidated financial statements prior to such acquisition or creation, then, as a condition precedent to coverage hereunder, the "insureds" shall give us written notice and full, written details of the acquisition or creation as soon as practicable (but, in all cases, within ninety (90) days of such acquisition or creation). There shall be no coverage under any renewal or replacement of this Coverage Part for any such new "subsidiary" and its subsidiaries, and any natural persons that would qualify as "insured persons" thereof, unless the "insureds" comply with the terms of this provision.

2.  **Mergers**

If, before or during the "policy period", any "insured entity" merges with another entity such that the "insured entity" is the surviving entity, then such merged entity and its subsidiaries, and any natural persons that would qualify as "insured persons" thereof, shall be "insureds" to the extent such entities and persons would otherwise qualify as "insureds" under this Coverage Part, but only for "wrongful acts" occurring after such merger.  No coverage shall be available for any "wrongful act" of such "insureds" occurring before such merger or for any "interrelated wrongful acts" thereto.

However, if the fair value of the assets of any newly merged entity exceed 25% of the total assets of the "named insured" as reflected in its most recent consolidated financial statements prior to such merger,

then, as a condition precedent to coverage hereunder, the "insureds" shall give us written notice and full, written details of the merger as soon as practicable (but, in all cases, within ninety (90) days of such merger).   There shall be no coverage under any renewal or replacement of this Coverage Part for any newly merged entity or any of its subsidiaries, and any natural persons that would qualify as "insured persons" thereof, unless the "insureds" comply with the terms of this provision.

3.  **Takeover of Named Insured**

If, before or during the "policy period":

a.  the "named insured" merges into or consolidates with another entity such that the "named insured" is not the surviving entity; or

b.  more than 50% of the securities representing the right to vote for the "named insured's" board of directors or managers is acquired by another person or entity, group of persons or entities, or persons and entities acting in concert,

then coverage shall continue under this Coverage Part, but only for "wrongful acts" occurring before any such transaction.  No coverage shall be available for any "wrongful act" occurring after such transaction.  Upon such transaction, this Coverage Part shall not be cancelled and the entire premium for this Coverage Part shall be deemed fully earned.  The "insured" shall give us written notice and full, written details of such transaction as soon as practicable (but, in all cases, within ninety (90) days of such transaction).  If any transaction described herein occurs, then we will not be obligated to offer any renewal or replacement of this Coverage Part.

4.  **Loss of Subsidiary Status**

If, before or during the "policy period", any entity ceases to be a "subsidiary", then coverage shall be available under this Coverage Part for such "subsidiary" and its "insured persons", but only for a "wrongful act" of such "insureds" occurring before such transaction.  No coverage shall be available for any "wrongful act" of such "insureds" occurring after such transaction.

K.  **References To Laws**

1.  Wherever this Coverage Part mentions any law, including, without limitation, any statute, Act or Code of the United States,

**EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM**

    such mention shall be deemed to include all amendments of, and all rules or regulations promulgated under, such law.

2. Wherever this Coverage Part mentions any law or laws, including, without limitation, any statute, Act or Code of the United States, and such mention is followed by the phrase "or any similar law", such phrase shall be deemed to include all similar laws of all jurisdictions throughout the world, including, without limitation, statutes and any rules or regulations promulgated under such statutes as well as common law.

**L. Action Against Us**

1. No action shall be taken against us unless there shall have been full compliance with all the terms and conditions of this Coverage Part.

2. No person or organization shall have any right under this Coverage Part to join us as a party to any "claim" against the "insureds" nor shall we be impleaded by the "insureds" in any such "claim".

**M. Entire Agreement**

This Coverage Part, the "application" and any written endorsements attached hereto, along with the Declarations constitute the entire agreement between you and us relating to this Coverage Part's insurance.

**N. Bankruptcy or Insolvency**

Bankruptcy or insolvency of any "insureds" shall not relieve us of any of our obligations under this Coverage Part.

**O. Authorization of First Named Insured**

The first "named insured" shall act on behalf of all "Insureds" with respect to all matters under this Coverage Part, including, without limitation, giving and receiving of notices regarding "claims", cancellation, election of the Extended Reporting Period, payment of premiums, receipt of any return premiums, and acceptance of any endorsements to this Coverage Part.

**P. When We Do Not Renew**

1. If we decide not to renew this Coverage Part, we will mail or deliver to the first "named insured" shown in the Declarations written notice of the nonrenewal not less than thirty (30) days before the expiration date.

2. If notice is mailed, proof of mailing will be sufficient proof of notice.

3. Any state amendatory endorsement changing Nonrenewal Conditions for any part of this policy shall also apply to this Coverage Part.



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

# THIRD PARTY LIABILITY ENDORSEMENT - EMPLOYMENT PRACTICES LIABILITY

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM

I.  **SECTION I - INSURING AGREEMENT** of this Coverage Part is amended to include the following:

**Third Party Liability**

We shall pay "loss" on behalf of the "insureds" resulting from a "third party claim" first made against the "insureds" during the "policy period" or the Extended Reporting Period, if applicable, for a "third party wrongful act" by the "insureds."

II.  **SECTION II - DEFINITIONS** of this Coverage Part is amended in the following manner:

A.  The definition of "claim" is amended to include the following:

"Claim" also means any "third party claim."

B.  The definition of "wrongful act" is amended to include the following:

"Wrongful act" also means any actual or alleged "third party wrongful act".

C.  The following definitions are added:

"Third party" means any natural person who is a customer, vendor, service provider or other business invitee of an "insured entity". "Third party" shall not include "employees".

"Third party claim" means any:

1.  written demand for monetary damages or other civil non-monetary relief commenced by the receipt of such demand;

2.  civil proceeding, including an arbitration or other alternative dispute resolution proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading; or

3.  formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;

by or on behalf of a "third party".

"Third party claim" also means a written request to the "insureds" to toll or waive a statute of limitations regarding a potential "third party claim" as described above. Such "claim" shall be commenced by the receipt of such request.

"Third party wrongful act" means:

1.  discrimination against a "third party" based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state or local law; or

2.  sexual harassment or other harassment of a "third party", including unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature.

III.  The following exclusion is added to **SECTION III - EXCLUSIONS:**

We shall not pay "loss" in connection with any "third party claim" based upon, arising from or in any way related to any price discrimination or violation of any anti-trust law or any similar law designed to protect competition or prevent unfair trade practices.

All other terms and conditions of this Coverage Part remain unchanged.

Form SS 09 70 12 14

© 2014, The Hartford

Page 1 of 1



THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

# RETROACTIVE DATE ENDORSEMENT - EMPLOYMENT PRACTICES LIABILITY

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM**

I.  **SECTION I - INSURING AGREEMENT** of this Coverage Part is amended to include the following:

This Coverage Part applies only to "claims" for "wrongful acts" that occurred on or after the "retroactive date" set forth in the Declarations and before the end of the "policy period", regardless of whether such "claim" is made during the "policy period" or the Extended Reporting Period, if applicable.

II.  The following definition is added to **SECTION II - DEFINITIONS** of this Coverage Part:

"Retroactive date" means the date specified in the Declarations.  If no date is specified, the "retroactive date" will be the same as the Effective Date of this Coverage Part.

All other terms and conditions of this Coverage Part remain unchanged.

© 2014, The Hartford



THE
HARTFORD

Named Insured:      GSNRH,  LLC

Policy Number:      08 SBA PY2938

Effective Date:      07/01/15                    Expiration Date:    07/01/16

Company Name:      SENTINEL  INSURANCE  COMPANY,  LIMITED


THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## TRADE OR ECONOMIC SANCTIONS ENDORSEMENT


This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, including, but not limited to, the payment of claims.


All other terms and conditions remain unchanged.


**Form IH 99 41 04 09**                                        Page 1 of 1

Insurer: SENTINEL INSURANCE COMPANY, LIMITED
         ONE HARTFORD PLAZA, HARTFORD, CT 06155



This Declarations Page, with Umbrella Liability Provisions and Endorsements, if any, issued to form a part thereof, shall together constitute this Umbrella Liability Supplemental Contract, which in turn forms a part of Policy Number shown below.

None of the provisions of the policy to which this Supplemental Contract is attached applies to the Umbrella Liability Insurance provided hereunder.

Wherever the word "policy" appears in this form or in endorsements attached to or made a part of this Supplemental Contract, it means "Supplemental Contract".

POLICY NUMBER: 08 SBA PY2938

## DECLARATIONS

Named Insured and Mailing Address:   GSNRH, LLC

255 WORCESTER RD
FRAMINGHAM     MA  01701

Policy Period              From: 07/01/15  To: 07/01/16
12:01 A.M., Standard time at the address of the named insured as stated herein.

Premium                  $ INCLUDED  ADVANCE PREMIUM

Self Insured Retention        $10,000     each occurrence

The Limits of Insurance subject to all the terms of this policy that apply are:

| | | | |
|---|---|---|---|
| Each Occurrence | $ 1,000,000 | Products-Completed Operations Aggregate Limit | $ 1,000,000 |
| General Aggregate Limit (Other than Products - Completed Operations, Bodily Injury By Disease and Automobile) | $ 1,000,000 | Bodily Injury By Disease Aggregate Limit | $ 1,000,000 |

Schedule of Underlying Insurance Policies
*See Attached "Extension Schedule of Underlying Insurance Policies"*

Form Numbers of Forms and Endorsements that apply.

SX80041008     SX80020405     SX01311008     SX21030401
SX21040697     SX21050697     SX21771206     SX21821008
SX24330610     SX24351008

Countersigned by   *Susan L. Castaneda*          04/22/15
                   Authorized Representative      Date

Form SX 80 01 06 97 T Printed in U.S.A. (NS)
Process Date: 04/22/15                Policy Expiration Date: 07/01/16

# EXTENSION SCHEDULE OF
# UNDERLYING INSURANCE POLICIES



This extension schedule forms a part of the policy designated in the Declarations.

**Carrier, Policy Number and Policy Period:**

A. SENTINEL INSURANCE COMPANY, LIMITED

   08 SBA PY2938          07/01/15 TO 07/01/16

| Type of Coverage | Applicable Limits |
|---|---|
| ( X ) Business Liability - including: | Bodily Injury and Property Damage Liability Combined |
| | $1,000,000   each occurrence |
| | $2,000,000   general aggregate |
| Employees as Additional Insureds | |
| Contractual Liability | |
| Limited Non-Owned Watercraft | |
| Additional Insureds | |
| Damages To Premises Rented To You | Property Damage Liability |
| | $1,000,000   each occurrence |
| ( X )  Personal and Advertising Injury | $1,000,000 |
| ( X )  Products/Completed Operations | $2,000,000   Prod./Comp. Ops. aggregate |
| (  )  Hired Auto and Non-Owned Auto | Limit of Liability |

B.

| | |
|---|---|
| (  )  Comprehensive Automobile Liability - Owned Automobiles | Bodily Injury Liability |
| | each person |
| | each accident |
| | Property Damage Liability |
| (  )  Non-Owned Automobiles | each accident |
| | Bodily Injury and Property Damage |
| (  )  Hired Automobiles | Liability Combined |
| | each accident |
| (  )  Uninsured Motorist | each occurrence |

C.

| | |
|---|---|
| (  )  Employer's Liability | each accident* |
| | each employee by disease* |
| | total policy by disease* |

D.

   (  )  Liquor Liability

An "X" marked in the box indicates the coverage is provided in the Underlying Policies.

**(Note Maintenance of Underlying Insurance Condition SX 80 02 or SX 80 03)**

*Except that in any jurisdiction where the amount of Employers Liability Coverage afforded by the underlying insurer is by law unlimited, the limit stated does not apply and the policy of which this extension schedule forms a part shall afford no insurance with respect to Employers Liability in such jurisdiction.

**EXTENSION SCHEDULE OF UNDERLYING INSURANCE POLICIES (Continued)**

POLICY NUMBER:  08  SBA  PY2938

**Carrier, Policy Number and Policy Period:**
E.

| Type of Coverage | Applicable Limits |
|---|---|
| (   ) Foreign Commercial General Liability- including: | each occurrence |
| Personal and Advertising Injury | Personal and Advertising Injury aggregate |
| Products/Completed Operations | Products/Completed Operations aggregate |
| (   ) Foreign Contingent Auto Liability | each accident |
| (   ) Foreign Employer's Liability | each accident *<br>each employee by disease*<br>total policy by disease* |

An "X" marked in the box indicates the coverage is provided in the Underlying Policies.

**(Note Maintenance of Underlying Insurance Condition SX 80 02 or SX 80 03)**

*Except that in any jurisdiction where the amount of Employers Liability Coverage afforded by the underlying insurer is by law unlimited, the limit stated does not apply and the policy of which this extension schedule forms a part shall afford no insurance with respect to Employers Liability in such jurisdiction.

Form SX 80 04 10 08                                                                 Page 2 of 2
Process Date:  04/22/15                        Policy Expiration Date:  07/01/16

# SPECIAL PROPERTY COVERAGE FORM

© 2005, The Hartford

# QUICK REFERENCE

### SPECIAL PROPERTY COVERAGE FORM
### READ YOUR POLICY CAREFULLY

**SPECIAL PROPERTY COVERAGE FORM**                                                       **Beginning on Page**

**A.   COVERAGES**                                                                                       1

      Covered Property                                                               1
      Property Not Covered                                                      1
      Covered Causes of Loss                                                  2
      Limitations                                                                        2
      Additional Coverages                                                     3
      Coverage Extensions                                                     13

**B.   EXCLUSIONS**                                                                                    16

**C.   LIMITS OF INSURANCE**                                                                   18

**D.   DEDUCTIBLES**                                                                                 19

**E.   PROPERTY LOSS CONDITIONS**                                                       19

      Abandonment                                                                  20
      Appraisal                                                                          20
      Duties in the Event of Loss or Damage                        20
      Legal Action Against Us                                                 20
      Loss Payment                                                                  20
      Recovered Property                                                         22
      Resumption of Operations                                              22
      Vacancy                                                                            22

**F.   PROPERTY GENERAL CONDITIONS**                                                23

      Control of Property                                                          23
      Mortgage Holders                                                           23
      No Benefit to Bailee                                                       24
      Policy Period, Coverage Territory                                 24

**G.   PROPERTY DEFINITIONS**                                                             24

Form SS 00 07 07 05



# SPECIAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties, and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to the SECTION **G** - PROPERTY DEFINITIONS.

## A. COVERAGE

We will pay for direct physical loss of or physical damage to Covered Property at the premises described in the Declarations (also called "scheduled premises" in this policy) caused by or resulting from a Covered Cause of Loss.

### 1. Covered Property

Covered Property as used in this policy, means the following types of property for which a Limit of Insurance is shown in the Declarations:

a. **Buildings,** meaning only building(s) and structure(s) described in the Declarations, including:

(1) Completed additions;

(2) Permanently installed:

(a) Fixtures;

(b) Machinery; and

(c) Equipment;

(3) Outdoor fixtures;

(4) Your personal property in apartments, rooms or common areas furnished by you as landlord;

(5) Building Glass, meaning glass that is part of a building or structure;

(6) Personal property owned by you that is used to maintain or service the buildings or structures on the premises, including:

(a) Fire extinguishing equipment;

(b) Outdoor furniture;

(c) Floor coverings; and

(d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering; and

(7) If not covered by other insurance:

(a) Additions under construction, alterations and repairs to the buildings or structures;

(b) Materials, equipment, supplies and temporary structures, on or within 1,000 feet of the "scheduled premises", used for making additions, alterations or repairs to the buildings or structures.

b. **Business Personal Property** located in or on the building(s) described in the Declarations at the "scheduled premises" or in the open (or in a vehicle) within 1,000 feet of the "scheduled premises", including:

(1) Property you own that is used in your business;

(2) Tools and equipment owned by your employees, which are used in your business operations;

(3) Property of others that is in your care, custody or control;

(4) "Tenant Improvements and Betterments"; and

(5) Leased personal property for which you have contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.

### 2. Property Not Covered

Covered Property does not include:

a. Aircraft, automobiles, motor trucks and other vehicles subject to motor vehicle registration;

b. Automobiles held for sale;

c. "Money", bullion, numismatic and philatelic property and bank notes or "securities" except as provided in any Additional Coverages or Optional Coverages. Lottery tickets held for sale and postage stamps in current use and having face value are not "securities".

d. Contraband, or property in the course of illegal transportation or trade;

**SPECIAL PROPERTY COVERAGE FORM**

e. Land (including land on which the property is located), water, growing crops or lawns;

f. Outdoor fences, radio or television antennas (including satellite dishes), including their lead in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants (other then those held for sale or sold but not delivered), except as any of these may be provided in the:

    (1) Outdoor Property Coverage Extension; or

    (2) Outdoor Signs Optional Coverage;

g. Watercraft (including motors, equipment and accessories) while afloat;

h. The cost to research, replace or restore the information on "valuable papers and records", except as may be provided in any Coverage Extensions or Optional Coverages.

i. "Data" and "software" which exists on electronic "media" including the cost to research, replace or restore them, except as may be provided for in any Additional Coverages or Optional Coverages.

j. Accounts, bills, food stamps, other evidences of debt, accounts receivable or "valuable papers and records"; except as otherwise provided for in this policy.

3. **Covered Causes of Loss**

RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

a. Excluded in Section **B., EXCLUSIONS;** or

b. Limited in Paragraph **A.4.** Limitations; that follow.

4. **Limitations**

a. We will not pay for direct loss of or damage to:

    (1) Property that is missing, where the only evidence of the direct physical loss or physical damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property. This limitation does not apply to the Additional Coverage for "Money" and "Securities".

    (2) Property that has been transferred to a person or to a place outside the "scheduled premises" on the basis of unauthorized instructions.

    (3) The interior of any building or structure caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

        (a) The building or structure first sustains physical damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

        (b) The direct physical loss or physical damage is caused by or results from thawing of snow, sleet, or ice on the building or structure.

b. Pets and animals are covered only if:

    (1) They are inside the building; and

    (2) They are owned by others and boarded by you, or owned by you and held for sale or sold but not delivered.

And then we will pay only if they are killed, stolen, or their destruction is made necessary by a "specified cause of loss".

c. For direct physical loss or physical damage by "theft", the following types of property are covered only up to the limits shown:

    (1) $2,500 for furs, fur garments and garments trimmed with fur;

    (2) $5,000 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $500 or less per item;

    (3) $2,500 for patterns, dies, molds and forms; and

    (4) $500 for stamps, lottery tickets held for sale and letters of credit.

d. Unless specifically provided under a separate endorsement and with a specific Limit of Insurance indicated in the Declarations, we will not pay for direct physical loss of or physical damage to "perishable stock" caused by or resulting from:

    (1) A change in temperature or humidity resulting from:

        (a) Mechanical breakdown or failure of:

            (i) Stationary heating plants; or

            (ii) Refrigerating, cooling, or humidity control apparatus or equipment;

        (b) Artificially generated electric current, including electric arcing, that disturbs electrical devices, appliances or wires; or

        (c) Complete or partial failure of electric power on your "scheduled premises".

    (2) Contamination by refrigerant.

SPECIAL PROPERTY COVERAGE FORM

## 5. Additional Coverages

### a. Collapse

(1) With respect to Buildings:

  (a) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building cannot be occupied for its intended purpose;

  (b) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;

  (c) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building;

  (d) A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion.

(2) We will pay for direct physical loss or physical damage caused by or resulting from risks of collapse of a building or any part of a building that is insured by this policy caused only by one or more of the following:

  (a) "Specified cause of loss" or breakage of building glass, if such loss or breakage was covered by this policy;

  (b) Decay that is hidden from view, unless the presence of such decay was known to an insured prior to collapse;

  (c) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

  (d) Weight of people or personal property;

  (e) Weight of rain that collects on a roof; and

  (f) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

The criteria set forth in Paragraphs (1)(a) through (1)(d) do not limit the coverage otherwise provided under this Additional Coverage for the Causes of Loss listed in Paragraph (2)(a), (2)(d), and (2)(e).

(3) If the collapse is caused by a Covered Cause of Loss listed in Paragraphs (2)(b) through (2)(f), we will pay for direct physical loss of or physical damage to the property listed below, but only if such physical loss or physical damage is a direct result of the collapse of a building insured under this policy, and the property is property covered under this policy:

  (a) Awnings; gutters and downspouts; yard fixtures; outdoor swimming pools; piers, wharves and docks; beach or diving platforms or appurtenances; retaining walls; walks, roadways and other paved surfaces.

(4) If personal property abruptly falls down or caves in and such collapse is not the result of collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

  (a) The collapse was caused by a cause of loss listed in Paragraphs (2)(a) through (2)(f) of this Additional Coverage;

  (b) The personal property which collapses is inside a building; and

  (c) The property which collapses is not of a kind listed in Paragraph (3) above, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph (4) does not apply to personal property if marring or scratching is the only damage to that personal property caused by the collapse.

Collapse of personal property does not mean cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

(5) This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this policy.

**SPECIAL PROPERTY COVERAGE FORM**

b. **Debris Removal**

(1) We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the earlier of:

    (a) The date of direct physical loss or physical damage; or

    (b) The end of the policy period.

(2) The most we will pay under this additional Coverage is 25% of the amount we pay for the direct loss of or physical damage to Covered Property plus the deductible in this policy applicable to that physical loss or physical damage.

But this limitation does not apply to any additional Debris Removal limit provided in the Limits of Insurance section.

(3) This Additional Coverage does not apply to costs to:

    (a) Extract "pollutants and contaminants" from land; or

    (b) Remove, restore or replace polluted or contaminated land or water.

c. **Equipment Breakdown**

(1) We will pay for direct physical loss or physical damage caused by or resulting from an Equipment Breakdown Accident to Equipment Breakdown Property.

Equipment Breakdown Accident means:

    (a) Mechanical breakdown, including rupture or bursting caused by centrifugal force.

    (b) Artificially generated electric current, including electric arcing, that disturbs electrical devices, appliances or wires.

    (c) Explosion of steam boilers, steam piping, steam engines or steam turbines owned or leased by you, or operated under your control.

    (d) Physical loss or physical damage to steam boilers, steam pipes, steam engines or steam turbines

caused by or resulting from any condition or event inside such boilers or equipment.

    (e) Physical loss or physical damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

Equipment Breakdown Property means Covered Property built to operate under vacuum or pressure, other than weight of contents, or used for the generation, transmission or utilization of energy.

The following is not Equipment Breakdown Property:

    (a) Any structure, foundation, cabinet, compartment or air supported structure building;

    (b) Any insulating or refractory material;

    (c) Any sewer piping, any underground vessels or piping, any piping forming a part of a sprinkler system, water piping other than boiler feed water piping, boiler condensate return piping, or water piping forming a part of a refrigerating or air conditioning system;

    (d) Any vehicle or any equipment mounted on a vehicle. As used here, vehicle means any machine or apparatus that is used for transportation or moves under its own power. Vehicle includes, but is not limited to, car, truck, bus, trailer, train, aircraft, watercraft, forklift, bulldozer, tractor or harvester. However, any property that is stationary, permanently installed at a "scheduled premises" and that receives electrical power from an external power source will not be considered a vehicle.

    (e) Any equipment manufactured by you for sale.

(2) **Coverage Extensions**

The following coverage extensions apply only to direct physical loss or physical damage caused by or resulting from an Equipment Breakdown Accident:

SPECIAL PROPERTY COVERAGE FORM

**(a) Hazardous Substances**

We will pay in any one occurrence for the additional cost, not to exceed $50,000, to repair or replace Covered Property because of contamination by a hazardous substance. This includes the expenses to clean up or dispose of such property. Hazardous substance means any substance that is hazardous to human health or that has been declared by a government agency to be hazardous to human health.

Additional cost in this extension means those beyond what would have been required had no hazardous substance been involved.

This limit is part of and not in addition to the Limits of Insurance for Covered Property.

**(b) Expediting Expenses**

With respect to your damaged Covered Property, we will pay in any one occurrence, up to $50,000, for the reasonable and necessary additional expenses you incur to:

(i) Make temporary repairs; or

(ii) Expedite permanent repairs or permanent replacement.

**(c) Defense**

If a claim or "suit" is brought against you alleging that you are liable for damage to property of another in your care, custody or control directly caused by Equipment Breakdown we will either:

(i) Settle the claim or "suit"; or

(ii) Defend you against the claim or "suit," but keep for ourselves the right to settle it at any point.

**(d) Supplementary Payments**

We will pay, with respect to any claim or "suit" we defend:

(i) All expenses we incur;

(ii) The cost of bonds to release attachments, but only for bond

amounts within the Limit of Insurance. We do not have to furnish these bonds;

(iii) All reasonable expenses incurred by you at our request to assist us in the investigation or defense of the claim or "suit" including actual loss of earnings up to $100 a day because of time off from work;

(iv) All costs taxed against you in any "suit" we defend;

(v) Prejudgment interest awarded against you on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer; and

(vi) All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the Limit of Insurance shown in the Declarations.

These payments will not reduce the Limit of Insurance shown in the Declarations.

**(e) Business Income and Extra Expense Extension**

The Business Income and Extra Expense Additional Coverages are extended to provide coverage for a tenant who has a loss of income from the lack of heating, cooling or power as a result of equipment breakdown to mechanical, electrical or pressure equipment of the building owner.

**(f)** If Equipment Breakdown Property requires replacement due to an Equipment Breakdown Accident, we will pay your additional cost to replace it with equipment that is better for the environment, safer or more efficient than the equipment being replaced. However, we will not pay more than 125% of what the cost would have been to repair or replace with property of

**SPECIAL PROPERTY COVERAGE FORM**

comparable material and quality. This coverage does not increase any of the applicable limits. This coverage does not apply to any property indicated as being valued on an Actual Cash Value basis.

If you wish to retrofit air conditioning or refrigeration equipment that utilizes a refrigerant containing CFC (chlorofluorocarbon) substances to accept a non-CFC refrigerant or replace the system with a system using a non-CFC refrigerant, we will consider this better for the environment. Any associated Business Income or Extra Expense will be included in determining the additional cost, if Business Income and Extra Expense apply to this policy.

**(3) Additional Condition - Bankruptcy**

The bankruptcy or insolvency of you or your estate will not relieve us of any obligation under this Additional Coverage.

**(4) Jurisdictional Inspections:**

If any boiler or pressure vessel requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf.

**d. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $25,000 in any one occurrence for your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

**e. Fire Extinguisher Recharge**

We will pay to cover your expenses for recharge of your hand fire extinguishers when they are emptied while fighting fire.

**f. Forgery**

**(1)** We will pay for loss resulting directly from forgery or alteration of any check, draft, promissory note, or similar written promises, orders or directions to pay a sum certain in "money" that you or your

agent has issued, or that was issued by someone who impersonates you or your agent. This includes written instruments required in conjunction with any credit, debit, or charge card issued to you or any "employee" for business purposes.

**(2)** If you are sued for refusing to pay any Covered Instrument on the basis that it has been forged or altered, and you have our written consent to defend against the "suit", we will pay for any reasonable expenses that you incur and pay in that defense.

**(3)** We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

**(a)** Money orders, including counterfeit money orders, of any United States or Canadian post office, express company or national or state (or Canadian) chartered bank that are not paid upon presentation; and

**(b)** Counterfeit United States or Canadian paper currency.

**(4)** The most we will pay in any one occurrence, including legal expenses, under this Additional Coverage is $5,000, unless a higher Limit of Insurance is shown in the Declarations.

**g. Glass Expense**

We will pay for necessary expenses incurred to:

**(1)** Put up temporary plates or board up openings if repair or replacement of damaged glass is delayed;

**(2)** Repair or replace encasing frames; and

**(3)** Remove or replace obstructions when repairing or replacing glass that is part of a building.

This does not include removing or replacing window displays.

**h. Lock and Key Replacement**

We will pay up to $1,000 in any one occurrence for the re-keying of locks or the repair or replacement of locks at "scheduled premises" following the theft or the attempted theft of keys by burglars.

**i. Money and Securities**

**(1)** We will pay for loss of "money" and "securities" used in your business while

at a bank or savings institution, within your living quarters or the living quarters of your partners or any employee having use and custody of the property, at the "scheduled premises", or in transit between any of these places, resulting directly from:

**(a)** "Theft";

**(b)** Disappearance; or

**(c)** Destruction.

**(2)** In addition to the Limitations and Exclusions applicable to property coverage, we will not pay for loss:

**(a)** Resulting from accounting or arithmetical errors or omissions;

**(b)** Due to the giving or surrendering of property in any exchange or purchase; or

**(c)** Of property contained in any "money"-operated device unless a continuous recording instrument in the device records the amount of "money" deposited in the "money"-operated device.

**(3)** The most we will pay for loss in any one occurrence is:

**(a)** The limit shown in the Declarations for Inside the Premises for "money" and "securities" while:

**(i)** In or on the "scheduled premises"; or

**(ii)** Within a bank or savings institution; and

**(b)** The limit shown in the Declarations for Outside the Premises for "money" and "securities" while anywhere else.

**(4)** All loss:

**(a)** Caused by one or more persons; or

**(b)** Involving a single act or series of related acts;

is considered one occurrence.

**(5)** You must keep records of all "money" and "securities" so we can verify the amount of any loss or damage.

**j.   Ordinance or Law**

**(1)** If a Covered Cause of Loss occurs to covered Building property, we will pay on a "scheduled premises" any of the following costs that are caused by enforcement of an ordinance or law:

## SPECIAL PROPERTY COVERAGE FORM

**Undamaged Part**

**(a)** For loss to the undamaged portion of the Building that requires the demolition of parts of the same property not damaged by a Covered Cause of Loss provided that any such ordinance or law resulting in this type of loss:

**(i)** Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the "scheduled premises"; and

**(ii)** Is in force at the time of the loss.

The most we will pay in any one occurrence for this coverage is $25,000 as a Limit of Insurance.

**Demolition Cost**

**(b)** The cost to demolish and clear the site of undamaged parts of the property caused by enforcement of a building, zoning or land use ordinance or law.

The most we will pay in any one occurrence for this coverage is $25,000 as a Limit of Insurance.

**Increased Cost of Construction**

**(c)** The increased cost to repair, rebuild or reconstruct the covered property, caused by enforcement of a building, zoning or land use ordinance or law.

The most we will pay in any one occurrence for this coverage is $25,000 as a Limit of Insurance.

**"Tenants Improvements and Betterment"**

**(d)** The increased cost to repair, rebuild or reconstruct "tenant's improvements and betterments" caused by enforcement of building, zoning or land use ordinance or law.

The most we will pay in any one occurrence for this coverage is $25,000 as a Limit of Insurance.

**(2) Additional Exclusions**

We will not pay under this Additional Coverage for:

**(a)** The enforcement of any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or

**Form SS 00 07 07 05**

**Page 7 of 25**

**SPECIAL PROPERTY COVERAGE FORM**

remediation of property due to contamination by "pollutants and contaminants" or due to the presence, growth, proliferation, spread of any activity of "fungi", wet or dry rot, bacteria or virus; or

**(b)** The costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants or contaminants", "fungi", wet or dry rot, bacteria or virus.

**(c)** Loss caused by, resulting from, contributed to or aggravated by earthquake or volcanic eruption.

**(d)** Loss due to an ordinance or law that:

    **(i)** You were required to comply with before the loss even if the building was undamaged; and

    **(ii)** You failed to comply with.

**(3) Additional Limitations – Loss to Undamaged Portion of Building**

Subject to the limit stated in Paragraph **A.5.j.(1)(a)**, the insurance provided under this Additional Coverage for loss in value to the undamaged portion of the building is limited as follows:

**(a)** If Replacement Cost applies and the property is repaired or replaced on the same or another premises, we will not pay more for physical loss of or physical damage to designated Building property, including loss caused by enforcement of an ordinance or law, than:

    **(i)** The amount you actually spend to repair, rebuild or reconstruct the Building, but not for more than the amount it would cost to restore the Building on the same premises; and

    **(ii)** The amount it would cost to restore the undamaged portion to the same height, floor area, style and comparable quality of the original property insured.

**(b)** If the Building(s) Full Value Endorsement applies and the property is repaired or replaced on the same or another premises, we will not pay more for physical loss of or physical damage to designated Building property, including loss caused by enforcement of an ordinance or law, than:

    **(i)** The amount you actually spend to repair, rebuild or reconstruct the Building, but not for more than the amount it would cost to restore the Building on the same premises; and

    **(ii)** The amount it would cost to restore the undamaged portion to the same height, floor area, style and comparable quality of the original property insured.

**(c)** If Replacement Cost or the Building(s) Full Value Endorsement applies and the property is not repaired or replaced, or if Actual Cash Value applies, then we will not pay more for physical loss of or physical damage to designated Building property, including loss caused by enforcement of an ordinance or law, than the lesser of:

    **(i)** The Actual Cash Value of the Building at the time of loss; or

    **(ii)** The Limit of Insurance applicable to the covered Building property stated in Paragraph **A.5.j.(1)(a)**.

**(4) Additional Limitation – Demolition Cost**

We will not pay more than the lesser of:

**(a)** The amount actually spent to demolish and clear the site of the "scheduled premises"; or

**(b)** The applicable Demolition Cost Limit of Insurance as stated in Paragraph **A.5.j.(1)(b)**.

**(5) Additional Limitation – Increased Cost of Construction**

The insurance provided under this Additional Coverage for increased cost of construction is limited as follows:

**(a)** We will not pay:

SPECIAL PROPERTY COVERAGE FORM

    (i)  Until the property is actually repaired or replaced, at the same or another premises; and

    (ii)  Unless the repairs or replacements are made as soon as reasonably possible after the physical loss or physical damage, not to exceed two years. We may extend this period in writing during the two years.

**(b)** If the Building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay is the lesser of:

    (i)  The increased cost of construction at the same premises; or

    (ii)  The applicable Increased Cost of Construction Limit of Insurance stated in Paragraph **A.5.j.(1)(c)**.

**(c)** If the ordinance or law requires relocation to another premises, the most we will pay is the lesser of:

    (i)  The Increased Cost of Construction at the new premises; or

    (ii)  The applicable Increased Cost of Construction Limit of Insurance stated in Paragraph **A.5.j.(1)(c)**.

**k.** **"Pollutants and Contaminants" Clean Up and Removal**

We will pay your expense to extract "pollutants and contaminants" from land or water at the "scheduled premises" if the discharge, dispersal, seepage, migration, release or escape of the "pollutants and contaminants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the earlier of:

**(1)** The date of direct physical loss or physical damage; or

**(2)** The end of the policy period.

The most we will pay in any one occurrence for each location under this Additional Coverage is $15,000 for the sum of all such expenses arising out of Covered Causes of Loss.

**l.** **Preservation of Property**

If it is necessary to move Covered Property from the "scheduled premises" to preserve it from direct physical loss or physical damage by a Covered Cause of Loss, we will pay for any direct physical loss of or physical damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the direct physical loss or physical damage occurs within 45 days after the property is first moved.

**m.** **Theft Damage to Building**

This Additional Coverage applies only to premises where you are a tenant and are responsible in the lease for physical loss or physical damage to the building you lease, rent, or occupy that is caused by or results from "theft", burglary or robbery.

We will pay for direct physical loss or physical damage directly resulting from "theft", burglary or robbery (except loss by fire or explosion) to a building:

**(1)** You occupy, including personal property that is used to maintain or service the building; or

**(2)** Containing covered personal property if you are legally liable for such physical loss or physical damage.

But we will not pay for such physical loss of or physical damage to property that is away from the "scheduled premises".

**n.** **Water Damage, Other Liquid, Powder or Molten Material Damage**

If direct physical loss or physical damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

We will not pay the cost to repair any defect that caused the direct physical loss or physical damage except as provided in paragraph **A.5.c., Equipment Breakdown** of this coverage form. But we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

**(1)** Results in discharge of any substance from an automatic fire protection system; or

SPECIAL PROPERTY COVERAGE FORM

    (2) Is directly caused by freezing.

**o.  Business Income**

    (1) We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or physical damage to property at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet of the "scheduled premises", caused by or resulting from a Covered Cause of Loss.

    (2) With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the "scheduled premises" are located, your "scheduled premises" also means:

        (a) The portion of the building which you rent, lease or occupy; and

        (b) Any area within the building or on the site at which the "scheduled premises" are located, but only if that area services, or is used to gain access to, the "scheduled premises".

    (3) We will only pay for loss of Business Income that occurs within 12 consecutive months after the date of direct physical loss or physical damage.

    This Additional Coverage is not subject to the Limits of Insurance.

    (4) Business Income means the:

        (a) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no direct physical loss or physical damage had occurred; and

        (b) Continuing normal operating expenses incurred, including payroll.

    (5) With respect to the coverage provided in this Additional Coverage, suspension means:

        (a) The partial slowdown or complete cessation of your business activities; or

        (b) That part or all of the "scheduled premises" is rendered untentantable as a result of a Covered Cause of Loss if coverage for Business Income applies to the policy.

**p.  Extra Expense**

    (1) We will pay reasonable and necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or physical damage to property at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet, caused by or resulting from a Covered Cause of Loss.

    (2) With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the "scheduled premises" are located, your "scheduled premises" also means:

        (a) The portion of the building which you rent, lease or occupy; and

        (b) Any area within the building or on the site at which the "scheduled premises" are located, but only if that area services, or is used to gain access to, the "scheduled premises".

    (3) Extra Expense means expense incurred:

        (a) To avoid or minimize the suspension of business and to continue "operations":

            (i) At the "scheduled premises"; or

            (ii) At replacement premises or at temporary locations, including:

                (aa) Relocation expenses; and

                (bb) Cost to equip and operate the replacement or temporary location, other than those costs necessary to repair or to replace damaged stock and equipment.

        (b) To minimize the suspension of business if you cannot continue "operations".

        (c) (i) To repair or replace any property; or

SPECIAL PROPERTY COVERAGE FORM

(ii) To research, replace or restore the lost information on damaged "valuable papers and records";

to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage o., Business Income.

We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or physical damage. This Additional Coverage is not subject to the Limits of Insurance.

(4) With respect to the coverage provided in this Additional Coverage, suspension means:

(a) The partial slowdown or complete cessation of your business activities; or

(b) That part or all of the "scheduled premises" is rendered untentantable as a result of a Covered Cause of Loss if coverage for Extra Expense applies to the policy.

(5) **Limitation**

This Extra Expense Coverage does not apply to:

(a) Any deficiencies in insuring building or business personal property; or

(b) Any expense related to any recall of products you manufacture, handle or distribute.

q. **Civil Authority**

(1) This insurance is extended to apply to the actual loss of Business Income you sustain when access to your "scheduled premises" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your "scheduled premises".

(2) The coverage for Business Income will begin 72 hours after the order of a civil authority and coverage will end at the earlier of:

(a) When access is permitted to your "scheduled premises"; or

(b) 30 consecutive days after the order of the civil authority.

r. **Extended Business Income**

(1) If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

(a) Begins on the date property is actually repaired, rebuilt or replaced and "operations" are resumed; and

(b) Ends on the earlier of:

(i) The date you could restore your "operations" with reasonable speed, to the condition that would have existed if no direct physical loss or damage occurred; or

(ii) 30 consecutive days after the date determined in **(1)(a)** above.

Loss of Business Income must be caused by direct physical loss or physical damage at the "scheduled premises" caused by or resulting from a Covered Cause of Loss.

(2) With respect to the coverage provided in this Additional Coverage, suspension means:

(a) The partial slowdown or complete cessation of your business activities; and

(b) That a part or all of the "scheduled premises" is rendered untenantable as a result of a Covered Cause of Loss.

s. **Business Income from Dependent Properties**

(1) We will pay for the actual loss of Business Income you sustain due to direct physical loss or physical damage at the premises of a dependent property caused by or resulting from a Covered Cause of Loss.

The most we will pay under this Additional Coverage is $5,000 in any one occurrence unless a higher Limit of Insurance is indicated in the Declarations.

**SPECIAL PROPERTY COVERAGE FORM**

(2) We will reduce the amount of your Business Income loss, other than Extra Expense, to the extent you can resume "operations", in whole or in part, by using any other available:

    (a) Source of materials; or

    (b) Outlet for your products.

(3) If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

(4) Dependent Property means property owned, leased or operated by others whom you depend on to:

    (a) Deliver materials or services to you or to others for your account. But services do not include:

        (i) Water, communication, power services or any other utility services; or

        (ii) Any type of web site, or Internet service.

    (b) Accept your products or services;

    (c) Manufacture your products for delivery to your customers under contract for sale; or

    (d) Attract customers to your business premises.

The dependent property must be located in the coverage territory of this policy.

(5) The coverage period for Business Income under this Additional Coverage:

    (a) Begins 72 hours after the time of direct physical loss or physical damage caused by or resulting from a Covered Cause of Loss at the premises of the dependent property; and

    (b) Ends on the date when the property at the premises of the dependent property should be repaired, rebuilt or replaced with reasonable speed and similar quality.

(6) The Business Income coverage period, as stated in Paragraph (5), does not include any increased period required due to the enforcement of any ordinance or law that:

    (a) Regulates the construction, use or repair, or requires the tearing down of any property; or

    (b) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects "pollutants."

(7) The definition of Business Income contained in the Business Income Additional Coverage also applies to this Business Income From Dependent Properties Additional Coverage.

**t.  Tenant Glass**

This Additional Coverage applies only to premises where you are a tenant and are responsible in the lease for such damage.

We will cover loss to glass, which is in your care, custody or control and for which the lease holds you responsible. The glass must be part of a building described in the Declarations or at a location that would be included in Coverage Extension **b.** Newly Acquired or Constructed Property.

The most that we will pay in any one occurrence for each location under this Additional Coverage is $25,000.

**u.  Leasehold Improvements**

If your lease is cancelled in accordance with a valid lease provision as the direct result of a Covered Cause of Loss to property at the location in which you are a tenant, and you cannot legally remove "Tenant Improvements and Betterments", we will extend Business Personal Property coverage to apply to the unamortized value of "Tenants Improvement and Betterment" that remain and that you were forced to abandon.

The most we will pay in any one occurrence for loss under this Additional Coverage is $25,000.

**v.  Lease Assessment**

Your Business Personal Property is extended to apply to your share of any assessment charged to all tenants by the building owner as a result of direct physical damage caused by or resulting from a Covered Cause of Loss to building property you occupy as agreed to in your written lease agreement.

We will pay no more than $2,500 in any one occurrence for this Additional Coverage.

**6. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building at the "scheduled premises" or in the open (or in a vehicle) within 1,000 feet of the "scheduled premises". All Coverage Extensions are subject to the terms, conditions and exclusions of this policy, except as otherwise provided.

In addition to the Limits of Insurance, you may extend the insurance provided by this policy as follows:

**a. Accounts Receivable**

(1) You may extend the insurance that applies to your Business Personal Property, to apply to your accounts receivable.

We will pay for:

(a) All amounts due from your customers that you are unable to collect;

(b) Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

(c) Collection expenses in excess of your normal collection expenses that are made necessary by the physical loss or physical damage; and

(d) Other reasonable expenses that you incur to reestablish your records of accounts receivable;

that result from direct physical loss of or physical damage to your records of accounts receivable.

(2) Paragraph **A.3.**, Covered Causes of Loss, and Section **B.**, Exclusions, do not apply to this Additional Coverage except for:

(a) Paragraph **B.1.b.**, Governmental Action;

(b) Paragraph **B.1.c.**, Nuclear Hazard; and

(c) Paragraph **B.1.e.**, War and Military Action.

(3) Additional Exclusions

(a) Dishonest acts by you, anyone else with an interest in the records of accounts receivable, or your or their employees or authorized representatives, or anyone entrusted with the records of accounts receivable, whether or not acting alone or in collusion with other persons or occurring during the hours of employment.

This exclusion does not apply to a carrier for hire.

(b) Alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of "money," "securities," or other property.

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

(c) Bookkeeping, accounting or billing errors or omissions.

(d) Electrical or magnetic injury, disturbance or erasure of electronic recordings.

But we will pay for direct physical loss or physical damage caused by Lightning.

(e) Voluntary parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

(f) Unauthorized instructions to transfer property to any person or to any place.

(4) We will not pay for direct physical loss or physical damage that requires any audit of records or any inventory computation to prove its factual existence.

(5) The most we will pay in any one occurrence for direct physical loss of or physical damage to your accounts receivable at each "scheduled premises" is $25,000.

(6) The most we will pay in any one occurrence for direct physical loss of or physical damage to accounts receivables away from the "scheduled premises", including while in transit, is $25,000.

**b. Arson and "Theft" Reward**

(1) In the event that a covered fire loss was the result of an act of arson, we will reimburse you for rewards you pay for information leading to convictions for that act of arson.

SPECIAL PROPERTY COVERAGE FORM

(2) In the event of a covered "theft" loss, we will reimburse you for rewards you pay for information leading to convictions for the "theft" loss.

The most we will pay to reimburse you in any one occurrence for arson or "theft" rewards is $10,000.

This is additional insurance. The deductible does not apply to these reimbursements.

**c. Data and Software**

We will pay up to $10,000 in any one occurrence to cover your costs to research, replace or restore "data" or "software" which exists or existed on electronic or magnetic "media" that is lost or damaged as a result of direct physical loss or physical damage to "computer equipment" at the "scheduled premises".

**d. Garages, Storage Buildings and Other Appurtenant Structures**

(1) You may extend the insurance that applies to Building to apply to garages, storage buildings and other appurtenant structures, except outdoor fixtures, at the "scheduled premises".

The most we will pay in any one occurrence for direct physical loss or physical damage under this Extension is $50,000 at each "scheduled premises".

(2) You may extend the insurance that applies to Business Personal Property in garages, storage buildings and other appurtenant structures at the "scheduled premises".

The most we will pay in any one occurrence for direct physical loss or physical damage under this Extension is $5,000 at each "scheduled premises".

**e. Newly Acquired or Constructed Property**

(1) You may extend the insurance that applies to Building to apply to:

(a) Your new buildings while being built on the "scheduled premises"; and

(b) Buildings you acquire at locations other than the "scheduled premises", intended for:

(i) Similar use as the Building described in the Declarations; or

(ii) Use as a warehouse.

The most we will pay in any one occurrence for loss or damage under this Extension is 25% of the Limit of Insurance for Building shown in the Declarations, but not more than $500,000 at each premises.

(2) You may extend the insurance that applies to Business Personal Property to apply to:

(a) Property at any premises you acquire or construct;

(b) Business Personal Property, including such property that you newly acquire, located at your newly constructed building, or

(c) Business Personal Property that you newly acquire, located at the "scheduled premises".

This extension does not apply to:

(a) Personal Property that you temporarily acquire in the course of installing or performing work on such property;

(b) Personal property of others that you temporarily acquire in the course of your wholesaling activity.

(c) Merchandise held for sale, except as provided under Paragraph **C.6.** Business Personal Property Limit – Seasonal Increase.

The most we will pay in any one occurrence for direct physical loss or physical damage under this Extension is $250,000 at each premises.

(3) You may extend the insurance that applies to Business Income and Extra Expense to apply to newly acquired or constructed locations.

The most we will pay in any one occurrence under this Extension is $50,000.

(4) If Covered Property is moved to a new premises endorsed onto this policy, from a "scheduled premises" being endorsed off this policy, the Limit of Insurance applicable to that vacated premises will apply proportionately to both premises as the property is moved. This coverage applies to up to 180 days after the move begins or upon completion of the move, whichever is sooner. This coverage does not apply to Business Personal Property while in transit.

(5) Insurance under this Extension for each newly acquired or constructed property will end when any of the following first occurs:

(a) This policy expires;

(b) 180 days after you acquire or begin to construct the property, or

(c) You report values to us.

We will charge you additional premium for values reported from the day construction begins or you acquire the property.

**f.   Outdoor Property**

You may extend the insurance provided by this policy to apply to your outdoor:

(1) Fences, signs (other than signs attached to buildings), trees, shrubs and plants caused by or resulting from any of the following causes of loss:

(a) Fire;

(b) Lightning;

(c) Explosion;

(d) Riot or Civil Commotion; and

(e) Aircraft.

The most we will pay in any one occurrence for direct physical loss or physical damage, including debris removal expense, under this Extension is $10,000 but not more than $1,000 for any one tree, shrub or plant.

(2) Radio and television antennas (including satellite dishes) caused by or resulting from any of the following causes of loss:

(a) Fire;

(b) Lightning;

(c) Windstorm;

(d) Ice, Snow, Sleet or Hail;

(e) Explosion;

(f) Riot or Civil Commotion; and

(g) Aircraft.

The most we will pay in any one occurrence for direct physical loss or physical damage, including debris removal expense, under this Extension is $2,000.

**g.   Personal Effects**

You may extend the insurance that applies to Business Personal Property to apply to personal effects owned by you, your officers, your partners, "managers", "members", or your employees.

## SPECIAL PROPERTY COVERAGE FORM

The most we will pay in any one occurrence for physical loss or physical damage under this Extension is $10,000 at each "scheduled premises".

**h.   Property Off-Premises**

(1) You may extend the insurance that applies to Building to apply to such property that is temporarily at a location you do not own, lease or operate. This Extension applies only if physical loss or physical damage is caused by or resulting from a Covered Cause of Loss. This Extension does not apply to property in course of transit.

The most we will pay in any one occurrence under this coverage extension is $5,000.

(2) You may extend the insurance that applies to Business Personal Property to apply to such property, other than Accounts Receivable, "money" and "securities" while:

(a) In the course of transit and more than 1,000 feet from the "scheduled premises". Property must be in or on, but not permanently attached to or installed in, a motor vehicle you own, lease or operate while between points in the coverage territory; or

(b) Temporarily at a premises you do not own, lease or operate.

(c) At a premises owned, leased, operated or used by you and the Business Personal Property is a vending machine.

(d) In or on, but not permanently attached to or installed in, motor vehicles operated by your employees in the course of your business operations.

(e) On temporary public display, or while being used at fairs, exhibitions, expositions, or trade shows or while in transit to and from these temporary sites.

The most we will pay in any one occurrence under this Extension is $2,500.

**i.   Valuable Papers and Records - Cost of Research**

You may extend the insurance that applies to Business Personal Property to apply to your costs to research, replace or restore the lost information on lost or damaged "valuable papers and records", for which duplicates do not exist.

SPECIAL PROPERTY COVERAGE FORM

The most we will pay in any one occurrence under this Extension is $25,000 at each "scheduled premises". For "valuable papers and records" not at the "scheduled premises", including while in transit, the most we will pay in any one occurrence is $25,000.

## B. EXCLUSIONS

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   a. **Earth Movement**

      (1) Earthquake, meaning a shaking or trembling of the earth's crust, caused by underground tectonic forces resulting in breaking, shifting, rising, settling, sinking or lateral movement;

      (2) Landslide, including any earth sinking, rising or shifting related to such event;

      (3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

      (4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil, and the action of water under the ground surface;

      But if Earth Movement, as described in Paragraphs (1) through (4) above, results in fire or explosion, we will pay for the physical loss or physical damage caused by that fire or explosion.

      (5) Volcanic eruption, meaning the eruption, explosion or effusion of a volcano. But if physical loss or physical damage by fire or volcanic action results, we will pay for that resulting physical damage.

      Volcanic action means direct physical loss or physical damage resulting from the eruption of a volcano when the physical loss or physical damage is caused by:

      (a) Airborne volcanic blast or airborne shock waves;

      (b) Ash, dust, or particulate matter; or

      (c) Lava flow.

      (d) All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

      Volcanic action does not include the cost to remove ash, dust, or particulate matter. That does not cause direct physical loss or physical damage to Covered Property.

   b. **Governmental Action**

      Seizure or destruction of property by order of governmental authority.

      But we will pay for acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this policy.

   c. **Nuclear Hazard**

      Nuclear reaction or radiation, or radioactive contamination however caused.

      But if physical loss or physical damage by fire results, we will pay for that resulting physical loss or physical damage.

   d. **Power Failure**

      The failure of power or other utility service supplied to the "scheduled premises", however caused, if the failure occurs away from the "scheduled premises". Failure includes lack of sufficient capacity and reduction in supply necessary to maintain normal operations.

      But if physical loss or physical damage by a Covered Cause of Loss results, we will pay for that resulting physical loss or physical damage.

   e. **War and Military Action**

      (1) War, including undeclared or civil war;

      (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

      (3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

   f. **Water**

      (1) Flood, including the accumulation of surface water, waves, tides, tidal waves, overflow of streams or any other bodies of water, or their spray, all whether driven by wind or not;

**(2)** Mudslide or mud flow;

**(3)** Water that backs up from a sewer or drain; or

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings.

But if loss or damage by fire, explosion or sprinkler leakage results, we will pay for that resulting physical loss or physical damage.

**(5)** Water damage caused by or resulting from earthquake or volcanic eruption:

**(a)** Earthquake means a shaking or trembling of the earth's crust, caused by underground tectonic forces resulting in breaking, shifting, rising, settling, sinking or lateral movement or other movement;

**(b)** Volcanic eruption means the eruption, explosion or effusion of a volcano.

**g.** **Neglect**

Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**2.** We will not pay for physical loss or physical damage caused by or resulting from:

**a.** **Consequential Losses:** Delay, loss of use or loss of market.

**b** **Smoke, Vapor, Gas:** Smoke, vapor or gas from agricultural smudging or industrial operations.

**c.** **Miscellaneous Types of Loss:**

**(1)** Wear and tear;

**(2)** Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents, mold, spore or other animals;

## SPECIAL PROPERTY COVERAGE FORM

**(6)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if physical loss or physical damage by the "specified causes of loss", building glass breakage or Equipment Breakdown Accident results, we will pay for that resulting physical loss or physical damage.

**d.** **Frozen Plumbing:** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**e.** **Dishonesty:** Dishonest or criminal act by you, any of your partners, "members", officers, "managers", employees, directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)** Acting alone or in collusion with others; or

**(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees; but theft by employees is not covered.

**f.** **False Pretense:** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**g.** **Exposed Property:** Rain, snow, ice or sleet to personal property in the open, except as provided in the Coverage Extension for Outdoor Property.

**h.** **Collapse,** except as provided in the Additional Coverage for Collapse. But if loss or damage by a Covered Cause of Loss results at the "scheduled premises", we will pay for that resulting loss or damage.

**i.** **Pollution:** We will not pay for loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release or escape of "pollutants and

**SPECIAL PROPERTY COVERAGE FORM**

contaminants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." But if physical loss or physical damage by the "specified causes of loss" results, we will pay for the resulting physical loss or physical damage caused by the "specified cause of loss."

3. We will not pay for loss or damage caused by or resulting from any of the following. If physical loss or physical damage by a Covered Cause of Loss results, we will pay for that resulting physical loss or physical damage.

   a. **Weather conditions:** Weather conditions. This exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the physical loss or physical damage.

   b. **Acts or Decisions:** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

   c. **Negligent Work:** Faulty, inadequate or defective:

      (1) Planning, zoning, development, surveying, siting;

      (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

      (3) Materials used in repair, construction, renovation or remodeling; or

      (4) Maintenance of part or all of any property on or off the "scheduled premises".

4. **Business Income and Extra Expense Exclusions.** We will not pay for:

   a. Any Extra Expense, or increase of Business Income loss, caused by or resulting from:

      (1) Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

      (2) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations', we will cover such loss that affects your Business Income during the "period of restoration".

   b. Any other consequential loss.

5. **Equipment Breakdown Exclusion**

   We will not pay for physical loss or physical damage caused by or resulting from any of the following tests:

   (a) A hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel; or

   (b) An insulation breakdown test of any type of electrical equipment.

**C. LIMITS OF INSURANCE**

1. The most we will pay for physical loss or physical damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

2. The most we will pay for physical loss of or physical damage to outdoor signs attached to buildings is $5,000 per sign in any one occurrence.

3. The limits applicable to:

   a. Coverage Extensions; and

   b. The following Additional Coverages:

      (1) Accounts Receivable,

      (2) Fire Department Service Charges,

      (3) Fire Extinguisher Recharge, and

      (4) "Pollutants and Contaminants" Clean Up and Removal

   are in addition to the Limits of Insurance.

4. Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

   a. Preservation of Property; or

   b. Debris Removal; but if:

      (1) The sum of direct physical loss or physical damage and Debris Removal expense exceeds the Limit of Insurance; or

      (2) The Debris Removal expense exceeds the amount payable under the 25% limitation in the Debris Removal Additional Coverage.

   We will pay up to an additional $10,000 for each location stated in the Declarations in any one occurrence under the Debris Removal Additional Coverage.

5. **Building Limit - Automatic Increase**

   a. The Limit of Insurance for Buildings will automatically increase annually by 8%.

   b. The amount of increase will be:

      (1) The Limit of Insurance for Buildings that applied on the most recent of the policy

inception date, policy anniversary date, or the date of any other policy change amending the Buildings limit, times

**(2)** The percentage of annual increase shown above, expressed as a decimal (.08); times

**(3)** The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance for Buildings, divided by 365.

Example: The applicable Limit of Insurance for Buildings is $100,000. The annual percentage increase is 8%. The number of days since the beginning of the policy period (or last policy change) is 146.

The amount of increase is:

$100,000 X .08 X 146 divided by 365 = $3,200

**6. Business Personal Property Limit - Seasonal Increase**

**a.** The Limit of Insurance for Business Personal Property will automatically increase by 25% to provide for seasonal variations.

**b.** This increase will apply only if all Limits of Insurance shown in the Declarations for Business Personal Property at the "scheduled premises" is at least 100% of your average monthly values during the lesser of:

**(1)** The 12 months immediately preceding the date the physical loss or physical damage occurs; or

**(2)** The period of time you have been in business as of the date the physical loss or physical damage occurs.

**D. DEDUCTIBLES**

**1.** We will not pay for physical loss or physical damage in any one occurrence until the amount of physical loss or physical damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible up to the applicable Limit of Insurance.

**2.** Except as otherwise listed, the deductible applicable to Additional Coverages and Coverage Extensions is the Special Property Coverage Form is $250.

**3.** A $250 deductible applies to the following Glass Coverages, unless Glass Coverage is provided under a separate coverage form:

**SPECIAL PROPERTY COVERAGE FORM**

**a.** Building Glass

**b.** Glass Expense

**c.** Tenant Glass

**4.** Unless a separate deductible is shown in the Declarations, the deductible applicable to the following Additional Coverages or Coverage Extensions is $250, whether the coverage is provided under this coverage form, provided on a separate coverage form or the coverage is provided in a form that includes a package of coverages, such as a Stretch endorsement:

**a.** Accounts Receivable;

**b.** Fine Arts

**c.** Outdoor Signs; and

**d.** "Valuable Papers and Records";

**5.** Unless a separate deductible is shown in the Declarations, the deductible applicable to the following Additional Coverages or Coverage Extensions is $100, whether the coverage is provided under this coverage form, provided on a separate coverage form or the coverage is provided in a form that includes a package of coverages, such as a Stretch endorsement:

**a.** Employee Dishonesy; and

**b.** Temperature Change.

**6.** No deductible applies to the following Coverage Extensions and Additional Coverages:

**a.** Fire Extinguisher Recharge;

**b.** Preservation of Property;

**c.** Fire Department Service Charge;

**d.** Business Income, Extra Expense, Civil Authority and Extended Business Income;

**e.** Arson Reward; and

**f.** Lock and Key Replacement

**7.** The Deductible applicable to the following Additional Coverages is the policy deductible or the deductible shown in the Declarations for the following coverage:

**a.** Equipment Breakdown;

**b.** Ordinance or Law Coverage; and

**c.** Leasehold Improvements.

**8.** Each deductible applicable to this policy shall be applied separately but only to the coverage specified, and the total deductible for all losses in any one occurrence shall be the highest deductible amount that applies to the occurrence.

**E. PROPERTY LOSS CONDITIONS**

**1. Abandonment**

There can be no abandonment of any property to us.

**SPECIAL PROPERTY COVERAGE FORM**

**2. Appraisal**

If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In that event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss.

If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**3. Duties In The Event Of Loss Or Damage**

You must see that the following are done in the event of loss of or damage to Covered Property:

**a.** Notify the police if a law may have been broken.

**b.** Give us prompt notice of the physical loss or physical damage. Include a description of the property involved.

**c.** As soon as possible, give us description of how, when and where the physical loss or physical damage occurred.

**d.** Take all reseasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss. If feasible, set the damaged property aside in the best possible order for examination. Also, keep a record of your expenses for emergency and temporary repairs, for consideration in the settlement of the claim.

This will not increase the Limits of Insurance.

**e.** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**f.** Permit us to inspect the property and records proving the loss or damage. Also permit us to take samples of damaged property for inspection, testing and analysis.

**g.** If requested, permit us to question you under oath at such times as may be reasonably required about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed.

**h.** Send us a signed, sworn statement of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**i.** Cooperate with us in the investigation or settlement of the claim.

**j.** Resume part or all of your "operations" as quickly as possible.

**4. Legal Action Against Us**

No one may bring a legal action against us under this insurance unless:

**a.** There has been full compliance with all of the terms of this insurance; and

**b.** The action is brought within 2 years after the date on which the direct physical loss or physical damage occurred.

**5. Loss Payment**

In the event of physical loss or physical damage covered by this policy:

**a.** At our option we will either:

**(1)** Pay the value of physically lost or physically damaged property, as described in paragraph **d.** below;

**(2)** Pay the cost of repairing or replacing the physically lost or physically damaged property, plus any reduction in value of repaired items;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality.

**b.** We will give notice of our intentions within 30 days after we receive the sworn statement of loss.

**c.** We will not pay you more than your financial interest in the Covered Property.

**d.** We will determine the value of Covered Property as follows:

**(1)** At replacement cost (without deduction for depreciation), except as provided in **(2)** through **(7)** below.

**(a)** You may make a claim for physical loss or physical damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have physical loss or physical damage settled on an actual cash value basis, you may still make a claim on a

SPECIAL PROPERTY COVERAGE FORM

replacement cost basis if you notify us of your intent to do so within 180 days after the physical loss or physical damage.

(b) We will not pay on a replacement cost basis for any physical loss or physical damage:

(i) Until the physically lost or physically damaged property is actually repaired or replaced; and

(ii) Unless the repairs or replacement are made as soon as reasonably possible after the physical loss or physical damage.

However, if the cost to repair or replace the damaged property is $2,500 or less, we will settle the loss according to the provisions of Paragraphs d.(1)(a) and d.(1)(b) above whether or not the actual repair or replacement is complete.

(c) We will not pay more for physical loss or physical damage on a replacement cost basis than the least of:

(i) The cost to replace, on the same premises, the physically lost or physically damaged property with other property of comparable material and

quality and which is used for the same purpose; or

(ii) The amount you actually spend that is necessary to repair or replace the physically lost or physically damaged property.

(2) If the **Actual Cash Value - Buildings** option applies, as shown in the Declarations, paragraph (1) above does not apply to Buildings. Instead, we will determine the value of Buildings at actual cash value.

(3) The following property at actual cash value:

(a) Manuscripts;

(b) Works of art, antiques or rare articles, including etchings, pictures, statuary, objects of marble, bronzes, porcelains and bric-a-brac.

(c) Household contents, except personal property in apartments or rooms furnished by you as landlord.

(4) Glass at the cost of replacement with safety glazing material if required by law.

(5) "Tenants' Improvements and Betterments" at:

(a) Replacement cost if you make repairs promptly.

(b) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

(i) Multiply the original cost by the number of days from the physical loss or physical damage to the expiration of the lease; and

(ii) Divide the amount determined in (i) above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

(c) Nothing, if others pay for repairs or replacement.

(6) "Valuable Papers and Records", at the cost of:

(a) Blank materials for reproducing the records; and

(b) Labor to transcribe or copy the records.

(7) "Money" and "Securities":

(a) "Money" at its face value; and

(b) "Securities" at their value at the close of business on the day the loss is discovered.

(8) The value of United States Government Internal Revenue taxes and custom duties and refundable state and local taxes paid or fully determined on the following property held for sale will not be considered in determining the value of Covered Property:

(a) Distilled spirits;

(b) Wines;

SPECIAL PROPERTY COVERAGE FORM

(c) Rectified products; or

(d) Beer.

(9) Applicable to Accounts Receivable:

(a) If you can not accurately establish the amount of the accounts receivable outstanding as of the time of physical loss or physical damage the following method will be used:

(i) Determine the total of the average monthly value of accounts receivable for 12 months immediately preceding the month in which the direct physical loss or physical damage occurred; and

(ii) Adjust the total determined in paragraph (i) above for any normal fluctuations in the value of accounts receivable for the month in which the direct physical loss or physical damage occurred for any demonstrated variance from the average of that month.

(b) The following will be deducted from the total value of accounts receivable, however that value is established:

(i) The value of the accounts for which there is no physical loss or physical damage;

(ii) The value of the accounts that you are able to re-establish or collect;

(ii) A value to allow for probable bad debts that you are normally unable to collect; and

(iv) All unearned interest and services charged.

e. Our payment for physical loss of or physical damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of physically lost or physically damaged property if other than you. If we pay the owners, such payment will satisfy your claims against us for the owners' property.

We will not pay the owners more than their financial interest in the Covered Property.

f. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

g. We will pay for covered physical loss or physical damage within 30 days after we receive the sworn statement of loss, if:

(1) You have complied with all of the terms of this policy; and

(2) (a) We have reached agreement with you on the amount of loss, or

(b) An appraisal award has been made.

h. The following condition applies to any loss payment for Extra Expense:

We will deduct from the total Extra Expense to be paid:

(1) The salvage value that remains of any property bought for temporary use during the Period of Restoration, once business operations are resumed; and

(2) Any Extra Expense that is paid for by other insurance.

6. **Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, you may retain the property. But then you must return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limits of Insurance.

7. **Resumption of Operations**

In the event of physical loss or physical damage at the "scheduled premises" you must resume all or part of your "operations" as quickly as possible.

We will reduce the amount of your:

a. Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the "scheduled premises" or elsewhere.

b. Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

8. **Vacancy**

a. **Description of Terms**

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in Paragraphs.

SPECIAL PROPERTY COVERAGE FORM

**(a)** and **(b)** below:

    **(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

    **(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

        **(i)** Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

        **(ii)** Used by the building owner to conduct customary operations.

**(2)** Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where physical loss or physical damage occurs has been vacant for more than 60 consecutive days before that physical loss or physical damage occurs:

    **(1)** We will not pay for any physical loss or physical damage caused by any of the following even if they are Covered Causes of Loss:

        **(a)** Vandalism;

        **(b)** Sprinkler leakage, unless you had protected the system against freezing;

        **(c)** Building glass breakage;

        **(d)** Water damage;

        **(e)** Theft; or

        **(f)** Attempted theft.

    **(2)** With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the physical loss or physical damage by 15%.

**F. PROPERTY GENERAL CONDITIONS**

**1. Control of Property**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Form at one or more locations will not affect coverage at any location where, at the time of physical loss or physical damage, the breach of condition does not exist.

**2. Mortgage Holders**

    **a.** The term mortgage holder includes trustee.

    **b.** We will pay for covered physical loss of or physical damage to buildings or structures to each mortgage holder shown in the Declarations in their order of precedence, as interests may appear.

    **c.** The mortgage holder has the right to receive loss payment even if the mortgage holder has started foreclosure or similar action on the building or structure.

    **d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this policy, the mortgage holder will still have the right to receive loss payment if the mortgage holder:

        **(1)** Pays any premium due under this policy at our request if you have failed to do so;

        **(2)** Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so; and

        **(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgage holder.

All of the terms of this policy will then apply directly to the mortgage holder.

    **e.** If we pay the mortgage holder for any physical loss or physical damage and deny payment to you because of your acts or because you have failed to comply with the terms of this policy:

        **(1)** The mortgage holder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

        **(2)** The mortgage holder's rights to recover the full amount of the mortgage holder's claim will not be impaired.

At our option, we may pay to the mortgage holder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**SPECIAL PROPERTY COVERAGE FORM**

    **f.** If we cancel this policy, we will give written notice to the mortgage holder at least:

        **(1)** 10 days before the effective date of cancellation if we cancel for your non payment of premium; or

        **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

    **g.** If we elect not to renew this policy, we will give written notice to the mortgage holder at least 10 days before the expiration date of this policy.

**3. No Benefit to Bailee**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**4. Policy Period, Coverage Territory**

Under this form:

    **a.** We cover physical loss or physical damage commencing:

        **(1)** During the policy period shown in the Declarations; and

        **(2)** Within the coverage territory or, with respect to property in transit, while it is between points in the coverage territory.

    But we do not cover physical loss or physical damage that is also covered by a preceding policy.

    **b.** The coverage territory is:

        **(1)** The United States of America (including its territories and possessions);

        **(2)** Puerto Rico; and

        **(3)** Canada.

**5.** Additional Conditions

The following conditions apply to paragraph A.5.u., Forgery Additional Coverage:

    **a.** We will treat mechanically reproduced facsimile signatures the same as handwritten signatures.

    **b.** You must include with your proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

    **c.** The Coverage Territory is revised to cover loss you sustain anywhere in the world.

**G. PROPERTY DEFINITIONS**

**1.** "Computer" means a programmable electronic device that can store, retrieve and process "data".

**2.** "Computer Equipment" means "computers", "peripheral devices", "media", and manuals that are purchased to be used in conjunction with hardware and "software".

**3.** "Counterfeit" means an imitation of an actual valid original which is intended to deceive and to be taken as the original.

**4.** "Data" means information or facts stored in a "computer's" memory, on "software" or on "media".

**5.** "Finished Stock" means stock you have manufactured.

"Finished Stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this policy.

**6.** "Manager" means a person serving in a directorial capacity for a limited liability company.

**7.** "Media" means the material used solely with the "computer" or "peripheral device" upon which "software" or "data" is stored, such as tapes, CD-ROMs or disks.

**8.** "Member" means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager".

**9.** "Messenger" means you, any any of your partners or any employee while having care and custody of the property outside your premises.

**10.** "Money" means:

    **a.** Currency, coins and bank notes whether or not in current use; and

    **b.** Travelers checks, registered checks and money orders held for sale to the public.

**11.** "Operations" means your business activities occurring at the "scheduled premises" and tenantability of the "scheduled premises".

**12.** "Period of Restoration" means the period of time that:

    **a.** Begins with the date of direct physical loss or physical damage caused by or resulting from a Covered Cause of Loss at the "scheduled premises", and

    **b.** Ends on the date when:

        **(1)** The property at the "scheduled premises" should be repaired, rebuilt or replaced with reasonable speed and similar quality;

        **(2)** The date when your business is resumed at a new, permanent location.

SPECIAL PROPERTY COVERAGE FORM

"Period of Restoration" does not include any increased period required due to enforcement of any law that:

**a.** Regulates the construction, use or repair, or required the tearing down of any property; or

**b.** Regulates the prevention, control, repair, clean up or restoration of environmental damage.

The expiration date of this policy will not cut short the "period of restoration".

**13.** "Peripheral Device" means any physical unit used to operate the "computer" that cannot be used for purposes other than as part of the computer's system, such as tape or disk drives, printers, or modems.

**14.** "Perishable Stock" means personal property:

**a.** Maintained under controlled conditions for its preservation; and

**b.** Susceptible to physical loss or physical damage if the controlled conditions change.

**15.** "Pollutants and Contaminants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, chemicals and waste, or any other material which causes or threatens to cause physical loss, physical damage, impurity to property, unwholesomeness, undesirability, loss of marketability, loss of use of property, or which threatens human health or welfare. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Scheduled Premises" means any premises listed by location address in the Scheduled Premises section of the Declarations.

**17.** "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or other property and includes:

**a.** Tokens, tickets except Lottery Tickets, revenue and other non-postage stamps whether or not in current use; and

**b.** Evidences of debt issued in connection with credit or charge cards, which are not of your own issue;

but does not include "money."

**18.** "Software" means instructions or programs that are stored on "media" and which instruct the hardware as to how to process "data".

**19.** "Specified Cause of Loss" means the following:

Fire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

**a.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. It does not include the cost of filling sinkholes.

**b.** Falling objects does not include loss of or damage to:

**(1)** Personal property in the open; or

**(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

**c.** Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam.

**20.** "Suit" means a civil proceeding and includes:

**a.** An arbitration proceeding in which damages are claimed and to which you must submit or do submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which damages are claimed and to which you submit with our consent.

**21.** "Tenant Improvements and Betterments" means fixtures, alterations, installations or additions made a part of the Building you occupy but do not own and that you cannot legally remove; and

**a.** Which are made at your expense; or

**b.** That you acquired from the prior tenant at your expense.

**22.** "Theft" means the act of stealing.

**23.** "Valuable papers and records" means inscribed, printed or written documents, manuscripts or records, including abstracts, books, deeds, drawings, films, maps or mortgages.

But "valuable papers and records" does not mean "money" and "securities", "data" and "software" or the materials on which the "data" and "software" is recorded.

Form SS 00 07 07 05

B

 **BELFOR Property Restoration**

138 Bartlett St, Marlborough MA, 01752
(866) 914-0939 Tel. - (508) 544-4324 Fax
MA License # 59495 - Fed ID # 84-1309171

| | |
|---|---|
| Client: | GSNRH |
| Property: | 250 Worcester Rd |
| | Framingham, MA 01701 |
| | |
| Operator: | JASON.CA |
| | |
| Estimator: | Jason Camerano |

Business: (774) 721-6714
E-mail: jason.camerano@us.belfor.com

| | |
|---|---|
| Type of Estimate: | Freeze |
| Date Entered: | 3/15/2016 |

Date Assigned:

| | |
|---|---|
| Price List: | MABO8X_FEB16 |
| Labor Efficiency: | Restoration/Service/Remodel |
| Estimate: | 19-16-GSRNH_REP |

We would like to thank you for the opportunity to provide you with this estimate. The total cost for the repairs detailed in the following estimate is **$103,954.76**.

The attached estimate details the specific work to be completed. Additional work outside of that specified in this estimate will be through separate proposal(s) and/or change order(s) detailing the additional/changed scope of work as well as the terms and pricing of those changes. Repairs will be scheduled after a signed copy of this estimate is received.

Progress payments may be billed at 25%, 50%, 75%, and 90% of completion with the balance due upon substantial completion of this scope of work. Change orders will be billed as completed and credits will be applied to the final contract billing.

Unless noted otherwise, the customer is required to provide heat, water and electricity on-site for the duration of this project. The customer is responsible for providing continuous access to the project area during normal business hours, Monday - Friday, 8:00 am - 5:00 pm. Where an item is being replaced, we will be matching the existing item's quality, color, finish, texture or material as close as possible where applicable unless noted otherwise, there is no guaranty either specified or implied on exact matches . This estimate does not include hazardous material testing or abatement unless specifically detailed in the following estimate.

This estimate is valid for 30 days from 3/21/2016. If you have any questions about this estimate, please contact Jason Camerano to discuss those questions.

I/we agree to the terms and conditions of this proposal.

_____   Date_____        _____   Date_____
Owner/Authorized signature                                                        BELFOR Representative



**BELFOR Property Restoration**

138 Bartlett St, Marlborough MA, 01752
(866) 914-0939 Tel. - (508) 544-4324 Fax
MA License # 59495 - Fed ID # 84-1309171

### 19-16-GSRNH_REP
### Main Level

**Front DR**                                                                    Height: 8'

| Missing Wall | 4' 2" X 8' | Opens into RAMP |
| Missing Wall | 12' 2" X 8' | Opens into RAMP |

| DESCRIPTION | | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|---|
| 1. Tear out non-salv wood floor & bag - Category 3 water | 410.64 | SF @ | 4.23 | = | 1,737.01 |
| 2. Floor preparation for resilient flooring | 410.64 | SF @ | 0.57 | = | 234.06 |
| 3. Pre-finished solid wood flooring (High grade) | 410.64 | SF @ | 10.61 | = | 4,356.89 |
| 4. Add for glued down application over concrete substrate | 410.64 | SF @ | 1.06 | = | 435.28 |
| 5. Painter - per hour | 4.00 | HR @ | 78.23 | = | 312.92 |
|     Pint touch-up to walls after flooring replaced | | | | | |
| 6. Painting supplies | 1.00 | EA @ | 75.00 | = | 75.00 |

**Ramp**                                                                        Height: 8'

| Missing Wall | 12' 2" X 8' | Opens into FRONT_DR |
| Missing Wall | 4' 2" X 8' | Opens into FRONT_DR |

| DESCRIPTION | | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|---|
| 7. Tear out non-salv wood floor & bag - Category 3 water | 50.69 | SF @ | 4.23 | = | 214.42 |
| 8. Floor preparation for resilient flooring | 50.69 | SF @ | 0.57 | = | 28.89 |
| 9. Screw down existing subfloor - eliminate floor squeaks | 50.69 | SF @ | 0.62 | = | 31.43 |
| 10. Pre-finished solid wood flooring (High grade) | 50.69 | SF @ | 10.61 | = | 537.82 |
| 11. Add for glued down application over wood substrate | 50.69 | SF @ | 1.06 | = | 53.73 |
| 12. Painter - per hour | 2.00 | HR @ | 78.23 | = | 156.46 |
|     Pint touch-up to walls & balustrade after flooring replaced | | | | | |
| 13. Painting supplies | 1.00 | EA @ | 75.00 | = | 75.00 |
| 14. Detach & Reset Balustrade | 12.00 | LF @ | 96.90 | = | 1,162.80 |

**Middle DR**                                                                   Height: 8'

| Missing Wall | 5' 6" X 8' | Opens into ENTRY |

| DESCRIPTION | | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|---|
| 15. Tear out non-salv wood floor & bag - Category 3 water | 1,368.09 | SF @ | 4.23 | = | 5,787.02 |
|     2 layers of hardwood flooring | | | | | |
| 16. Screw down existing subfloor - eliminate floor squeaks | 684.04 | SF @ | 0.62 | = | 424.10 |
| 17. Underlayment - 3/4" BC plywood | 684.04 | SF @ | 2.30 | = | 1,573.29 |

19-16-GSRNH_REP                                                    3/21/2016          Page: 2



**BELFOR Property Restoration**

138 Bartlett St, Marlborough MA, 01752
(866) 914-0939 Tel. - (508) 544-4324 Fax
MA License # 59495 - Fed ID # 84-1309171

**CONTINUED - Middle DR**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 18. Pre-finished solid wood flooring (High grade) | 684.04 SF @ | 10.61 = | 7,257.66 |
| 19. Add for glued down application over wood substrate | 684.04 SF @ | 1.06 = | 725.08 |
| 20. Painter - per hour | 8.00 HR @ | 78.23 = | 625.84 |
| Pint touch-up to walls after flooring replaced | | | |
| 21. Painting supplies | 1.00 EA @ | 150.00 = | 150.00 |
| 22. Finish Carpenter - per hour | 10.00 HR @ | 63.45 = | 634.50 |
| Detach & reset 20lf of foot rest for bar | | | |

**Entry**                                                                                   Height: 8'

**Missing Wall**          5' 6" X 8'                    Opens into MIDDLE_DR

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 23. Screw down existing subfloor - eliminate floor squeaks | 88.92 SF @ | 0.62 = | 55.13 |
| 24. Underlayment - 3/4" BC plywood | 88.92 SF @ | 2.30 = | 204.52 |
| 25. Pre-finished solid wood flooring (High grade) | 88.92 SF @ | 10.61 = | 943.44 |
| 26. Add for glued down application over wood substrate | 88.92 SF @ | 1.06 = | 94.26 |
| 27. Painter - per hour | 4.00 HR @ | 78.23 = | 312.92 |
| Pint touch-up to walls after flooring replaced | | | |
| 28. Painting supplies | 1.00 EA @ | 75.00 = | 75.00 |

**Bathroom 1**                                                                             Height: 8'

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 29. Additional charge for screwing down underlayment | 54.00 SF @ | 0.63 = | 34.02 |
| 30. Underlayment - 3/4" BC plywood | 54.00 SF @ | 2.30 = | 124.20 |
| 31. 1/2" Cement board | 54.00 SF @ | 3.75 = | 202.50 |
| 32. Ceramic/porcelain tile | 54.00 SF @ | 10.62 = | 573.48 |
| Floor tile | | | |
| 33. R&R Ceramic/porcelain tile | 150.00 SF @ | 12.28 = | 1,842.00 |
| Wall tile | | | |
| 34. R&R Glass tile | 30.00 SF @ | 24.27 = | 728.10 |
| 35. R&R 1/2" Cement board | 150.00 SF @ | 4.51 = | 676.50 |

19-16-GSRNH_REP                                    3/21/2016                    Page: 3



**BELFOR Property Restoration**

138 Bartlett St, Marlborough MA, 01752
(866) 914-0939 Tel. - (508) 544-4324 Fax
MA License # 59495 - Fed ID # 84-1309171

**CONTINUED - Bathroom 1**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 36. R&R Furring strip - 1" x 2" | 150.00 | SF @ | 1.18 | = | 177.00 |
| 37. Seal grout on tile wall | 150.00 | SF @ | 1.19 | = | 178.50 |
| 38. Grout sealer | 54.00 | SF @ | 1.10 | = | 59.40 |
| 39. Seal/prime then paint more than the floor perimeter twice (3 coats) | 90.00 | SF @ | 1.29 | = | 116.10 |
| 40. Mask and prep for paint - tape only (per LF) | 30.00 | LF @ | 0.63 | = | 18.90 |
| 41. Toilet - Detach & reset | 1.00 | EA @ | 228.39 | = | 228.39 |
| 42. Sink - wall mounted - Detach & reset | 1.00 | EA @ | 229.89 | = | 229.89 |
| 43. Bathroom mirror - Detach & reset | 10.00 | SF @ | 8.10 | = | 81.00 |
| 44. Handicap grab bar - Detach & reset | 2.00 | EA @ | 29.16 | = | 58.32 |
| 45. Toilet paper dispenser - Detach & reset | 1.00 | EA @ | 28.03 | = | 28.03 |
| 46. Detach & Reset Soap dispenser - wall mounted | 1.00 | EA @ | 13.34 | = | 13.34 |
| 47. Remove Paper towel dispenser | 1.00 | EA @ | 13.82 | = | 13.82 |
| 48. (Install) Paper towel dispenser | 1.00 | EA @ | 18.23 | = | 18.23 |
| 49. Interior door - Detach & reset - slab only | 1.00 | EA @ | 16.92 | = | 16.92 |
| 50. Paint door slab only - 2 coats (per side) | 2.00 | EA @ | 37.39 | = | 74.78 |
| 51. Paint door opening - 2 coats (per side) | 2.00 | EA @ | 31.79 | = | 63.58 |
| 52. Paint window opening - Large - 2 coats (per side) | 1.00 | EA @ | 37.39 | = | 37.39 |

**Janitors Closet**          **Height: 8'**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 53. Additional charge for screwing down underlayment | 12.00 | SF @ | 0.63 | = | 7.56 |
| 54. Underlayment - 3/4" BC plywood | 12.00 | SF @ | 2.30 | = | 27.60 |
| 55. 1/2" Cement board | 12.00 | SF @ | 3.75 | = | 45.00 |
| 56. Ceramic/porcelain tile | 12.00 | SF @ | 10.62 | = | 127.44 |
| Floor tile | | | | | |
| 57. Ceramic tile base | 16.00 | LF @ | 16.78 | = | 268.48 |
| 58. Grout sealer | 12.00 | SF @ | 1.10 | = | 13.20 |
| 59. Seal/prime then paint the walls and ceiling twice (3 coats) | 140.00 | SF @ | 1.29 | = | 180.60 |
| 60. Mask and prep for paint - tape only (per LF) | 16.00 | LF @ | 0.63 | = | 10.08 |
| 61. Interior door - Detach & reset - slab only | 1.00 | EA @ | 16.92 | = | 16.92 |
| 62. Paint door slab only - 2 coats (per side) | 1.00 | EA @ | 37.39 | = | 37.39 |
| 63. Paint door opening - 2 coats (per side) | 1.00 | EA @ | 31.79 | = | 31.79 |
| 64. Shelving - wire (vinyl coated) - Detach & reset | 6.00 | LF @ | 7.39 | = | 44.34 |
| 65. Detach & Reset Laundry tub | 1.00 | EA @ | 278.79 | = | 278.79 |



**BELFOR Property Restoration**

138 Bartlett St, Marlborough MA, 01752
(866) 914-0939 Tel. - (508) 544-4324 Fax
MA License # 59495 - Fed ID # 84-1309171

## CONTINUED - Janitors Closet

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|

**Bathroom 2**                        **Height: 8'**

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 66. Additional charge for screwing down underlayment | 54.00 | SF @ | 0.63 = | 34.02 |
| 67. Underlayment - 3/4" BC plywood | 54.00 | SF @ | 2.30 = | 124.20 |
| 68. 1/2" Cement board | 54.00 | SF @ | 3.75 = | 202.50 |
| 69. Ceramic/porcelain tile | 54.00 | SF @ | 10.62 = | 573.48 |
| Floor tile | | | | |
| 70. R&R Ceramic/porcelain tile | 150.00 | SF @ | 12.28 = | 1,842.00 |
| Wall tile | | | | |
| 71. R&R Glass tile | 30.00 | SF @ | 24.27 = | 728.10 |
| 72. R&R 1/2" Cement board | 150.00 | SF @ | 4.51 = | 676.50 |
| 73. R&R Furring strip - 1" x 2" | 150.00 | SF @ | 1.18 = | 177.00 |
| 74. Seal grout on tile wall | 150.00 | SF @ | 1.19 = | 178.50 |
| 75. Grout sealer | 54.00 | SF @ | 1.10 = | 59.40 |
| 76. Seal/prime then paint more than the floor perimeter twice (3 coats) | 90.00 | SF @ | 1.29 = | 116.10 |
| 77. Mask and prep for paint - tape only (per LF) | 30.00 | LF @ | 0.63 = | 18.90 |
| 78. Toilet - Detach & reset | 1.00 | EA @ | 228.39 = | 228.39 |
| 79. Sink - wall mounted - Detach & reset | 1.00 | EA @ | 229.89 = | 229.89 |
| 80. Bathroom mirror - Detach & reset | 10.00 | SF @ | 8.10 = | 81.00 |
| 81. Handicap grab bar - Detach & reset | 2.00 | EA @ | 29.16 = | 58.32 |
| 82. Toilet paper dispenser - Detach & reset | 1.00 | EA @ | 28.03 = | 28.03 |
| 83. Detach & Reset Soap dispenser - wall mounted | 1.00 | EA @ | 13.34 = | 13.34 |
| 84. Remove Paper towel dispenser | 1.00 | EA @ | 13.82 = | 13.82 |
| 85. (Install) Paper towel dispenser | 1.00 | EA @ | 18.23 = | 18.23 |
| 86. Interior door - Detach & reset - slab only | 1.00 | EA @ | 16.92 = | 16.92 |
| 87. Paint door slab only - 2 coats (per side) | 2.00 | EA @ | 37.39 = | 74.78 |
| 88. Paint door opening - 2 coats (per side) | 2.00 | EA @ | 31.79 = | 63.58 |

**Storage Closet**                        **Height: 8'**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|



**BELFOR Property Restoration**

138 Bartlett St, Marlborough MA, 01752
(866) 914-0939 Tel. - (508) 544-4324 Fax
MA License # 59495 - Fed ID # 84-1309171

**CONTINUED - Storage Closet**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 89.  Additional charge for screwing down underlayment | 12.00 | SF @ | 0.63 = | | 7.56 |
| 90.  Underlayment - 3/4" BC plywood | 12.00 | SF @ | 2.30 = | | 27.60 |
| 91.  1/2" Cement board | 12.00 | SF @ | 3.75 = | | 45.00 |
| 92.  Ceramic/porcelain tile | 12.00 | SF @ | 10.62 = | | 127.44 |
|       Floor tile | | | | | |
| 93.  Ceramic tile base | 16.00 | LF @ | 16.78 = | | 268.48 |
| 94.  Grout sealer | 12.00 | SF @ | 1.10 = | | 13.20 |
| 95.  Seal/prime then paint the walls and ceiling twice (3 coats) | 140.00 | SF @ | 1.29 = | | 180.60 |
| 96.  Mask and prep for paint - tape only (per LF) | 16.00 | LF @ | 0.63 = | | 10.08 |
| 97.  Interior door - Detach & reset - slab only | 1.00 | EA @ | 16.92 = | | 16.92 |
| 98.  Paint door slab only - 2 coats (per side) | 1.00 | EA @ | 37.39 = | | 37.39 |
| 99.  Paint door opening - 2 coats (per side) | 1.00 | EA @ | 31.79 = | | 31.79 |
| 100.  Shelving - wire (vinyl coated) - Detach & reset | 6.00 | LF @ | 7.39 = | | 44.34 |

**Hallway**                                                                      Height: 8'

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 101.  Tear out non-salv wood floor & bag - Category 3 water | 72.00 | SF @ | 4.23 = | | 304.56 |
|        2 layers of hardwood flooring | | | | | |
| 102.  Screw down existing subfloor - eliminate floor squeaks | 36.00 | SF @ | 0.62 = | | 22.32 |
| 103.  Underlayment - 3/4" BC plywood | 36.00 | SF @ | 2.30 = | | 82.80 |
| 104.  Pre-finished solid wood flooring (High grade) | 36.00 | SF @ | 10.61 = | | 381.96 |
| 105.  Add for glued down application over wood substrate | 36.00 | SF @ | 1.06 = | | 38.16 |
| 106.  R&R Cove base molding - rubber or vinyl, 4" high | 12.00 | LF @ | 2.20 = | | 26.40 |
| 107.  Painter - per hour | 2.00 | HR @ | 78.23 = | | 156.46 |
|        Pint touch-up to walls after flooring replaced | | | | | |
| 108.  Painting supplies | 1.00 | EA @ | 50.00 = | | 50.00 |

**Base Level**

**Water Main Closet**                                                            Height: 8'

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|

19-16-GSRNH_REP                                          3/21/2016          Page: 6



**BELFOR Property Restoration**

138 Bartlett St, Marlborough MA, 01752
(866) 914-0939 Tel. - (508) 544-4324 Fax
MA License # 59495 - Fed ID # 84-1309171

### CONTINUED - Water Main Closet

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 109. R&R Interior door - solid oak - paneled - pre-hung unit | 1.00 EA @ | 420.75 = | 420.75 |
| 110. R&R Door knob - interior | 1.00 EA @ | 52.36 = | 52.36 |

**Pump Area**                                                             Height: 8'

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 111. 2" x 4" lumber (.667 BF per LF) | 48.00 LF @ | 2.09 = | 100.32 |
| 112. Access Panel | 1.00 EA @ | 105.67 = | 105.67 |

**Office**                                                                Height: 8'

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| 113. 1/2" drywall - hung, taped, with smooth wall finish | 64.00 SF @ | 2.64 = | 168.96 |
| 114. Seal/prime then paint the ceiling twice (3 coats) | 243.50 SF @ | 1.29 = | 314.12 |
| 115. Mask and prep for paint - tape only (per LF) | 67.00 LF @ | 0.63 = | 42.21 |
| 116. Painter - per hour | 4.00 HR @ | 78.23 = | 312.92 |
| Additional time to navigate around exposed pipes & wires in this room | | | |
| 117. Batt insulation - 4" - R15 - paper faced | 268.00 SF @ | 1.18 = | 316.24 |
| 118. Furring strip - 1" x 2" | 268.00 SF @ | 0.81 = | 217.08 |
| 119. Underlayment - 1/2" particle board | 268.00 SF @ | 1.70 = | 455.60 |
| 120. Paneling - High grade | 536.00 SF @ | 2.35 = | 1,259.60 |
| 121. Crown molding - 3 1/4" stain grade | 67.00 LF @ | 5.29 = | 354.43 |
| 122. Baseboard - 3 1/4" stain grade | 67.00 LF @ | 3.40 = | 227.80 |
| 123. Stain & finish crown molding | 67.00 LF @ | 1.73 = | 115.91 |
| 124. Stain & finish baseboard | 67.00 LF @ | 1.62 = | 108.54 |
| 125. Casing - 2 1/4" stain grade | 54.00 LF @ | 2.35 = | 126.90 |
| 126. Stain & finish casing | 54.00 LF @ | 1.62 = | 87.48 |
| 127. Stain & finish door slab only (per side) | 4.00 EA @ | 59.70 = | 238.80 |
| 128. 2" x 4" lumber (.667 BF per LF) | 32.00 LF @ | 2.09 = | 66.88 |
| 129. Regrout tile | 243.50 SF @ | 3.10 = | 754.85 |
| 130. Grout sealer | 243.50 SF @ | 1.10 = | 267.85 |



**BELFOR Property Restoration**

138 Bartlett St, Marlborough MA, 01752
(866) 914-0939 Tel. - (508) 544-4324 Fax
MA License # 59495 - Fed ID # 84-1309171

**Basement Bathroom**                                                                                   Height: 8'

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 131. R&R Bead board - 1/4" to 3/8" hardwood | 193.65 | SF @ | 3.33 = | 644.86 |
| 132. Furring strip - 1" x 2" | 193.65 | SF @ | 0.81 = | 156.86 |
| 133. Stain and finish wood judges paneling | 193.65 | SF @ | 4.97 = | 962.44 |
| 134. Countertop - flat laid plastic laminate | 4.00 | LF @ | 36.59 = | 146.36 |
| 135. Vanity - High grade | 4.00 | LF @ | 155.67 = | 622.68 |
| 136. (Install) Sink - single | 1.00 | EA @ | 102.23 = | 102.23 |
| 137. (Install) Sink faucet - Bathroom | 1.00 | EA @ | 73.60 = | 73.60 |
| 138. Stain & finish baseboard - oversized | 21.01 | LF @ | 1.81 = | 38.03 |
| 139. R&R Baseboard - 4 1/4" hardwood | 21.01 | LF @ | 5.90 = | 123.95 |
| 140. Toilet - Reset | 1.00 | EA @ | 139.00 = | 139.00 |
| 141. R&R Baseboard heater replacement cover | 4.00 | LF @ | 9.37 = | 37.48 |
| 142. Toilet paper dispenser - Detach & reset | 1.00 | EA @ | 28.03 = | 28.03 |
| 143. Remove Paper towel dispenser | 1.00 | EA @ | 13.82 = | 13.82 |
| 144. (Install) Paper towel dispenser | 1.00 | EA @ | 18.23 = | 18.23 |
| 145. Soap dispenser - Detach & reset | 1.00 | EA @ | 26.51 = | 26.51 |
| 146. Regrout tile | 25.58 | SF @ | 3.10 = | 79.30 |
| 147. Grout sealer | 25.58 | SF @ | 1.10 = | 28.14 |

**Storage Room**                                                                                       Height: 8'

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 148. 2" x 4" lumber - treated (.667 BF per LF)<br>Framing of the wall around the clean-out | 128.00 | LF @ | 2.20 = | 281.60 |
| 149. R&R Bead board - 1/4" to 3/8" hardwood | 618.13 | SF @ | 3.33 = | 2,058.38 |
| 150. Special Doors - Cleanout access | 1.00 | EA @ | 105.67 = | 105.67 |
| 151. R&R Batt insulation - 4" - R15 - paper faced | 445.27 | SF @ | 1.41 = | 627.83 |
| 152. Furring strip - 1" x 2" | 618.13 | SF @ | 0.81 = | 500.69 |
| 153. Seal/prime then paint the walls and ceiling twice (3 coats) | 618.13 | SF @ | 1.29 = | 797.39 |
| 154. Mask and prep for paint - tape only (per LF) | 55.66 | LF @ | 0.63 = | 35.07 |
| 155. R&R Baseboard heater replacement cover | 10.00 | LF @ | 9.37 = | 93.70 |
| 156. Regrout tile | 172.86 | SF @ | 3.10 = | 535.87 |
| 157. Grout sealer | 172.86 | SF @ | 1.10 = | 190.15 |

**Basement Kitchen**                                                                                    Height: 8'

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 158. Batt insulation - 4" - R15 - paper faced | 320.00 | SF @ | 1.18 = | 377.60 |

19-16-GSRNH_REP                                                                 3/21/2016                Page: 8



**BELFOR Property Restoration**

138 Bartlett St, Marlborough MA, 01752
(866) 914-0939 Tel. - (508) 544-4324 Fax
MA License # 59495 - Fed ID # 84-1309171

**CONTINUED - Basement Kitchen**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 159.  Batt insulation - 10" - R30 - unfaced batt | 216.00 | SF @ | 1.47 | = | 317.52 |
| 160.  Furring strip - 1" x 2" | 536.00 | SF @ | 0.81 | = | 434.16 |
| 161.  5/8" drywall - hung, taped, with smooth wall finish | 216.00 | SF @ | 2.79 | = | 602.64 |
| 162.  Sheathing - plywood - 1/2" - treated | 72.00 | SF @ | 1.93 | = | 138.96 |
| 163.  Seal/prime then paint the surface area twice (3 coats) | 72.00 | SF @ | 1.29 | = | 92.88 |
| 164.  Seal/prime then paint the ceiling twice (3 coats) | 644.50 | SF @ | 1.29 | = | 831.41 |
| 165.  Mask and prep for paint - tape only (per LF) | 111.00 | LF @ | 0.63 | = | 69.93 |
| 166.  Painter - per hour | 8.00 | HR @ | 78.23 | = | 625.84 |
| Additional time to navigate around exposed pipes & wires in this room | | | | | |
| 167.  5/8" drywall - hung & fire taped only | 320.00 | SF @ | 1.65 | = | 528.00 |
| 168.  Backsplash - Sheetmetal - Commercial | 320.00 | SF @ | 14.00 | = | 4,480.00 |
| 169.  Finish Carpenter - per hour | 20.00 | HR @ | 63.45 | = | 1,269.00 |
| Resetting of all kitchen fixtures in preparation for the plumber & electrician to reconnect | | | | | |
| 170.  Plumber - per hour | 16.00 | HR @ | 115.00 | = | 1,840.00 |
| Connection of the plumbing fixtures in the kitchen | | | | | |
| 171.  Electrician - per hour | 16.00 | HR @ | 95.57 | = | 1,529.12 |
| Connection of the plumbing fixtures in the kitchen | | | | | |
| 172.  Regrout tile | 644.50 | SF @ | 3.10 | = | 1,997.95 |
| 173.  Grout sealer | 644.50 | SF @ | 1.10 | = | 708.95 |

**Lower Steps**                                                                              **Height: 17'**

**Missing Wall**                    4' X 17'                    **Opens into Exterior**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 174.  Seal/prime then paint the walls twice (3 coats) | 130.40 | SF @ | 1.29 | = | 168.22 |
| 175.  Mask and prep for paint - tape only (per LF) | 10.17 | LF @ | 0.63 | = | 6.41 |
| 176.  Add for glued down application over wood substrate | 59.50 | SF @ | 1.06 | = | 63.07 |
| 177.  Carpet | 59.50 | SF @ | 2.90 | = | 172.55 |
| 178.  Step charge for "waterfall" carpet installation | 7.00 | EA @ | 6.23 | = | 43.61 |

**Upper Steps**                                                                              **Height: 17'**



**BELFOR Property Restoration**

138 Bartlett St, Marlborough MA, 01752
(866) 914-0939 Tel. - (508) 544-4324 Fax
MA License # 59495 - Fed ID # 84-1309171

| Missing Wall | 4' X 17' | | Opens into LANDING | |
|---|---|---|---|---|
| **DESCRIPTION** | | **QTY** | **UNIT PRICE** | **TOTAL** |
| 179. 5/8" drywall - hung, taped, with smooth wall finish | | 32.00 SF @ | 2.79 = | 89.28 |
| 180. Seal/prime then paint the walls twice (3 coats) | | 130.40 SF @ | 1.29 = | 168.22 |
| 181. Mask and prep for paint - tape only (per LF) | | 10.17 LF @ | 0.63 = | 6.41 |
| 182. Add for glued down application over wood substrate | | 59.50 SF @ | 1.06 = | 63.07 |
| 183. Carpet | | 59.50 SF @ | 2.90 = | 172.55 |
| 184. Step charge for "waterfall" carpet installation | | 7.00 EA @ | 6.23 = | 43.61 |

| Landing | | | | Height: 10' |
|---|---|---|---|---|
| Missing Wall | 4' X 10' | | Opens into UPPER_STEPS | |
| **DESCRIPTION** | | **QTY** | **UNIT PRICE** | **TOTAL** |
| 185. 5/8" drywall - hung, taped, with smooth wall finish | | 32.00 SF @ | 2.79 = | 89.28 |
| 186. Seal/prime then paint the walls twice (3 coats) | | 204.00 SF @ | 1.29 = | 263.16 |
| 187. Mask and prep for paint - tape only (per LF) | | 24.83 LF @ | 0.63 = | 15.64 |
| 188. Add for glued down application over wood substrate | | 34.00 SF @ | 1.06 = | 36.04 |
| 189. Carpet | | 34.00 SF @ | 2.90 = | 98.60 |

| General | | | | |
|---|---|---|---|---|
| **DESCRIPTION** | | **QTY** | **UNIT PRICE** | **TOTAL** |
| 190. Commercial Supervision / Project Management - per hour | | 96.00 HR @ | 69.44 = | 6,666.24 |
| 191. Dumpster load - Approx. 30 yards, 5-7 tons of debris | | 2.00 EA @ | 630.00 = | 1,260.00 |
| 192. Cleaning Technician - per hour | | 64.00 HR @ | 32.66 = | 2,090.24 |
| 193. Taxes, insurance, permits & fees (Bid item) - OPEN ITEM | | 1.00 EA @ | | 0.00 |
| 194. Content Manipulation (Bid Item) - OPEN ITEM | | 1.00 EA @ | | 0.00 |
| Content packing, moving to storage, offsite storage & return to restaurant | | | | |
| 195. Electrical (Bid Item) - OPEN ITEM | | 1.00 EA @ | | 0.00 |
| 196. Plumbing (Bid Item) - OPEN ITEM | | 1.00 EA @ | | 0.00 |
| 197. Fire Protection Systems (Bid Item) - OPEN ITEM | | 1.00 EA @ | | 0.00 |
| 198. Heat, Vent, & Air Conditioning (Bid Item) - OPEN ITEM | | 1.00 EA @ | | 0.00 |



**BELFOR Property Restoration**

138 Bartlett St, Marlborough MA, 01752
(866) 914-0939 Tel. - (508) 544-4324 Fax
MA License # 59495 - Fed ID # 84-1309171

## Grand Total Areas:

| | | |
|---|---|---|
| 6,134.14 SF Walls | 2,682.85 SF Ceiling | 8,816.99 SF Walls and Ceiling |
| 2,761.85 SF Floor | 306.87 SY Flooring | 766.68 LF Floor Perimeter |
| 0.00 SF Long Wall | 0.00 SF Short Wall | 753.83 LF Ceil. Perimeter |
| 2,761.85 Floor Area | 2,882.68 Total Area | 5,834.33 Interior Wall Area |
| 3,789.00 Exterior Wall Area | 417.00 Exterior Perimeter of Walls | |
| 0.00 Surface Area | 0.00 Number of Squares | 0.00 Total Perimeter Length |
| 0.00 Total Ridge Length | 0.00 Total Hip Length | |

19-16-GSRNH_REP                                    3/21/2016        Page: 11



**BELFOR Property Restoration**

138 Bartlett St, Marlborough MA, 01752
(866) 914-0939 Tel. - (508) 544-4324 Fax
MA License # 59495 - Fed ID # 84-1309171

## Summary

| | |
|---|---:|
| Line Item Total | 84,331.41 |
| Material Sales Tax | 2,297.47 |
| Subtotal | 86,628.88 |
| Overhead | 8,662.94 |
| Profit | 8,662.94 |
| **Replacement Cost Value** | **$103,954.76** |
| **Net Claim** | **$103,954.76** |

Jason Camerano





Base Level

Base Level          Page: 13

3/21/2016

19-16-GSRNH_REP





**EMSL Analytical, Inc.**
7 Constitution Way, Suite 107 Woburn, MA  01801
Tel/Fax: (781) 933-8411 / (781) 933-8412
http://www.EMSL.com / bostonlab@emsl.com

| EMSL Order: | 131600738 |
|---|---|
| Customer ID: | HILL63 |
| Customer PO: | M3-3534 |
| Project ID: | |

| Attention: | Jeffrey Bedard | Phone: | (617) 429-7617 |
|---|---|---|---|
| | Hillmann Environmental Group LLC | Fax: | (781) 431-7877 |
| | 54 Middlesex Turnpike | Received Date: | 02/19/2016  3:10 PM |
| | Bedford, MA  01730 | Analysis Date: | 02/19/2016 |
| | | Collected Date: | |
| Project: | M3-3534 | | |

### Test Report: Asbestos Analysis of Bulk Materials via EPA 600/R-93/116 Method using Polarized Light Microscopy

| Sample | Description | Appearance | Non-Asbestos % Fibrous | Non-Asbestos % Non-Fibrous | Asbestos % Type |
|---|---|---|---|---|---|
| 01-01<br>131600738-0001 | Basement Stairs Wall - Drywall | Brown/Gray<br>Fibrous<br>Homogeneous | 5% Cellulose | 95% Non-fibrous (Other) | None Detected |
| 01-02<br>131600738-0002 | Basement Ceiling in Kitchen - Drywall | Brown/White<br>Fibrous<br>Homogeneous | 10% Cellulose<br>4% Glass | 86% Non-fibrous (Other) | None Detected |
| 01-03<br>131600738-0003 | Basement Back Room - Drywall | Brown/White<br>Fibrous<br>Homogeneous | 12% Cellulose<br>2% Glass | 86% Non-fibrous (Other) | None Detected |
| 01-04<br>131600738-0004 | 1st Floor Stairs Wall - Drywall | Brown/Gray<br>Fibrous<br>Homogeneous | 12% Cellulose<br>4% Glass | 84% Non-fibrous (Other) | None Detected |
| 01-05<br>131600738-0005 | 1st Floor Kitchen - Drywall | Brown/Gray<br>Fibrous<br>Homogeneous | 12% Cellulose<br>4% Glass | 84% Non-fibrous (Other) | None Detected |
| 02-01<br>131600738-0006 | Basement Back Room - Joint Compound | White<br>Non-Fibrous<br>Homogeneous | | 100% Non-fibrous (Other) | None Detected |
| 02-02<br>131600738-0007 | Basement Stairs/Wall - Joint Compound | White<br>Non-Fibrous<br>Homogeneous | | 100% Non-fibrous (Other) | None Detected |
| 03-01<br>131600738-0008 | Basement Basement Kitchen - Tile Grout | Tan<br>Non-Fibrous<br>Homogeneous | | 100% Non-fibrous (Other) | None Detected |
| 03-02<br>131600738-0009 | Basement Back Room - Tile Grout | Tan<br>Non-Fibrous<br>Homogeneous | | 100% Non-fibrous (Other) | None Detected |
| 04-01<br>131600738-0010 | Basement Bathroom - Black 2"x2" Tile | White/Black<br>Non-Fibrous<br>Homogeneous | | 100% Non-fibrous (Other) | None Detected |
| 05-01<br>131600738-0011 | Bsaement Back Room - 9x9 Black Tile | Black/Green<br>Non-Fibrous<br>Homogeneous | | 94% Non-fibrous (Other) | 6% Chrysotile |
| 06-01<br>131600738-0012 | Basement Basement Kitchen - 12x12 White Tile | Brown/White<br>Non-Fibrous<br>Homogeneous | | 100% Non-fibrous (Other) | None Detected |
| 07-01<br>131600738-0013 | Basement Basement Room - 12x12 Brown Tile | Brown<br>Non-Fibrous<br>Homogeneous | | 100% Non-fibrous (Other) | None Detected |
| 08-01<br>131600738-0014 | 1st Floor 1st Floor Kitchen - 6"x6" Red Tile | Red<br>Non-Fibrous<br>Homogeneous | | 100% Non-fibrous (Other) | None Detected |
| 09-01<br>131600738-0015 | 1st Floor Entrance - 12"x12" Red Tile | Red<br>Non-Fibrous<br>Homogeneous | | 100% Non-fibrous (Other) | None Detected |

Initial Report From: 02/19/2016 16:05:13



**EMSL Analytical, Inc.**
7 Constitution Way, Suite 107 Woburn, MA  01801
Tel/Fax: (781) 933-8411 / (781) 933-8412
http://www.EMSL.com / bostonlab@emsl.com

| EMSL Order: 131600738 |
| Customer ID: HILL63 |
| Customer PO: M3-3534 |
| Project ID: |

### Test Report: Asbestos Analysis of Bulk Materials via EPA 600/R-93/116 Method using Polarized Light Microscopy

| Sample | Description | Appearance | Non-Asbestos | | Asbestos |
| | | | % Fibrous | % Non-Fibrous | % Type |
| --- | --- | --- | --- | --- | --- |

Analyst(s)

*Alexander Maxinoski (15)*

Alexander Maxinoski, Asbestos Laboratory Manager
or Other Approved Signatory

EMSL maintains liability limited to cost of analysis.  This report relates only to the samples reported and may not be reproduced, except in full, without written approval by EMSL.   EMSL bears no responsibility for sample collection activities or analytical method limitations.  Interpretation and use of test results are the responsibility of the client.  This report must not be used by the client to claim product certification, approval, or endorsement by NVLAP, NIST or any agency of the federal government.   Non-friable organically bound materials present a problem matrix and therefore EMSL recommends gravimetric reduction prior to analysis.  Samples received in good condition unless otherwise noted.  Estimated accuracy, precision and uncertainty data available upon request. Unless requested by the client, building materials manufactured with multiple layers (i.e. linoleum, wallboard, etc.) are reported as a single sample. Reporting limit is 1%

Samples analyzed by EMSL Analytical, Inc. Woburn, MA NVLAP Lab Code 101147-0, CT PH-0315, MA  AA000188, RI AAL-107T3, VT AL998919, Maine Bulk Asbestos BA039

Initial Report From: 02/19/2016 16:05:13

OrderID: 131600738

**131600738**



**HILLMANN**
CONSULTING

Environmental Consulting & Lab Services
1600 Route 22 East, Union NJ 07083
(908) 688-7800 Fax (908) 688-2441

BULK SAMPLE IDENTIFICATION FORM

CLIENT: BELFOR

DATE: 02/18/16
JOB #: ~~GBBSBM3~~ 3hr

LOCATION: 250 Worcester RD Framingham, MA

Need Results by: RUSH

| Time Sample Collected | Sample # Lab # / (Lab use) | Floor/ Room | Description of Location | Sample of: Color of: | NOB (NY Only) | Lab Results: |
|---|---|---|---|---|---|---|
| | 01-01 | Basement | Stairs Wall | Drywall | | |
| | 01-02 | Basement | Ceiling in Kitchen | Drywall | | |
| | 01-03 | Basement | Back Room | Drywall | | |
| | 01-04 | 1st Floor | Stairs wall | Drywall | | |
| | 01-05 | 1st Floor | Kitchen | Drywall | | |
| | 02-01 | Basement | Back Room | Joint Compd | | |
| | 02-02 | Basement | Stairs /wall | Joint Compnd | | |
| | 03-01 | Basement | Basement Kitchen | Tile grout | | |
| | 03-02 | Basement | Back Room | Tile grout | | |
| | 04-01 | Basement | Bathroom | Black 2"x2" Tile | | |
| | 05-01 | Basement | Back Room | 9x9 Tile Black | | |
| | 06-01 | Basement | Basement Kitchen | 12x12 tile White | | |
| | 07-01 | Basement | Basement room | 12x12 Brown tile | | |
| | 08-01 | 1st Floor | 1st Floor Kitchen | 6"x6" Red tile | | |
| | 09-01 | 1st Floor | Entrance | 12"x12" Red tile | | |

| SAMPLED BY: | CHAIN OF CUSTODY TRANSPORTED BY: | RECEIVED BY: | ANALYZED BY: |
|---|---|---|---|
| Print: Jeffrey Bedard | | G.I. | RECEIVED FEB 19 2016 |
| Sign: | | | |
| Date: 02/18/16 | | 15:10 | By: Hm |

PLM COC Version 1.2

C

# BELFOR (●)
### PROPERTYRESTORATION

| | |
|---|---|
| **INVOICE #** | **805792** |
| **JOB NAME** | **GSNRH, LLC** |
| **JOB #** | **101914759** |

| | | | |
|---|---|---|---|
| **INSURANCE** | SELF INSURED | **LOSS DATE** | 2/17/2016   WEDNESDAY |
| **CUSTOMER #** | 1119554 | **LOSS TYPE** | WATER |
| | | **PROPERTY TYPE** | COMMERCIAL |
| | | **SERVICE** | RESTORATION |

## #01 SUMMARY

THIS INVOICE INCLUDES SCHEDULED LABOR COST FROM   **2/17/2016**   TO   **3/24/2016**

| | INVOICE CATEGORIES | | AMOUNT | MARKUP % | | MARKUP AMOUNT | | SUBTOTAL |
|---|---|---|---|---|---|---|---|---|
| **LABOR & ASSOCIATED FEES** | LABOR | $ | 13,045.13 | | $ | - | $ | 13,045.13 |
| | PPE-SMALL TOOLS-PRP-PFP | $ | 960.74 | | $ | - | $ | 960.74 |
| | VEHICLES | $ | 2,936.00 | | $ | - | $ | 2,936.00 |
| | PER DIEM | $ | - | 10.00% | $ | - | $ | - |
| | HOTEL | $ | - | 10.00% | $ | - | $ | - |
| | | $ | 16,941.87 | | $ | - | $ | 16,941.87 |
| **EQUIPMENT** | UNSCHEDULED EQUIPMENT | $ | - | 21.00% | $ | - | $ | - |
| | SCHEDULED EQUIPMENT | $ | 19,698.50 | | $ | - | $ | 19,698.50 |
| | | $ | 19,698.50 | | $ | - | $ | 19,698.50 |
| **CONSUMABLES** | UNSCHEDULED MATERIALS | $ | 56.46 | 21.00% | $ | 11.86 | $ | 68.32 |
| | SCHEDULED CONSUMABLES | $ | 620.04 | | $ | - | $ | 620.04 |
| | | $ | 676.50 | | $ | 11.86 | $ | 688.36 |
| **UNSCHEDULED INVOICES & RECEIPTS** | REIMBURSABLE | $ | - | 10.00% | $ | - | $ | - |
| | VENDOR | $ | 1,591.00 | 21.00% | $ | 334.11 | $ | 1,925.11 |
| | SUB-CONTRACTOR | $ | 1,915.00 | 21.00% | $ | 402.15 | $ | 2,317.15 |
| | | $ | 3,506.00 | | $ | 736.26 | $ | 4,242.26 |
| | | | | | | **SUBTOTAL** | $ | 41,570.99 |

| | | | |
|---|---|---|---|
| | SALES TAX  0.000% | $ | - |
| | **TOTAL** | $ | 41,570.99 |

# BELFOR (®)
### PROPERTYRESTORATION

# INVOICE #        805792

**TOTAL DUE THIS INVOICE**
# $41,570.99

**BILL TO INFORMATION**

| | |
|---|---|
| NAME | GSNRH, LLC |
| | C/O PC HEALTHSTOP |
| ADDRESS | 255 WORCESTER RD. ROUTE 9W |
| | FRAMINGHAM, MA 01701 |
| | PCHEALTH@PCHEALTHSTOP.COM |
| ATTENTION | GARY SINEWITZ |
| INSURANCE | SELF INSURED |
| CUSTOMER # | 1119954 |

**JOB INFORMATION**

| | |
|---|---|
| NUMBER | 101914759 |
| NAME | GSNRH, LLC |
| ADDRESS | 255 WORCESTER RD. ROUTE 9W |
| | FRAMINGHAM, MA 01701 |
| LOSS DATE | 2/17/2016   WEDNESDAY |
| LOSS TYPE | WATER |
| PROPERTY TYPE | COMMERCIAL |
| SERVICE | RESTORATION |

THIS INVOICE COVERS SCHEDULED ITEM COST FROM ___2/17/2016___ TO ___3/24/2016___

| INVOICE CATEGORIES | | TOTAL |
|---|---|---|
| LABOR & ASSOCIATED FEES | $ | 16,941.87 |
| EQUIPMENT CHARGES | $ | 19,698.50 |
| CONSUMABLES & MATERIALS | $ | 688.36 |
| REIMBURSABLES | $ | - |
| VENDORS & SUBCONTRACTORS | $ | 4,242.26 |
| SUBTOTAL | $ | 41,570.99 |

| | | |
|---|---|---|
| SALES TAX   0.000% | $ | - |
| TOTAL DUE THIS INVOICE | $ | 41,570.99 |

**INVOICE DATE   5/18/2016**

THIS INVOICE IS DUE UPON RECEIPT. PAYMENT IS CONSIDERED LATE IF NOT RECEIVED BY :        **6/16/2016**

REMIT PAYMENT TO:

BELFOR USA GROUP, INC
ACCOUNTS RECEIVABLE DEPT
185 OAKLAND AVE
SUITE 150
BIRMINGHAM, MI 48009-3433

FOR QUESTIONS REGARDING THIS INVOICE, PLEASE CONTACT: jason.camerano@us.belfor.com

# BELFOR (●)
## PROPERTYRESTORATION

| INVOICE # | 805792 | TOTAL DUE THIS INVOICE |
|---|---|---|
| | | **$41,570.99** |

**BILL TO INFORMATION**

| | |
|---|---|
| NAME | GSNRH, LLC |
| | C/O PC HEALTHSTOP |
| ADDRESS | 255 WORCESTER RD. ROUTE 9W |
| | FRAMINGHAM, MA 01701 |
| | PCHEALTH@PCHEALTHSTOP.COM |
| ATTENTION | GARY SINEWITZ |
| | |
| INSURANCE | SELF INSURED |
| CUSTOMER # | 1119954 |

**JOB INFORMATION**

| | |
|---|---|
| NUMBER | 101914759 |
| NAME | GSNRH, LLC |
| ADDRESS | 255 WORCESTER RD. ROUTE 9W |
| | FRAMINGHAM, MA 01701 |
| LOSS DATE | 2/17/2016   WEDNESDAY |
| LOSS TYPE | WATER |
| PROPERTY TYPE | COMMERCIAL |
| SERVICE | RESTORATION |

THIS INVOICE COVERS SCHEDULED ITEM COST FROM _____2/17/2016_____ TO _____3/24/2016_____

| INVOICE CATEGORIES | | TOTAL |
|---|---|---|
| LABOR & ASSOCIATED FEES | $ | 16,941.87 |
| EQUIPMENT CHARGES | $ | 19,698.50 |
| CONSUMABLES & MATERIALS | $ | 688.36 |
| REIMBURSABLES | $ | - |
| VENDORS & SUBCONTRACTORS | $ | 4,242.26 |
| SUBTOTAL | $ | 41,570.99 |
| | | |
| SALES TAX   0.000% | $ | - |
| TOTAL DUE THIS INVOICE | $ | 41,570.99 |

**INVOICE DATE   5/18/2016**

THIS INVOICE IS DUE UPON RECEIPT. PAYMENT IS CONSIDERED LATE IF NOT RECEIVED BY :     **6/16/2016**

REMIT PAYMENT TO:

**BELFOR USA GROUP, INC
ACCOUNTS RECEIVABLE DEPT
185 OAKLAND AVE
SUITE 150
BIRMINGHAM, MI 48009-3433**

FOR QUESTIONS REGARDING THIS INVOICE, PLEASE CONTACT: jason.camerano@us.belfor.com

BELFOR

PERFECTRESTORATION